UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR MULLINS,

     Plaintiff,

v.

FORD MOTOR COMPANY;
and BRIAN BUTCHER, an individual,

     Defendants.

Case No. 19-cv-10372

Hon. Matthew F. Leitman

Magistrate Judge Anthony P. Patti

---

James B. Rasor (P43476)
Andrew J. Laurila (P78880)
RASOR LAW FIRM, PLLC
Attorneys for Plaintiff
201 E. Fourth St.
Royal Oak, MI  48067
(248) 543-9000
jbr@rasorlawfirm.com
ajl@rasorlawfirm.com

Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
 PELTON & FORREST, P.L.C.
Attorneys for Defendants
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

---

**Defendants' Motion for Summary Judgment**

Defendants Ford Motor Company and Bryan Butcher ("Defendants") move this Court, under Rule 56, for entry of summary judgment. In support of the motion, Defendants state:

1.      Mullins's Complaint was removed to this Court on February 6, 2019. *See* ECF No. 1, PageID.1-6.

2.      On August 28, 2019, the Court entered a stipulated order striking certain paragraphs from the Complaint, and dismissing the Complaint in part, because deposition testimony established that Mullins had made false statements with respect to his accusations of sexual harassment by a female co-worker. ECF No. 15, PageID.154. This left only claims only under the Family and Medical Leave Act, and under Michigan's Persons with Disability Civil Rights Act.

3.      For the reasons set forth in the accompanying brief, there is no genuine dispute as to any material fact arising out of the claims stated in Mullins's Complaint, and Defendants are entitled to judgment as a matter of law.

4.      Counsel for Defendants explained the nature of the motion and relief it would be seeking. On March 17, 2020, Plaintiff's counsel responded. Counsel agreed that summary judgment should be granted on Mullins's FMLA claim, but otherwise concurrence was not obtained, necessitating the filing of this motion.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
 PELTON & FORREST, P.L.C.


By:  /s/ *Thomas J. Davis*
    Elizabeth P. Hardy (P37426)
    Thomas J. Davis (P78626)
Counsel for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

Dated:  November 19, 2020

359248

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR MULLINS,

     Plaintiff,

v.

FORD MOTOR COMPANY;
and BRIAN BUTCHER, an individual,

     Defendants.

Case No. 19-cv-10372

Hon. Matthew F. Leitman

Magistrate Judge Anthony P. Patti

---

James B. Rasor (P43476)
Andrew J. Laurila (P78880)
RASOR LAW FIRM, PLLC
Attorneys for Plaintiff
201 E. Fourth St.
Royal Oak, MI  48067
(248) 543-9000
jbr@rasorlawfirm.com
ajl@rasorlawfirm.com

Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
 PELTON & FORREST, P.L.C.
Attorneys for Defendants
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

---

**Defendants' Brief in Support of Motion for Summary Judgment**

**Statement of the Issues Presented**

1. **Temporary disabilities are not covered by PWDCRA.** Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") does not apply to temporary disabilities lasting less than two years. Here, Mullins admits that his disability began in April 2017, and was "on and off" from then until his June 2018 termination. Because Mullins's temporary, periodic disability did not last two years, should summary judgment be granted on <u>all</u> PWDCRA claims because he was not disabled as defined in the act?

2. **Mullins's situational "disability" is not covered by the PWDCRA.** The PWDCRA does not cover "disabilities" arising out of an inability to work with particular persons due to personality conflicts. But here, Mullins admits that he could perform all of his job duties—and even more strenuous duties—so long as he was not in the presence of certain female co-workers. Because this does not constitute an PWDCRA disability, should summary judgment be granted on the PWDCRA claims?

3. **Mullins did not properly request accommodation.** The PWDCRA requires that an accommodation request (1) be made in writing; and (2) at least briefly explain why accommodation is needed in terms of a physical or mental condition. Here, Mullins admits he never requested accommodation in writing, and his alleged verbal request for accommodation (being moved away from female co-workers) was not tied to any mental or physical condition. Should his accommodation claim therefore be dismissed?

4. **Reassignment is not a reasonable accommodation under Michigan law.** The Michigan Supreme Court has held that reassignment is not an accommodation required by the PWDCRA. Because Mullins's claim rests entirely on the alleged denial of reassignment as an accommodation, should the PWDCRA accommodation claim be dismissed?

5. **Reassignment is unreasonable in a union workplace.** Even when applicable law sometimes permits reassignment, it is unreasonable to request reassignment when doing so would violate the terms of a collective bargaining agreement. Here, the CBA does not simply permit Ford to move Mullins to a new job outside of the contractual transfer provision, and reassignment would

potentially violate his co-workers' rights. Because Mullins's request is unreasonable, should the accommodation claim be dismissed?

6. **Mullins has no *prima facie* termination claim.** To state a *prima facie* claim of disability-based termination, a plaintiff must show that he could perform his duties with or without reasonable accommodation. Here, Mullins's own theory is (i) he could not perform his job without accommodation; and (ii) he should have been granted the (unreasonable) accommodation of reassignment. Because he cannot state a *prima facie* case, should Mullins's termination claim be dismissed?

7. **Mullins cannot show pretext for termination**. To avoid summary judgment, a PWDCRA termination plaintiff must show that the stated reason for termination is false and pretextual. Here, Mullins admits that the stated reason for the termination is true: he refused to either clear through medical to return to work, or to open a new leave of absence, and thus was terminated as AWOL consistent with the Ford-UAW collective bargaining agreement. Because Mullins cannot show pretext, should summary judgment be granted?

8. **Mullins cannot show a perceived disability**. An employer is permitted to examine employees whose unusual behaviors may impact their ability to perform the job. Here, Mullins's history of unusual behaviors affected his job duties, and thus his fitness for duty could be evaluated. Should the Court thus dismiss Mullins's claim for this reason too, to the extent it is based on "perceived" disability?

9. **Mullins cannot show retaliation.** Mullins claims that his mental-health examination and subsequent termination was retaliation for filing EEOC charges. But the determination that Mullins would have a mental-health fitness for duty test came before Ford received those EEOC charges on February 20, 2020. Likewise, for the reasons stated above, he cannot show that the reason for his termination was pretext for retaliation. Should the Court dismiss the retaliation claims?

10. **No FMLA discrimination.** In order to state an FMLA discrimination claim, a party must invoke FMLA rights. Mullins admits that he did not take unpaid FMLA during the relevant time-frame; rather, he took paid leave under Ford

policy. And during the meet-and-confer, Plaintiff's counsel agrees that summary judgment should be granted on this claim. Should the Court grant summary judgment on the FMLA claim?

11. **Defendant Butcher was not a decision-maker.** Defendant Butcher's last contact with Mullins was in February 2018, well before the June 2018 termination. In addition to the other reasons cited above, should all discrimination and retaliation claims as to Butcher be dismissed because he was not a decision-maker with respect to the alleged adverse actions in question?

## Table of Contents

Statement of the Issues Presented ............................................................. i

Controlling Authorities ........................................................................ vi

Introduction .......................................................................................1

Background .........................................................................................2

A.   Mullins is hired at Ford, where his girlfriend Shalisa Lee works,
     and tells everyone she is his cousin. ...............................................2

B.   In April 2017, Mullins has a screaming match with Pierrie and
     is investigated for tampering with his hi-lo, leading to his taking
     medical leave. ..............................................................................3

C.   Mullins takes a medical leave in May 2017 due to "depression"
     over his work issues, which he admits was temporary and
     intermittent...................................................................................4

D.   Mullins returns in September 2017, and almost immediately
     goes on leave again after further conflict with Pierrie. ..................4

E.   Mullins returns to work January 26, 2018 and alarms people
     with his unusual behavior, leading to discussions of a mental-
     health fit-for-duty exam. ...............................................................6

F.   On February 2, 2018, Mullins again went to Labor Relations
     demanding to be moved, curses at Butcher, and is suspended........9

G.   On February 9, Butcher completes an unusual behavior report
     and refers Mullins to a mental-health fit for duty examination....10

H.   Mullins eventually goes to the outside examination, and Ford
     works with the examiner to address the concerns it raised. ..........11

I.   Mullins is notified that he may return to work, etc. and refuses,
     even after being given more time. ................................................13

Argument............................................................................................14

I.      Mullins is not disabled under the PWDCRA, which covers
        neither temporary conditions nor "disabilities" due to co-worker
        conflicts...................................................................................................14

II.     Mullins has not stated a PWDCRA reasonable accommodation
        claim.......................................................................................................16

        A.      Mullins did not request accommodation for a disability in
                writing..........................................................................................16

        B.      Reassignment is not a reasonable PWDCRA
                accommodation. ...........................................................................17

        C.      Mullins's request to be moved so he could avoid co-
                workers is unreasonable, particularly for a unionized
                workforce.....................................................................................18

III.    Mullins was not terminated because of a disability. ....................................19

IV.     Mullins was not terminated because of a perceived disability.....................21

V.      Mullins cannot show retaliation under the PWDCRA. ................................22

VI.     Mullins has Agreed to Dismiss his FMLA Discrimination
        Claim.......................................................................................................25

Conclusion ...............................................................................................................25

# Controlling Authorities

## Cases

*Aho v. Dep't of Corr.*,
263 Mich. App. 281 (2004) ..................................................................23

*Bachman v. Swan Harbour Ass'n*,
252 Mich. App. 400 (2002) ................................................................19

*Bageris v. Brandon Twp.*,
264 Mich. App. 156 (2004) ................................................................16

*Barlia v. MWI Veterinary Supply, Inc.*,
721 F. App'x 439 (6th Cir. 2018) ......................................................15

*Berger v. Auto. Media, LLC*, No. 18-11180,
2020 WL 3129902 (E.D. Mich. June 12, 2020) .................................22

*Burdett-Foster v. Blue Cross Blue Shield of Mich.*,
574 F. App'x 672 (6th Cir. 2014) ......................................................15

*Burns v. Coca-Cola Enters, Inc.*,
222 F.3d 247 (6th Cir. 2000) .............................................................18

*Calvin v. Ford Motor Co.*,
185 F. Supp. 2d 792 (E.D. Mich. 2002) .............................................17

*Chiles v. Mach. Shop, Inc.*,
238 Mich. App. 462 (1999) .................................................... 14, 15, 16

*Clark County Sch. Dist. v. Breeden*,
532 U.S. 268 (2001) ...........................................................................23

*Dillon-Barber v. Regents of Univ. of Mich.*,
2005 WL 1335132 (Mich. Ct. App. June 7, 2005) .............................15

*Edgar v. JAC Prod., Inc.*,
443 F.3d 501 (6th Cir. 2006) .............................................................25

*Estate of Jackson by Jackson v. 36th Dist. Court*,
2019 WL 4180178 (Mich. Ct. App. Sept. 3, 2019) ...................... 14, 19

*Fricke v. E.I Dupont Co.*,
    219 F. App'x 384 (6th Cir.2007).............................................................................15

*Gaul v. Lucent Techs., Inc.*,
    134 F.3d 576 (3d Cir. 1998) ..................................................................................19

*Green v. DaimlerChrysler Motors Corp*,
    No. 263980, 2006 WL 141914 (Mich. Ct. App. Jan. 19, 2006)..........................22

*Henschel v. Clare Cty. Rd. Comm'n*,
    737 F.3d 1017 (6th Cir. 2013) ...............................................................................18

*Judge v. Landscape Forms, Inc.*,
    2014 WL 12502685 (W.D. Mich. Mar. 6, 2014) ..................................................15

*Lewis v. Zilog, Inc.*,
    908 F. Supp. 931 (N.D. Ga. 1995) ........................................................................19

*Macreno v. St. James Capital*,
    2011 WL 5604062 (Mich. Ct. App. Nov. 17, 2011)............................................21

*Michalski v. Bar-Levav*,
    463 Mich. 723 (2001) ...........................................................................................21

*Miller v. Michigan State Police*,
    2017 WL 3043972 (Mich. Ct. App. July 18, 2017) .............................................22

*Morrow v. Donahoe*,
    2015 WL 3463554 (N.D. Ill. May 29, 2015) .......................................................24

Noe v. Department of Treasury,
    2019 WL 452164 (Mich. Ct. App. Feb. 5, 2019).......................................... 17, 20

*Peden v. City of Detroit*,
    470 Mich. 195 (2004).................................................................................... 19, 20

*Ponder v. Martin-Brower Co., LLC*,
    2008 WL 3852252 (M.D. Tenn. Aug. 14, 2008) .................................................24

Rourk v. Oakwood Hosp. Corp.,
    458 Mich. 25 (1998) ..................................................................................... 17, 18

*Sullivan v. River Valley Sch. Dist.*,
  197 F.3d 804 (6th Cir. 1999) .................................................................22

*Williams v. Dep't of Corr.*, 2015 WL 4469366 (Mich. Ct. App. July
  21, 2015) ...............................................................................................17

**Statutes**

MCL 37.1103(d)(i)(A) ...............................................................................14

## Introduction

Plaintiff Arthur Mullins suffers from mental health issues: his doctor wrote, days before the key events in this case, that Mullins was "paranoid" and "possibly delusional." His problems appear to have contributed to a bizarre and long-running feud that he had with co-worker Krystal Pierrie, arising out of Mullins's inexplicable decision to falsely tell his co-workers that his girlfriend (and co-worker) Shalisa Lee was his cousin. Mullins suspected that Pierrie had correctly deduced that Mullins was dating Lee, and had told others. So Mullins started complaining to Ford Labor Relations that he was being harassed over "false" accusations that he was dating "his cousin" Lee, which soon grew into claims that Pierrie was threatening and stalking him—and led to a report that Mullins had loudly threatened to "kick [Pierrie's] ass."

During this time, Mullins started taking paid leaves citing "stress" and "anxiety," and began to believe that management, the union, and plant medical were conspiring against him. Labor Relations was alarmed by Mullins's bizarre behavior, and asked him to take a mental-health fitness for duty test. After the test, he was told he could open a new medical leave *or* return to work with medical clearance—and was even given extra time to comply—but Mullins simply refused to do so, and stayed absent without leave until he was terminated under Ford attendance policy.

Mullins claims disability discrimination under the Michigan Persons with Disabilities Civil Rights Act (PWDCRA). But Mullins, notably, does *not* claim he

has paranoia; per his own testimony, he disagrees that he is paranoid because he thinks the Ford-UAW-Medical conspiracy is real. Ex. A, Pl's Dep. 138-140. Rather, he claims his "disability" is depression caused Pierrie's "harassment"—a claim rooted in material misrepresentations that already led to this Court's dismissal of his Pierrie-related harassment claims with prejudice. And his remaining accommodation and retaliation claims fare no better. The Court should grant summary judgment.

## Background

**A.     Mullins is hired at Ford, where his girlfriend Shalisa Lee works, and tells everyone she is his cousin.**  Mullins applied for employment with Ford in March 2015, and was hired as a hi-lo driver effective March 16, 2015. Ex. A, Pl's Dep. 60, 69-70, 132 & Dep. Ex. 3. He was assigned to the Dearborn Stamping Plant. *Id.* at 131. As part of his hiring paperwork, Mullins filled out a form confirming that he was not disabled. *Id.* at 59-60 & Dep. Ex. 2.

At the time Mullins was hired, his girlfriend Shalisa Lee was already working at the Dearborn Stamping Plant. Ex. A, Pl's Dep. 22-23; Ex. B, Lee Dep. 17, 20. Mullins and Lee had been dating since 2013 or 2014. *Id.* Mullins, however, decided to falsely tell his Ford co-workers that Lee was his cousin. Ex. A at 175-76. Mullins and Lee frequently ate lunch together and took breaks together, which Mullins agreed might cause people to (correctly) assume they were dating. *Id.* at 229-230, 233. In 2016, Mullins heard that co-worker Krystal Pierrie was telling people that

he and Lee were sleeping together, with Pierrie reportedly claiming she had seen Mullins's car outside Lee's house. Ex. A, Pl's Dep. 174-77; Ex. B, Lee Dep. 43.

**B.    In April 2017, Mullins has a screaming match with Pierrie and is investigated for tampering with his hi-lo, leading to his taking medical leave.** In April 2017, Mullins and Pierrie had an altercation on the plant floor, over her alleged comments that Mullins and Lee were dating. Ex. A, Pl's Dep. 185-86, 214-216. Witnesses heard the two screaming at each other, with Pierrie claiming that Mullins threatened to "kick her ass." *Id.*; Ex C, Watson Decl. ¶ 3. Because there was an allegation of a physical threat, Mullins was suspended pending investigation. Ex. A at 214; Ex. C ¶ 3. The investigation results were inconclusive, and Mullins returned to the job. Ex. C ¶ 3. Around the same time, Mullins's supervisor had told him that a co-worker reported him for tampering with hi-lo ignition switches so that they would start without his assigned key fob.[1] Ex. A, Pl's Dep. 257-58. Then, after receiving several unrelated write-ups, and he was disqualified from the hi-lo after a hearing with Labor Relations Supervisor Maria Watson and UAW Chairman Frank Engel. Ex. C, Watson Decl. ¶ 4. At deposition, Mullins claimed that Pierrie was behind the report that he tampered with his hi-lo, and that he was disqualified as part of a convoluted conspiracy to punish him for complaining that Pierrie "sexually

---

[1]Mullins had earlier been disqualified from the hi-lo after his key fob data showed that he had been driving a hi-lo that had struck a water line. Ex. A, Dep. 258-262. Lee later claimed that she had hit the water line, and Mullins was reinstated. *Id.*

harassed" him. *See* Ex. A, Pl's Dep. 248-257. The sexual harassment claims related to Pierrie, originally part of this suit, were dismissed with prejudice after Mullins admitted to making false statements in his Complaint. ECF No. 15, PageID.154.

**C.     Mullins takes a medical leave in May 2017 due to "depression" over his work issues, which he admits was temporary and intermittent.**   After his disqualification, Mullins took a paid medical leave in May 2017. Ex. A, Pl's Dep. 263, 338, 462-63. He completed his portion of a certification for short-term disability benefits, and had his psychiatrist Dr. Leon Rubenfaer complete the rest. *Id.* at 338-341 & Dep. Ex. 21. Rubenfaer's portion of the form cited ICD 309.0—adjustment disorder with depressed mood—as the basis for the disability leave. *Id.* at Dep. Ex. 21. Mullins claims that this was the first time he had "depression," and ties it to his issues at Ford. Ex. A, Pl's Dep. 77, 80, 87, 109-11. He explained that his depression was "off and on," and that when he was back at work after his medical leaves, he was no longer disabled and had a "clean bill of health." *Id.* at 84-86, 112-14.

**D.     Mullins returns in September 2017, and almost immediately goes on leave again after further conflict with Pierrie.**   Mullins returned from medical leave on September 5, 2017 after his doctors determined that he could work without restrictions. Ex. A, Pl's Dep. 267-68. On September 8, 2017, he went to Labor Relations Supervisor Watson to complain about being disqualified from the hi-lo, claiming (incorrectly) that he had never had a hearing. Ex. C, Watson Decl. ¶ ¶¶ 7-

8 & Decl. Ex. 1. After Watson repeatedly explained that Mullins did have the hearing, and confirmed it for him on a call to the UAW Chairman, Mullins said that he had never had a hearing *there*, in Watson's office. *Id.* Watson was alarmed by Mullins's behavior, and was unsure as to whether he was suffering from some mental condition or substance-induced state, or whether he was trying to manipulate her. She would ultimately make a written record of this interaction with Mullins as one of several uneasy and uncomfortable interactions she had with him. *Id.*

On September 15, 2017, Mullins went to Labor Relations and reported that Pierrie had "threatened" him by following him into the plant. *Id.* ¶ 9. Mullins claims she entered the plant from the same entrance he did, about 20 feet behind him, but that she did not say anything to him or touch him. Ex. A, Pl's Dep. 188-190. He said that he broke into a run to get away from Pierrie, who did not give chase. *Id.* Mullins also made a call to Ford's harassment hotline that morning, complaining about Pierrie, Maria Watson, and several others. Ex. C, Watson Decl. ¶ 34 & Ex. 8.

Later on September 15, a union representative brought a crying Pierrie up to Labor Relations, who said she wanted the conflict with Mullins to end. *Id.* ¶¶ 10-11 & Decl. Ex. 1. Pierrie was not found to have done anything wrong, and returned to work. *Id.* About an hour later, it was reported that Mullins's girlfriend Lee intentionally used her hi-lo to strike Pierrie's hi-lo. *Id.* ¶¶ 10-11, 35 & Decl. Ex. 9. Mullins himself reported to medical, stating that "I feel threatened at work. Everyone

is out to get me." Ex. D, Ubom Decl. ¶ 8, Decl. Ex. 3. He also said he had been "off for depression" and that although he had been prescribed Zoloft and trazadone, he was "not taking those." *Id.* Mullins again went on medical leave the next day, September 16, 2017. Ex. C, Watson Decl. ¶ 12; Ex. A, Pl's Dep. 341.

**E.     Mullins returns to work January 26, 2018 and alarms people with his unusual behavior, leading to discussions of a mental-health fit-for-duty exam.**  On January 10, 2018, Mullins's psychiatrist Dr. Rubenfaer cleared Mullins to return to work without restrictions. Ex. A, Pl's Dep. 114-15 & Dep. Ex. 6. Mullins states he was given a "clean bill of health" with respect to the depression, but Ruebenfaer's notes (not disclosed to Ford until discovery) indicated that Mullins was "paranoid" and "possibly delusional." *Id.* at 123 & Dep. Ex. 7.

Mullins reported to work on Friday, January 26, 2018. Ex. A, Pl's Dep. 110. He saw a friend of Pierrie's named Shavonda near his workstation, and although she did not say anything to him, Mullins complained to Labor Relations while secretly recording the conversation in violation of Ford policy. *Id.* at 300-01, 350-51; Ex. C, Watson Decl. ¶¶ 36-37 & Exs. 10-11. He reported to Labor Relations Representative Bryan Butcher that he was suffering "ongoing retaliation and sexual harassment" by Pierrie and Shavonda, and demanded to be moved from the West building to the East. *Id;* Ex. E, Butcher Dep. 30-31 & Dep. Ex. 1; Ex. F, Butcher Decl. ¶¶ 5-6. Butcher did not have the authority to reassign manpower, and told Mullins that. Ex.

E, Butcher Dep. 26; Ex. A, Pl's Dep. 350. Butcher, however, spoke to Mullins's supervisor Daryl Rinehart, who allowed Mullins to work in east for one day. Ex. F, Butcher Decl. ¶¶ 7-8; Ex. A, Pl's Dep. 270-71 & Dep. Ex. 14; Ex. I (audio).

Mullins then went to a previously-scheduled meeting with Labor Relations' Larissa Kujan and Michelle Pasquali to address his September 2017 hotline complaint. Ex. G, Kujan Decl. ¶¶ 3-5 & Decl. Ex. 1. The meeting ended after 30 minutes, with Mullins unwilling to make a statement unless he could speak to the "highest levels" of Labor Relations and the UAW, referenced police reports, claimed that Maria Watson was corrupt, and said that he needed to "gather evidence" that would "prove everything." *Id.* Kujan was alarmed by Mullins's conduct, and felt that he was unable to focus and kept diverting from Pasquali's questions. *Id.*

The very next day—January 27, 2018—Mullins's supervisor Rinehart sent an email to Pasquali reporting that Mullins was "constantly stating he is in fear of his life," requesting escorts to his assigned jobs, claiming he was threatened, and doing no work. Ex. C, Watson Decl. ¶ 14 & Ex. 2. Rinehart asked for advice because "my team does not have the time in a day to keep dealing with this type of behavior." *Id.* Mullins went to medical that day, and reported that his hands were shaking, that he had blurry vision, and was "under a lot of stress" citing "issues at work." Ex. D, Ubom Decl. ¶ 9, Decl. Ex. 4. Mullins was sent home for the balance of his shift. *Id.*

Mullins would not return to work until February 1, 2018. On that day, he again

met with Pasquali and Kujan to give his statement regarding the September 2017 hotline call. Ex. G, Kujan Decl. ¶¶ 6-9 & Decl. Ex. 2, 3. He wore dark sunglasses in the meeting and appeared to be agitated and upset. *Id.* at Decl. Ex. 3. He claimed that he was being "harassed" and "retaliated" against by *fifteen* separate people since 2015, including Pierrie, Shavonda, and another friend of theirs named "Kimmie." *Id.* at Decl. Ex. 2. Shortly after he had answered questions about the alleged issues with Pierrie and Shavonda, he abruptly stopped the interview stating that he had "had enough." *Id.* at Decl. Ex. 3. Mullins appeared visibly upset, with tears running down his cheeks. *Id.* Kujan drafted a memo to file recording her observations, and noted that Mullins's demeanor was "abnormal," with Mullins continually "going off track" and avoiding answering the questions, prolonging the session. *Id.*

Kujan and Pasquali reported Mullins's unusual behavior to their supervisor Maria Watson. *Id.* ¶ 10; Ex. C, Watson Decl. ¶ 15. That evening, Watson emailed Ford's executive physician Daniel Kelderhouse and Plant Physician Brenda Ubom to inform them that they had an employee who "we feel may be suffering from some sort of mental breakdown / issue" and noted that her team was "quite concerned for his mental stability and well-being." Ex. C, Watson Decl. ¶¶ 16-18 & Decl. Ex. 3. She shared Kujan's observations from that day's interview, and noted Mullins's history of paranoid conduct (*i.e.*, claiming people are threatening his life without reason). *Id.* Watson decided to have an "Unusual Behavior Report" completed for

Mullins and send him for a mental-health fitness for duty examination, possibly as early as the next morning. Ex. C, Watson Decl. ¶ 18.

**F.** **On February 2, 2018, Mullins again went to Labor Relations demanding to be moved, curses at Butcher, and is suspended.**  The next morning, Mullins saw Pierrie and her colleague Shavonda in West—where all three were assigned—shortly after the start of his shift, and went to Labor Relations to complain, accompanied by alternate union representative Dan Queen. Ex. A, Pl's Dep. 343, 351-52; Ex. E, Butcher Dep. 37-38. Mullins—unbeknownst to Butcher *or* Queen—was secretly recording their conversation. Ex. A, Pl's Dep. 343-45; Ex. E, Butcher Dep. 53; Ex. J (audio). Mullins again demanded his workstation be moved, and claimed he wanted to report violations of Ford's zero tolerance policy by Pierrie, Shavonda, and Kimmie. Ex. A, Pl's Dep. 346-47, 356. Mullins repeatedly refused to answer Butcher's questions, including repeated direct questions as to what had happened "today"; instead, Mullins repeatedly said that he wanted to discuss prior events that had occurred "to date." Ex. A, Pl's Dep. 356-57; Ex. E, Butcher Dep. 45; *id.* at 71-73, 80-82, 104-117 (transcription); Ex. J (audio). Mullins later admitted that no new "harassment" had happened that day, but felt that since Pierrie was a woman, she would "falsify" things about him going forward. Ex. A, Pl's Dep. 354-55.

Butcher found Mullins's demeanor was at times angry, erratic, and upset—and, at one point, can be heard in Mullins's audio stating that he felt threatened by

Mullins's behavior. Ex. E, Butcher Dep. 45; *id.* at 64-65 (audio transcription). Butcher likewise was frustrated with Mullins's conduct, and the meeting was contentious. *Id.* at 44-56, 84-87 (testimony); 82-83 (audio transcription); Dep. Ex. 2. Near the end of the interview, Queen got up and left the room. Butcher reported that Mullins mouthed the words "Fuck you, bitch" at him. *Id.* Once Queen returned, Butcher announced what Mullins had done. *Id.* Butcher reported Mullins made an aggressive pose, and took a step towards him; Butcher then called out for Queen to get his attention.[2] *Id.* After a hearing, Mullins was given a two-week suspension. *Id.*

**G.    On February 9, Butcher completes an unusual behavior report and refers Mullins to a mental-health fit for duty examination.**  On February 7, 2018, Dr. Kelderhouse replied to Watson's February 1 email regarding Mullins's unusual behavior and asked if it had been resolved. Ex. C, Watson Decl. ¶ 16 & Decl. Ex. 3. Watson stated that it would be handled Friday, February 9. *Id.* On February 9, 2018, Butcher completed an unusual behavior report for Mullins, citing his illogical, paranoid, and erratic conduct with Labor Relations and floor management dating to September 2017. *Id.* ¶ 19, Ex. E, Butcher Dep. 118-122 & Dep. Ex. A. Mullins was

---

[2]Mullins intends to put great weight on the fact that he cannot be heard cursing on his secret audiotape, which he contends is "proof" that he didn't curse. But Butcher's testimony and his contemporaneous notes—made before he knew Mullins had been recording—reflect that Mullins's lightly-mouthed curse would not have been audible on the recording. Ex. E at 124 & Dep. Ex. 2. And his argument is ultimately irrelevant; it was not cursing, but rather Mullins's long record of unusual behavior, that instigated the examination. *Id.* at 121-22; Ex. C, Watson Decl. ¶ 19.

instructed to complete a third-party mental-health fitness for duty exam and clear through medical before returning to work. Ex. G, Kujan Decl. ¶ 11.

**H.      Mullins eventually goes to the outside examination, and Ford works with the examiner to address the concerns it raised.**   Mullins reported to Ford Medical on February 16, 2018 and was asked to sign authorization paperwork for the mental-health exam. He refused, claiming confusion over what test he had to take. Ex. A, Pl's Dep. 396-400. Mullins admits, however, that Ford's nurse told him that Labor Relations had requested a mental-health fit-for-duty exam that would be performed by an outside doctor. *Id.* He ultimately relented and was evaluated by the outside psychiatrist on March 13, 2018. *Id.* ¶ 22 & Decl. Ex. 5; Ex. A, Pl's Dep. 147.

Before the exam, Dr. Ubom and Watson communicated with the examiner and explained the reasons for the referral, including Mullins's paranoid, confused, and erratic behavior. Ex. C, Watson Decl. ¶ 20 & Decl. Ex 4. The examiner issued her report on March 20, 2018 stating that Mullins had an "unspecified mental health condition," noted his "situational anxiety when he comes in contact" with specific employees, and said he would be fit for duty if his workstation were relocated and he reestablished treatment with a psychiatrist. Ex. C, Watson Decl. Ex. 5.

Watson could not follow the suggestion that Mullins be reassigned; among other things, (1) Pierrie's job was to drive a hi-lo and could be assigned to work anywhere in the plant, meaning that her work duties might take her near Mullins at

any time, as could her use of any common facility, like the parking lot or shuttling busses; (2) permanently reassigning Mullins would likely not be possible without violating the Ford-UAW collective bargaining agreement; and (3) because Pierrie had not been found to have done anything wrong, restricting her duties or ability to use common facilities in the plant would likely be improper punishment or otherwise violate the CBA itself. Ex. C, Watson Decl. ¶¶ 23-26. A request for clarification was made, and the outside doctor reiterated that the temporary one-day reassignment to a different building should be made permanent.[3] *Id.* ¶ 27 & Decl. Ex. 6.

Although the outside evaluator's suggestion was not reasonable, Dr. Ubom, in consultation with other Ford medical and human resources employees, determined that accommodation paperwork should be sent to Mullins's own physician, along with a copy of the outside evaluator's report. Ex. D, Ubom Decl. ¶ 3. Dr. Ubom also received Mullins's permission to reach out to his psychiatrist Dr. Rubenfaer. *Id.* ¶¶ 4-5; Ex. A, Pl's Dep. 147-48 & Dep. Ex. 8. Dr. Ubom wrote to Rubenfaer, asking whether, as Mullins's doctor, he agreed that an accommodation was required, and what his recommendations were. Ex. D ¶¶ 4-5 & Decl. Exs. 1-2; Ex. A, Pl's Dep Ex. 8. Rubenfaer responded that he could not comment, because he had not seen Mullins since January 10, 2018 and did not know his current mental state. *Id.*

---

[3] As Mullins was not working, he was not entitled to be paid. Ex. C, Watson Decl. ¶ 21. However, Watson later decided she would pay Mullins for the hours he would have worked. *Id.* Mullins admits that he was paid in full. Ex. A, Pl's Dep. 452-453.

**I.      Mullins is notified that he may return to work, etc. and refuses, even after being given more time.**  While on leave, Mullins continued to display bizarre behavior. He took clips from his secret recordings, paid an audio engineer to add reverb to the clips, and texted the clips to plant officials alleging a "conspiracy." Ex. A, Pl's Dep. 272-277 & Dep. Ex. 15; Ex. K (audio clip). Nevertheless, Labor Relations sent Mullins a notice, dated May 8, 2018, stating that he could return to work so long as he either (1) provided a doctor's letter stating that he could work without restrictions; (2) provided a doctor's letter stating that he could work with restrictions; or (3) if he could not return, to open a medical leave of absence. Ex. A, Pl's Dep. 99-100, 106-08, 153-54; Ex. C, Watson Decl. ¶¶ 28-29 & Ex. 7. The letter had a deadline of May 15, 2018, and stated that if he did not return to work or open a leave, he would be considered terminated with loss of seniority per the CBA. *Id.*

Mullins claims he did not receive the letter until the end of May 2018; nonetheless, he admits that he went to Maria Watson after receiving the letter, and Watson gave him additional time to comply. Ex. A, Pl's Dep. 106-108; Ex. C, Watson Decl. ¶ 30. Mullins admitted that, at the time he received the letter, he was unable to work due to disability. Ex. A, Pl's Dep. at 107-08, 437. He nonetheless declined to open a medical leave, despite that being one of the three options provided. *Id.* Because Mullins did not comply with the terms of the return-to-work letter or open a leave, and remained AWOL, he was terminated as a voluntary quit

-13-

under Ford policy effective June 12, 2018. Ex. C, Watson Decl. ¶ 31.

## Argument

With (1) Counts I and II of Mullins's Complaint having been dismissed with prejudice earlier, ECF No. 15, PageID.154; and (2) Mullins having agreed to summary judgment on his FMLA claim, Mullins's only claims are Michigan Persons with Disabilities Civil Rights Act, directed at both Defendants. *See* Complaint, ECF No. 1-2, PageID.21-25. His "disability" for his claims is alleged depression arising out of workplace conflicts with co-worker Pierrie among others. Ex. A, Pl's Dep. 76-77, 91, 93, 110-111, 404, 432-34. These claims all fail as a matter of law.

## I.  Mullins is not disabled under the PWDCRA, which covers neither temporary conditions nor "disabilities" due to co-worker conflicts.

A prerequisite for a PWDCRA claim is that the plaintiff show that he is "disabled" as defined in the statute. *Estate of Jackson by Jackson v. 36th Dist. Court*, 2019 WL 4180178, at *3 (Mich. Ct. App. Sept. 3, 2019). But because Mullins is not disabled under the PWDCRA, his claims fail at the outset.

*First*, the PWDCRA does not cover temporary disabilities lasting less than two years. A disability under the statute must "substantially limit" an employee's "major life activities," MCL 37.1103(d)(i)(A). One factor in whether a disability is "substantial" is the "duration or expected duration of the impairment." *Chiles v. Mach. Shop, Inc.*, 238 Mich. App. 462, 479 (1999). And the Michigan courts have held that "temporary medical conditions" of less than two years are not substantial,

-14-

even if they are "intermittent, episodic impairments" or require leave from work. *Id.*; *cf. Dillon-Barber v. Regents of Univ. of Mich.*, 2005 WL 1335132, at *3 (Mich. Ct. App. June 7, 2005) ("temporary psychological impairments, such as Plaintiff's depression, do not constitute ADA-cognizable disabilities").[4]

Here, that is precisely what Mullins alleges: brief, episodic bouts of depression that arose over less than a year, with the bouts ending each time he was cleared to return to work: from April 2017 to early September 2017, then late September 2017 to January 2018. *Supra* pp. 4, 6. And Mullins left Ford in June 2018, meaning that less than two years had passed since his first episodic bout of depression in April 2017. He was not disabled under the PWDCRA.

*Second*, courts routinely hold that "[p]ersonality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the ADA." *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 680 (6th Cir. 2014) (citing *Fricke v. E.I Dupont Co.*, 219 F. App'x 384, 389 (6th Cir.2007)). In this limited respect, the ADA and the PWDCRA are similar; as the Michigan Court of Appeals has recognized, a person who says he cannot work due to disability must show that

---

[4]Until it was amended in 2008, the federal ADA had a similar temporary-disability rule. *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018). But the "PWDCRA has not been amended" like the ADA was, and Michigan still applies the rule. *Judge v. Landscape Forms, Inc.*, 2014 WL 12502685, at *5 (W.D. Mich. Mar. 6, 2014), *aff'd*, 592 F. App'x 403 (6th Cir. 2014).

he is unable to "perform at least a wide range of jobs." *Chiles v. Mach. Shop, Inc.*, 238 Mich. App. 462, 478 (1999). Here, Mullins admits that he could perform a wide range of jobs. His only limitation was that he was unable to work when disfavored co-workers were present, but he could perform his work—indeed, *more* strenuous work—if they were not there. Ex. A, Pl's Dep. 346-49, 432-34. That was likewise the opinion of the third-party mental health examiner, who stated that Mullins's issue was "situational" and tied to the presence of specific co-workers. *Supra* pp. 11-12. But such situational "disability" is not a disability under the PWDCRA.

## II.    Mullins has not stated a PWDCRA reasonable accommodation claim.

Mullins claims Ford did not reasonably accommodate him by placing him in a "safe work environment," which he defined as "being placed in a different area than where" the disfavored employees worked. Ex. A, Pl's Dep. 428. Even if Mullins were disabled under the PWDCRA, his accommodation claim nonetheless fails.

### A.    Mullins did not request accommodation for a disability in writing.

An employee cannot bring a PWDCRA accommodation claim unless he requests accommodation in writing within 182 days of when he knew or should have known he needed accommodation. MCL 37.1210(18). And the writing must contain at least a "brief explanation" of why accommodation is needed "in terms of some physical or mental condition." *Bageris v. Brandon Twp.*, 264 Mich. App. 156, 163 (2004). *Id.* Here, Mullins failed on both fronts. He never requested an

accommodation in writing. Ex. A, Pl's Dep. 110. And although he claims he verbally requested his accommodation, he admittedly did not tie this verbal request to his alleged disability. *Id.* The lack of writing and the failure to tie a request to a disability are each independently dispositive of the reasonable accommodation claim.

## B.     Reassignment is not a reasonable PWDCRA accommodation.

Mullins's claim also fails because, under the PWDCRA, reassignment is not an appropriate accommodation request. The Michigan Supreme Court held in *Rourk v. Oakwood Hosp. Corp.*, that because—unlike the ADA—the Handicapper's Civil Rights Act (the old name of the PWDCRA)[5] does not "expressly require reassignment as a form of accommodation," an employer has no duty to accommodate through reassignment. 458 Mich. 25, 32 (1998); *see also Williams v. Dep't of Corr.*, 2015 WL 4469366, at *7 (Mich. Ct. App. July 21, 2015) (applying *Rourk*); *Calvin v. Ford Motor Co.*, 185 F. Supp. 2d 792, 795 (E.D. Mich. 2002) (noting this difference between Michigan law and federal law). The case of *Noe v. Department of Treasury* involved a very similar fact pattern. 2019 WL 452164 (Mich. Ct. App. Feb. 5, 2019). There, the plaintiff claimed she had a disability (anxiety and PTSD) stemming from her workplace contact with a co-worker, and demanded a transfer to avoid working near him. *Id.* at *2. The trial court held that the "request for a transfer was not a reasonable request for accommodation in light

---

[5] *See* 1998 Mich. Legis. Serv. P.A. 20 (S.B. 352), Section 101.

of *Rourk*," and the Court of Appeals affirmed. *Id.* at *5. Based on these authorities, Mullins's claim that he suffered disability discrimination because Ford did not reassign him away from Pierrie and the other women fails as a matter of law.

### C. Mullins's request to be moved so he could avoid co-workers is unreasonable, particularly for a unionized workforce.

Finally, Mullins's request for a reassignment to avoid his co-workers would not be reasonable even if the PWDCRA permitted such reassignments, because an employer is not required to violate a collective bargaining agreement in order to accommodate an employee's disability. *See Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1025 (6th Cir. 2013) ("there is no requirement that an employer violate a collective bargaining agreement or create a new position in order to return a disabled employee to work."); *Burns v. Coca-Cola Enters, Inc.*, 222 F.3d 247, 257 (6th Cir. 2000) ("Employers are not required to . . . violate other employees' rights under a collective bargaining agreement" to "accommodate a disabled individual," including policies regarding "entitlements to intra-company transfers").

Both Mullins and Pierrie are union workers subject to a collective bargaining agreement. Mullins had no contractual right to bump someone out of their existing job under the contract, and permanent open positions would be filled by seniority preference. Ex. C, Watson Decl. ¶ 25. Mullins admits that *his own union* told him that Ford could not just reassign him, and would not "deny" that the union cited the CBA as the reason. Ex. A, Pl's Dep. 434-36. And even without the CBA, it is not

-18-

reasonable for Mullins to demand Ford reshuffle its workplace over co-worker disputes. *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) (rejecting accommodation of transfer to avoid stressful co-workers); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995) ("transferring disabled individuals solely to allow the employee to work in a different setting" is not a reasonable accommodation).

### III. Mullins was not terminated because of a disability.

To prove a PWDCRA discrimination claim, the plaintiff must show (1) that he is disabled as defined in the act, (2) that the disability is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute. *Peden v. City of Detroit*, 470 Mich. 195, 204 (2004). PWDCRA discrimination claims are resolved under a *McDonnell Douglas* analysis. *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 433 (2002). Mullins's claim that he was terminated due to his disability fails for several reasons.

*First*, as noted, Mullins was not disabled under the Act. *Supra* pp. 14-16. That is enough to deny the claim; unless a person is disabled under the PWDCRA, "there is no need to consider whether a defendant discriminated against the plaintiff based on his or her disability." *Estate of Jackson*, 2019 WL 4180178, at *3.

*Second*, the alleged disability is not "unrelated" to his ability to do the job. As a matter of law, the PWDCRA does not prohibit the termination of an employee who cannot perform the essential functions of the job with or without accommodation.

-19-

*See Peden*, 470 Mich. at 216-217 (affirming termination of police officer who failed to prove he could perform essential functions of job). Here, however, Mullins's very theory of discriminatory termination is that he was fired because he *could not* do his job with or without reasonable accommodation: (1) his "depression" meant he could not do his job around Pierrie without accommodation; but (2) because "labor did not" give him the *unreasonable* accommodation of separation from Pierre, the "result was termination." Ex. A, Pl's Dep. 438. As he himself claims he could not work with or without reasonable accommodation, he has no *prima facie* case.

*Third*, Mullins cannot show *prima facie* causation, or that the reason for the discharge—Mullins's failure to return to work, which is considered a quit under Ford policy—is false and pretext for discrimination. *Noe* is directly on point. There, the plaintiff was denied reassignment away her co-worker, but was told she could (i) return to work; or (ii) renew her medical leave. *Noe*, 2019 WL 452164 at *6. The plaintiff refused both options, and she was then fired for not returning to work. The *Noe* court found that the plaintiff's refusal to return to work both disproved the causal element of her PWDCRA *prima facie* case, *and* was a legitimate reason for termination that the plaintiff could not show was pretextual. *Id.*

So too here:  Mullins admits that Ford offered him multiple options to return to work, *and* gave him extra time to select one of those options—including opening a new medical leave if, as he claimed, he was unable to work. Mullins chose not to

take any of those options, despite knowing the consequences, and remained AWOL. Mullins was not fired due to a disability; rather, he effectively quit his job.

*Fourth*, as to Defendant Butcher, in addition to the above, he was not involved with Mullins after February 9, 2018. Ex. E, Butcher Dep. 37, 88. As he was not responsible for terminating Mullins, he cannot be liable. *See, e.g.*, *Macreno v. St. James Capital*, 2011 WL 5604062, at *1 (Mich. Ct. App. Nov. 17, 2011).

### IV.   Mullins was not terminated because of a perceived disability.

For the same reasons, Mullins could not avoid summary judgment by claiming he was discriminated against based on a "perceived" disability—such as the paranoia he denies having—rather than the depression he asserts was the true disability.

To state a *prima facie* "perceived" claim, the "perceived characteristic" must be "regarded as being unrelated" to his "ability to perform the duties of [his] particular job or position. . . ." *Michalski v. Bar-Levav*, 463 Mich. 723, 735 754 (2001). But here, the undisputed record is that the concerns about Mullins's paranoid behavior related to his ability to work; indeed, they *did* in fact disrupt his work. When he was on-site, Mullins was repeatedly in Labor Relations claiming he was being stalked or threatened by the mere existence of Pierrie and others in the building, rather than working. He refused to work where assigned, citing his paranoid fears. And he appeared confused about job duties, such as claiming he had never been removed from the hi-lo. *Supra* pp. 3-11. Those are legitimate, job-related

concerns. *See Green v. DaimlerChrysler Motors Corp.*, No. 263980, 2006 WL 141914, at *1 (Mich. Ct. App. Jan. 19, 2006) (rejecting "perceived" claim when plaintiff, a repairman, was thought to be "hostile and threatening to co-workers when repairs were needed"); *Berger v. Auto. Media, LLC*, No. 18-11180, 2020 WL 3129902, at *11 (E.D. Mich. June 12, 2020) (perception that plaintiff's "emotional" state decreased her productivity was job-related). And when job-related concerns are present, it is permissible to use a mental-health exam to determine fitness for duty without fear of "regarded as" liability. *See, e.g.*, *Miller v. Mich. State Police*, 2017 WL 3043972, at *5 (Mich. Ct. App. July 18, 2017); *cf. Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999) ("Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, this is not enough to suggest that the employee is regarded as mentally disabled.")

In any event, Mullins cannot show that he was terminated due to a "perceived" disability. Mullins was given multiple options to return to work even *after* continuing his bizarre behavior by emailing doctored audio to Ford officials alleging a conspiracy. He was terminated after refusing to return to work or open a leave. That undermines both his *prima facie* and pretext case, as noted *supra* at pp. 20-21.

## V. Mullins cannot show retaliation under the PWDCRA.

Finally, Mullins claims that he was retaliated against under the PWDCRA, citing as protected activity his filing of EEOC charges that issued to Ford on

February 20, 2018. Ex. A, Pl's Dep. 440, 448-450; Ex. H (EEOC Charges with Transmittal Letters). He claims, in essence, that the process related to his mental-health fitness for duty examination was retaliatory, because he was not immediately returned to work and that "delayed" his pay. Ex. A, Pl's Dep. 451-456.

Mullins cannot establish retaliation on these facts. To establish *a prima facie* case of unlawful retaliation, a plaintiff must show: (1) that he engaged in a protected activity, (2) defendant knew of the protected activity, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Aho v. Dep't of Corr.,* 263 Mich. App. 281 (2004). If the plaintiff establishes a *prima facie* case, the claim is analyzed under a *McDonnell Douglas* pretext analysis. *Id.*

*First*, Mullins cannot establish causation because the mental-health fit for duty examination had already been initiated prior to the protected activity, and the fact that the process continued is not proof of causation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers… proceeding[] along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Here, Watson decided to send Mullins for a mental-health fitness for duty examination on February 1, 2018; at her direction, an unusual behavior report was written on February 9, 2018; and Mullins was asked to sign the fitness-for-duty paperwork on February 16, 2018. *Supra* pp. 8-11. The fact that

Mullins was unable to work (and, consequently, get paid) while awaiting the results was a necessary consequence of those earlier actions. In other words, everything Mullins complains about was set into motion *before* the protected activity, and thus it could not have been caused by the protected activity. He cannot show causation.

*Second*, Mullins's short, less-than-two-month "delay" in his pay is not an adverse action. As noted, there was not actually a "delay" in the sense that Mullins suggests; rather, Watson made a gratuitous retroactive payment for hours Mullins *did not work*. *Supra* p. 12, n.3. But even if that could be characterized as a "delay," a short delay of a few months in receiving pay is not an adverse action in a retaliation case—particularly when some of the delay was due to Mullins's rescheduling his first appointment (Ex. A, Pl's Dep. 401). *See, e.g.*, *Ponder v. Martin-Brower Co., LLC*, 2008 WL 3852252, at *12 (M.D. Tenn. Aug. 14, 2008) (holding short delay in pay not adverse action in a retaliation case); *Morrow v. Donahoe*, 2015 WL 3463554, at *4 (N.D. Ill. May 29, 2015) ("slight delay in pay" partially caused by plaintiff not adverse action), *aff'd* 653 F. App'x 480 (7th Cir. 2016).

*Third*, Mullins again cannot possibly establish pretext. The only person he deposed—Butcher—had nothing to do with the return-to-work or pay decisions. *Supra* p. 21. The record reflects that Mullins was delayed in being asked to return to work for several reasons, including his own delay, the need to clarify the examination results, and Ford's need to figure out how to return Mullins to work in

light of the report. And when the delay became apparent, Watson affirmatively took action to *pay* Mullins, which undermines any alleged retaliatory motive not to pay him. *Supra* p. 12, n.3. And, of course, he cannot show causation or pretext because he was terminated for refusing to return to work. *Supra* pp. 20-21. Plaintiff cannot establish a retaliatory motive for any of his alleged claims.

## VI.   Mullins has Agreed to Dismiss his FMLA Discrimination Claim

At deposition, Mullins conceded that none of the leave he took during the relevant time frame was unpaid FMLA leave time, but rather paid leave time under Ford's own policy. Ex. A, Pl's Dep. 461-72. Given that an FMLA discrimination claim requires the plaintiff to have "invoked [his] FMLA rights," *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006), this is fatal to his claims. And Mullins's counsel has thus agreed to the relief of summary judgment on this claim.

## Conclusion

The Court should grant summary judgment on all claims.

Respectfully submitted,

By: /s/ *Thomas J. Davis*
    Elizabeth Hardy (P37426)
    Thomas J. Davis (P78626)
Attorneys for Defendants
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
Dated:  November 19, 2020    tdavis@khvpf.com

-25-

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ *Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy Viviano
Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com