EXHIBIT E



TRI-COUNTY COURT REPORTERS, INC.

(248)608-9250 Fax (844)270-7115

www.tri-countycourtreporters.com

# Transcript of the Testimony of
# Bryan Butcher

**Date:** October 15, 2019
**Volume:**

**Case:** Arthur Mullins v. Ford Motor Company

Printed On: October 25, 2019

Bryan Butcher
10/15/2019

Page 25

1   at some point I would have been made aware.
2   Q.  Did you ever have any discussions with anybody in
3       Labor Relations Department about Mr. Mullins and Miss
4       Perry calling the harassment hotline in September of
5       2017 or just calling the harassment hotline in
6       general?
7   A.  It's typical at our Labor meetings that we would
8       discuss hotline calls.
9   Q.  From your testimony, fair to say nothing stands out in
10      your mind that's significant that you can recall?
11  A.  No significance, but we would have discussed any
12      hotline call that was fielded by the Labor Office.
13  Q.  The first encounter you had with Mr. Mullins in August
14      or September of 2017, did you write any sort of
15      memorandum of that interaction that you can recall?
16  A.  No, no.
17  Q.  Okay.  Going forward from there what was the next
18      interaction that you had with Mr. Mullins?
19  A.  He showed up in what I'm pretty sure was the month of
20      September.
21  Q.  And what was that interaction about?
22  A.  He was requesting to be moved.
23  Q.  And Mr. Mullins at this time, was he still driving a
24      hi-lo, if you recall?
25  A.  It's my recollection that the entire time I had first

Page 26

1   encountered Mr. Mullins he was no longer on the hi-lo.
2   He had already been removed before I ever engaged with
3   him.
4   Q.  Got it.  So he just wanted to be what, moved to a
5       different part of the plant?
6   A.  Correct.
7   Q.  And is that something that Labor Relations could have
8       accomplished?
9   A.  Labor Relations does not move manpower.
10  Q.  Is that just a blanket sort of black-and-white rule?
11  A.  Yes.  That's a task that's left up to the operations
12      managers.
13  Q.  And who was the operations manager at that time who
14      would have had the oversight of Mr. Mullins?
15  A.  I don't have in front of me his shift that he would
16      have worked to understand that.
17  Q.  How many operations managers were there?
18  A.  There would be three.
19  Q.  Okay.  And who were those three individuals?
20          MR. DAVIS:  Object to the form, time frame.
21  BY MR. LAURILA:
22  Q.  We're talking about when he was in your office or
23      wherever you spoke with him asking to be moved,
24      whoever those operations managers were.
25          If you don't remember, it's okay.  It's not

Page 27

1   a memory contest.
2   A.  Yes.  To the best of my recollection, the three
3       managers would have been Jeff Case, Gino Vespa, and
4       Darryl Rinehart.  That would cover the three crews.
5   Q.  I think I remember seeing somewhere that Mr. Rinehart
6       was the operations manager on Mr. Mullins' shift.
7       When you said his name, it rang a bell.
8           Regardless, did you ever have any
9       discussions with any of the operations managers about
10      whether Mr. Mullins could be moved?
11  A.  This second encounter you're talking about or ever?
12  Q.  Let's kind of go through this.  He comes into Labor.
13      He asks you if he can be moved.  He wants to be moved,
14      correct?
15  A.  Uh-huh.
16  Q.  Is that yes?
17  A.  Sorry, yes.
18  Q.  And you tell him I can't do that, we can't move
19      manpower, is that fair?
20  A.  Yes.
21  Q.  Okay.  After that meeting did you have a conversation
22      with anybody in Labor or operations manager, somebody
23      on the operations side, whether it was possible for
24      Mr. Mullins to be moved?
25  A.  Karmel Bramlett, a production supervisor, came to the

Page 28

1   Labor Relations office.
2   Q.  That same --
3   A.  Day shift, day.
4   Q.  And what was that about?
5   A.  It was because Mr. Mullins had been absent from the
6       job for so long.  And to my recollection she was
7       following up as to what was going on, taking place.
8   Q.  Okay.  And so did you have a discussion with Karmel
9       Bramlett about whether he could be moved?
10  A.  Yes.
11  Q.  And is Karmel a man or woman?  Sorry.
12  A.  Karmel Bramlett, female.  Yes, female.
13  Q.  And you had a discussion with her about whether he
14      could be moved?
15  A.  Yes.
16  Q.  And what did she tell you?
17  A.  She made an agreement with UAW official Chris Sanders
18      to move him for the day.  My part in that was I'm not
19      going to get involved in moving her manpower, as that
20      wouldn't be fair.  That's not something that we can
21      control.  She has to run her floor.  So she made that
22      decision with UAW official Chris Sanders from there.
23  Q.  Was the conversation that you had with her, her
24      letting you know this is what I'm doing or --
25  A.  The conversation was me letting her know I'm not

7 (Pages 25 to 28)

Tri-County Court Reporters
248-608-9250

Electronically signed by Pamela Goletz (001-006-185-8642)                                      81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 29

1  getting involved with moving the manpower.  If you
2  make any sort of move, it's your decision.  I'm not
3  going to stand here and tell you one way or another.
4  Q.  You said that Mr. Mullins had been absent for a while.
5  Was this -- had he just returned back to work?
6  A.  Don't specifically recall, but I do believe that to be
7  the case.
8  Q.  Okay.  Mr. Mullins was off on -- I'm just going to
9  call it medical leaves for a couple periods of time in
10  2017, correct?
11  A.  I can't be specific about that without having the
12  information before me.
13  Q.  Sure.
14  A.  But I do know that he was off on medical at various
15  times.
16  Q.  Okay.  So as far as you know, Mr. Mullins was moved by
17  Karmel Bramlett for one day, at least one day, is that
18  fair?
19  A.  Correct.  That's what I recall.
20  Q.  Okay.  Anything else about that September 2017
21  encounter with Mr. Mullins where he was asking you to
22  be moved that we haven't discussed yet?  Any other
23  follow-ups you had with anyone else about it?
24  A.  Just those two people, Karmel and Chris Sanders from
25  the union side and the management side.

Page 30

1  Q.  Okay.  And as far as moving manpower goes, that's the
2  general way that needs to be or it has to be done, is
3  that fair?
4  A.  Correct.
5  Q.  Okay.  What about continuing on forward, the next
6  encounter you had with Mr. Mullins?
7  A.  My recollection, the next encounter with Mr. Mullins
8  would have been 1-26 of '18.
9  Q.  In that encounter you conducted an investigatory
10  interview with him?
11  A.  Correct.
12  Q.  And is that a term investigatory interview like a
13  formal Ford process?
14  A.  Yes.
15  Q.  Is there a specific manner in which those are supposed
16  to be conducted that's dictated by company policy?
17  A.  There's templates to try and follow.
18  Q.  Okay.  What do you remember about that January 26th,
19  2018 encounter?
20  A.  Specifically wanted to be moved again.
21  Q.  Do you recall why?
22  A.  Yes.  He gave an account of being harassed,
23  threatened, as I recall.
24  Q.  Do you recall who he was being or who he claimed he
25  was being harassed or threatened by?

Page 31

1  A.  I recall the name is Shavonda.  And I don't recall if
2  he mentioned Crystal on this date or not.  But I want
3  to say he mentioned Shavonda, Crystal, and a Kimmy.
4  Q.  And we're going to look at the document in a minute.
5  I just want to get an understanding of this process.
6  On January 26th, did Mr. Mullins come into
7  the Labor Relations Department offices kind of as a
8  walk-in in the way that you previously described?
9  A.  Correct.
10  Q.  How did the investigatory interview come about?  Was
11  that a decision that you made?
12  A.  Yes.
13  Q.  And what is the trigger for that as far as when you're
14  going to make a formal or conduct a formal
15  investigatory interview?
16  A.  So the trigger then was he claimed to have a new
17  encounter that was creating the negative environment
18  he explained.
19  Q.  Just so we're clear, he said or he claimed that there
20  was new harassment that had just recently occurred?
21  A.  Correct.
22  Q.  And why did that allegation trigger an investigatory
23  interview?  Is that company policy that one has to be
24  conducted?
25  A.  It's in our best interest.  It's company policy that

Page 32

1  it would be in our best interest to capture this new
2  event.
3  Q.  And the investigatory interview process is the way to
4  go about capturing that event?
5  A.  Correct.
6  MR. LAURILA:  I'm going to mark this as
7  Exhibit 1, please.
8  MARKED BY THE REPORTER:
9  DEPOSITION EXHIBIT 1
10  11:49 a.m.
11  BY MR. LAURILA:
12  Q.  Mr. Butcher, I'm going to hand you what we just marked
13  as Exhibit 1, which is the January 26th, 2018
14  investigatory interview that we have been speaking
15  about.  If you would please take a second, you can
16  read through it to yourself.  You don't need to read
17  it out loud, but just let me know when you're done
18  looking at it.
19  A.  Complete.
20  Q.  Okay.  Flipping to the last page of the exhibit, which
21  I'm going to refer to by the little bold Ford slash
22  Mullins 00998.  That's the Bates numbering.  Is that
23  your signature there in the middle line where it says
24  HR?
25  A.  Correct.

8 (Pages 29 to 32)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

## Page 37

1    1st, 2018 discussion that Mr. Mullins had with Labor?
2    A.  Correct.
3    Q.  Okay.  So the February 2nd, 2018 discussion that you
4        had with him was your next encounter.
5            Before we get into that one, going forward
6        from there did you have any other meetings or
7        discussions with Mr. Mullins from February 3rd, 2018
8        going forward?
9    A.  From February 3rd, 2018 through current day, I had not
10       had another interaction with Mr. Mullins that I recall
11       as any significant event.
12   Q.  Okay.  And on February 2nd, 2018 Mr. Mullins again
13       came to Labor Relations as a walk-in?
14   A.  Correct.
15   Q.  And was this again at the very start of his shift?
16   A.  Correct.
17   Q.  In the time that you were at Dearborn Stamping with
18       Mr. Mullins, is that modis operandi kind of consistent
19       with how he would function where he would come to
20       Labor at the beginning of his shift and make these
21       complaints?
22           MR. DAVIS:  Object to form.
23   BY MR. LAURILA:
24   Q.  As far as you know?
25   A.  I can only tell you what I know, the four encounters

## Page 38

1        that we've just discussed.
2    Q.  Did that all fit that kind of pattern?
3    A.  That is how it happened.
4    Q.  So tell me about the February 2nd, 2018 incident.  I
5        mean, he came into Labor Relations again, asked to
6        talk with you or somebody?
7    A.  Correct.
8    Q.  And sorry, were you -- did he ask to talk to you or
9        did he just ask to talk to somebody and you happened
10       to be available?
11   A.  He would have rang the bell or knocked on the door at
12       that time.  I can't recall if we had the bell
13       installed or not, but he would have rang the bell or
14       knocked on the door.  And I would have answered.  He
15       showed up with his district committee rep, which at
16       that time it was alternate Dan Queen.
17   Q.  And you had a discussion with Mr. Mullins and Mr.
18       Queen?
19   A.  Correct.
20   Q.  Did that occur in your office?
21   A.  Correct.
22   Q.  Were Mr. Mullins and Mr. Queen both in your office
23       together when that discussion started?
24   A.  Correct.
25   Q.  And what do you recall about that discussion?

## Page 39

1    A.  The request was again made for Mr. Mullins' job
2        assignment to be moved.
3    Q.  Was Mr. Mullins making that request or was Mr. Queen?
4    A.  I don't recall if it came out of Mr. Mullins' mouth,
5        if it came out of Dan's mouth.  But again, as we
6        understand, Mr. Queen represents Mr. Mullins, so the
7        request was made.
8    Q.  Okay.  Did you again notify them that that was not
9        something you could do?
10   A.  I did.
11   Q.  And did Mr. Mullins report additional harassment in
12       that meeting?
13   A.  Not in that meeting, no.
14   Q.  Do you recall typing up another investigatory
15       interview statement?
16   A.  On that day?
17   Q.  Yes.
18   A.  Yes.
19   Q.  And did it follow the same format as the last one
20       where you typed the same questions and answers?
21   A.  Similar, but not exact, as each investigatory
22       interview will have its own nuances.
23           MR. LAURILA:  Okay.  Why don't we mark
24       this, please, as Exhibit 2.
25           MARKED BY THE REPORTER:

## Page 40

1            DEPOSITION EXHIBIT 2
2            12:05 p.m.
3    BY MR. LAURILA:
4    Q.  I'm going to hand you what we marked as Exhibit 2.  As
5        with the last one, please take a look at it.  I guess
6        I should be clear.  I attached both the investigatory
7        interview document and then what I understand to be
8        your statement pertaining to this encounter all as
9        Exhibit 2.
10   A.  Okay.  Complete.
11   Q.  Okay.  And is what we just marked as Exhibit 2 the
12       investigatory interview that you typed up during that
13       February 2nd, 2018 encounter with Mr. Mullins and then
14       also your statement?
15   A.  Yes.
16   Q.  Okay.  The investigatory interview's unsigned.  Did
17       Mr. Mullins refuse to sign it?
18   A.  Yes.
19   Q.  And I also see there's no signature either for
20       yourself or Mr. Queen.  Why is that?
21   A.  We would only sign a completed and signed statement by
22       the member.
23   Q.  Got it.  So if the employee refuses to sign, no other
24       signatures?
25   A.  There's no statement at that point.

10 (Pages 37 to 40)

Electronically signed by Pamela Goletz (001-006-185-8642)                    81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 41

1  Q.  Okay.  Did you type up your statement yourself?
2  A.  I did.
3  Q.  And when did you do that?
4  A.  The same day.
5  Q.  Immediately afterwards or several hours later in the
6     day?
7  A.  It was at least a few hours.  I can't be exact, but it
8     was at least a few hours after the event.
9  Q.  Why did you type up a statement about the event?
10  A.  Because I wanted on record what I seen and heard take
11     place to the best of my recollection.
12  Q.  Did you talk with anybody in Labor Relations about
13     this incident prior to typing your statement?
14  A.  Yes.
15  Q.  Who did you talk to?
16  A.  Maria Watson.
17  Q.  What did you talk to her about?
18  A.  The events that took place.
19  Q.  Do you recall what you said to her?
20  A.  Verbatim, no.
21  Q.  Generally?
22  A.  Generally, yes.
23  Q.  Did you call her to let her know what had happened?
24  A.  It is my recollection I attempted to call her that
25     morning and I was unsuccessful.  We were playing a bit

Page 42

1     of phone tag.
2  Q.  Did you finally get ahold of her and recount what had
3     happened in this incident?
4  A.  I believe not till she reported to the office is my
5     first contact with her.
6  Q.  Got it.  And did that occur before you wrote the
7     statement?
8  A.  Yes.
9  Q.  Did she advise you to write the statement?
10  A.  Yes.
11  Q.  Did she give you a reason why?
12  A.  I don't recall if she gave a reason, but it's stands
13     to reason I would have done this without her
14     direction.
15  Q.  So whether it was a phone call or a face-to-face
16     conversation, at some point during that day you told
17     her about what had happened during this meeting with
18     Mr. Mullins, is that fair?
19  A.  Correct.
20  Q.  Do you recall what her response was?
21  A.  Disbelief that, you know, it had escalated to this
22     level.
23  Q.  When I asked you to look through Exhibit 2, did you
24     read through your statement word-for-word?
25  A.  No.

Page 43

1        MR. LAURILA:  Why don't you -- let's take a
2     break.  Tom, you said you wanted a break anyway.
3        So while we're on a break, if you want to
4     take your time to read through word-for-word and we
5     can talk about it when we get back.
6        (Off the record at 12:12 p.m.)
7        (Back on the record at 12:25 p.m.)
8  BY MR. LAURILA:
9  Q.  Mr. Butcher, during the break you had a chance to
10     review your statement from February 2nd, 2018?
11  A.  Yes.
12  Q.  And is this statement accurate to the best of your
13     recollection?
14  A.  Yes.
15  Q.  Is there anything about it sitting here today that you
16     would want to change?  Add, remove, anything like
17     that?
18  A.  No.
19  Q.  You mentioned that during that day you were playing
20     phone tag with Maria Watson.  The end of the first
21     paragraph on 881 and the very start of the second
22     paragraph on the second page, is that referencing kind
23     of that phone tag situation?
24        You stated that Shine Joseph came into my
25     office stating that our supervisor Maria Watson was

Page 44

1     trying to get in touch with you.  You stepped out to
2     call her back on your cell phone.
3        Were you not able to get in touch with her
4     at that time?
5  A.  Yes.  And correct, there are several questions in
6     there.
7  Q.  Sorry.  I appreciate that.  But okay.
8        So generally, yes, you were able to reach
9     her on your cell phone at that time?
10  A.  Yes.
11  Q.  Okay.  And then you proceeded to have this discussion
12     with Mr. Mullins?
13  A.  Well, that would enter into their return.  They were
14     already -- we had one discussion and that's what you
15     talked about first.
16  Q.  Got it.
17  A.  They were sent away.  And then they returned for a
18     second discussion.
19  Q.  Okay.  And that second discussion was where Mr.
20     Mullins kind of, generally paraphrasing it, provided
21     the information that appears in the investigatory
22     interview summary?
23  A.  Correct.
24  Q.  Okay.  How would you characterize Mr. Mullins'
25     demeanor during that second discussion when he

11 (Pages 41 to 44)

Electronically signed by Pamela Goletz (001-006-185-8642)                          81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

---

Page 45

1     explained to you the nature of the harassment that he
2     was complaining about?
3   A.  I would have to say it shifted from being erratic at
4     times, determined at times, upset at times, and even
5     angry at times.
6   Q.  What do you recall during that discussion made him
7     angry or at what point during the discussion did he
8     get angry?
9         MR. DAVIS:  Object to the form.
10   A.  I'd be speculating if I said I knew what made him
11     angry.
12   BY MR. LAURILA:
13   Q.  That's fair.  But at what point during the
14     conversation did you perceive him to be angry?
15   A.  It was a rather lengthy interview.  It was at some
16     point and it was in our back and forth over today
17     versus to date.  His reluctance to answer who had
18     threatened or harassed him today versus to date is it.
19   Q.  And what about his demeanor made you feel that he was
20     angry?
21   A.  At one point he stood up, leaned over my desk and
22     began pointing at my computer monitor.  His tone, his
23     body language, and things of those nature were
24     threatening.  They were intimidating.  And that's
25     where I felt I seen a change had shifted to a more

---

Page 46

1     aggressive and angry Arthur Mullins.
2   Q.  In the third paragraph on the 881 of your statement,
3     the very first sentence you state, I printed his
4     statement and he refused to sign it claiming it was
5     incomplete and not recorded accurately.
6        You're referring there to the investigatory
7     interview question and answer that we were looking at
8     on 879 and 880?
9   A.  Correct.
10   Q.  Was there another or a separate investigatory
11     interview statement or some other statement that you
12     typed up and subsequently tore up, or was this the
13     only one?
14   A.  Well, yes, it would be the same copy.  And if he makes
15     any changes or he add-on, we tear that copy up and
16     put it in the shredder.  And then there would be a new
17     copy with the additional statement questions,
18     etcetera.
19   Q.  Is there any content on 879 that he added that caused
20     you to tear up the initial copy?
21   A.  I can't remember the sequence, but I believe the last
22     question and answer were added after I originally
23     tried to get him to sign.  And if that's out of
24     sequence, I apologize, but I think that would --
25   Q.  That's okay.  Like I said, it's not a memory contest.

---

Page 47

1     I just want to understand what happened.
2   A.  Yes.
3   Q.  Okay.  During this discussion with Mr. Mullins, Mr.
4     Queen, as you state in your statement, was walking in
5     and out of your office, is that fair?
6   A.  Yes.
7   Q.  And from the content of your statement, it sounds like
8     at some point during this discussion Mr. Mullins --
9     and I'm just going to read the way that you wrote
10     it -- quote, "leaned into my desk and with pursed lips
11     and gritted teeth Arthur lightly said, fuck you,
12     bitch," end quote, which is from the end of 881.
13        Do you see that?
14   A.  I do.
15   Q.  And is that the way that it happened?
16   A.  Yes.
17   Q.  And this was during an occasion when Mr. Queen was out
18     of the office, out of your office?
19   A.  Correct.
20   Q.  What happened when Mr. Queen walked in?  Did you
21     tell him what had just happened?
22   A.  Yes.
23   Q.  And what was his reaction?
24   A.  Surprise.
25   Q.  Do you recall him saying anything to you about it?

---

Page 48

1   A.  Yes, something to the effect of don't do this.
2   Q.  Did he indicate that -- do you recall him saying
3     something to the effect of I was outside and I could
4     hear everything that was being said in the office?
5   A.  Yes.
6   Q.  Did you interpret that to be him saying he was
7     disputing that Mr. Mullins had said that?
8   A.  Yes.
9   Q.  Did you have any discussion with Mr. Queen about that
10     aspect of it?
11   A.  Yes.
12   Q.  What did you guys talk about or what was that
13     discussion?
14   A.  I explained to him what I wrote here, that he said it
15     lightly, and because you stepped away, you may have
16     missed it.
17   Q.  Did you have any sort of physical altercation with Mr.
18     Queen?
19   A.  Physical altercation as in?
20   Q.  Did he put his hands on you or you put your hands and
21     him -- excuse me, you put your hands on him?
22   A.  I touched him, yes.
23   Q.  And why?
24   A.  Because Arthur Mullins had put himself in a position
25     that he was charging me.

12 (Pages 45 to 48)

Tri-County Court Reporters
248-608-9250

Electronically signed by Pamela Goletz (001-006-185-8642)     81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 49

1  Q.  Arthur Mullins was charging you in your office?
2  A.  That's how it appeared, yes.
3  Q.  When you say that's how it appeared, what do you mean?
4  A.  What I mean is he made the charge, he caught himself,
5      stopped, and didn't complete it.
6  Q.  Okay.  How big is your office or how big was your
7      office?
8  A.  I'd call it eight foot by ten foot maybe.
9  Q.  Okay.  And where was the door in relation to your
10     desk?
11 A.  Three feet from the desk.
12 Q.  Okay.  So when this altercation with Mr. Mullins where
13     you said he charged at you, where was he standing?
14 A.  He was in the threshold of the door.
15 Q.  And where were you standing?
16 A.  Right at the edge of the desk.
17 Q.  Okay.  So a couple feet apart?
18 A.  Yes, yes.
19 Q.  Okay.  And where was Mr. Queen standing at that point?
20 A.  In between where Arthur was positioned and where I was
21     positioned.
22 Q.  Was he standing directly between the two of you?
23 A.  He was directly between us, but his body was turned
24     sideways.
25 Q.  Okay.  And then it sounds like from what you just told

Page 50

1      me that Mr. Mullins took a step towards you?
2  A.  Yes.
3  Q.  Was it just one step or more than one?
4  A.  So there was one definitive step, but if I'm being
5      honest, he had to take at least two, potentially
6      three, to get back in position.  Because he had turned
7      to leave my office and that's when I seen him turn and
8      reenter.
9  Q.  Okay.  And so Mr. Mullins turns kind of at the
10     threshold to reenter, takes at least one significant
11     step toward you?
12 A.  Inside the office now.
13 Q.  Inside the office now.  And at that point you had to
14     put your hands on Mr. Queen?  Is that the way it
15     happened?
16 A.  Yes.
17 Q.  Why did you have to put your hands on Mr. Queen at
18     that point?
19 A.  I thought Arthur was going to attack me.  And I was
20     turning Dan to say look, look at what's happening.
21     Dan was looking at me, not at what was happening.  So
22     I turned him and I'm saying Dan, Dan, Dan, look, as in
23     look.
24 Q.  Got it.  So Arthur takes this step towards you.  Mr.
25     Queen's back is turned to him, so he can't see what's

Page 51

1      going on?
2  A.  Yes.  As least his head was turned away.
3  Q.  Did Dan turn around and look at Mr. Mullins?
4  A.  When Dan turned is when Arthur had caught himself and
5      re-began the exit, the second exit from my office.
6  Q.  At some point during this did you notify Mr. Mullins
7      and/or Mr. Queen that you were going to call security?
8  A.  I notified them that if they didn't leave and Arthur
9      leave the premises, I would be calling security.
10 Q.  Did you end up having to call security?
11 A.  I believe I called security because they did not exit
12     the -- Arthur did not exit the premises.
13 Q.  How did you know that he didn't exit the premises?
14 A.  I followed to see if he was going to go out the doors
15     and head towards the exit and turnstyles, and he did
16     not.
17 Q.  Okay.  So if we look at page 882 of Exhibit 2, which
18     is back to your statement on the last page.  The first
19     full sentence on that page states, as this happened,
20     Dan walked back into my office.  I stood up, said this
21     meeting is over.  It continues on.
22         Is that the portion of your statement
23     addressing the interaction that we just discussed
24     where Mr. Mullins took that kind of threatening step
25     towards you?

Page 52

1  A.  No.
2  Q.  Which part of your statement addresses that portion of
3      the discussion?
4  A.  A few sentences down where it says he stood up and
5      turned to the door to exit my office, then suddenly at
6      the threshold turned back into the office with his
7      arms flexed, took a hard step toward me.
8  Q.  Okay.  When you said in your statement with his arms
9      flexed, what are you -- I guess what was his arms
10     doing that made you think that they were flexed?  Was
11     he raising them up like he was going to make a fist,
12     take a swing at you?
13 A.  You want me to show you?
14 Q.  Just describe it.
15     MR. DAVIS:  Just describe it for the
16     record.
17 BY MR. LAURILA:
18 Q.  If you can describe it.
19 A.  His arms were at his side.  And when he took the hard
20     step towards or even the entry step, once he turned
21     from exiting, his arms were at his side but they were
22     bowed, right?
23 Q.  I see.
24 A.  He had clenched fists, so he's like this and he
25     lowered, right?  So that was an aggressive approach.

13 (Pages 49 to 52)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

---

Page 53

1    And he had a grimace on his face.
2    Q.  I see.  Okay.  Fair to say while this February 2nd,
3    2018 meeting was occurring you were not aware that Mr.
4    Mullins was recording it, correct?
5    A.  Correct.
6    Q.  And you've listened to the recording of this meeting?
7    A.  Correct.
8    Q.  Is there anything about the recording that you feel --
9    is there anything from the meeting that you feel was
10   omitted from the recording, so not recorded?  Does
11   that make sense?
12   A.  Yes.  I can't say for certain.  There's some things
13   that sound odd.  I don't know if things were omitted,
14   things were altered.
15   Q.  When you say there are things that sound odd, what do
16   you mean?
17   A.  There were some echoes that I heard that I thought
18   that's a bit -- that it didn't sound natural, I guess
19   is maybe a better way to put it.  And there were
20   several times that I heard things through there like
21   that that didn't sound natural.  But of course, I
22   don't know for sure.
23   Q.  Sure.  You were obviously present for the entirety of
24   this interaction with Mr. Mullins, correct?
25   A.  Correct.

---

Page 54

1    Q.  So my question is more specific to, is there anything
2    from the conversation that you believe does not appear
3    in the recording?
4    A.  That happened?
5    Q.  Yes.
6    A.  There's going to be some things in there such as a
7    head nod.  There's a time where Dan nodded his head.
8    Q.  Of course.
9    A.  As in yeah, Arthur, he's correct or things like that
10   aren't going to be in there.  And specifically, you
11   know, the charge that I have "fuck you, bitch" that he
12   said to me can't be heard.  Didn't know then why, but
13   I know today why he made sure it was said -- it was
14   mouthed and not spoken loudly.  So yes, that's not on
15   the tape with clarity.
16   Q.  I see.  When Mr. Mullins said "fuck you, bitch" to
17   you, did he speak it audibly or did he just mouth the
18   words?  Do you understand the difference?
19   A.  I do.  And I hope you understand my explanation as
20   well.  It was a combination of lightly hitting a
21   consonant, mouthing lightly, hitting a consonant,
22   mouthing.
23   Q.  I see.  And the lightly hitting the consonant
24   portions, would you characterize it as like a whisper?
25   A.  Yes.

---

Page 55

1    Q.  When Mr. Mullins took that step to you kind of through
2    the door threshold where you indicated he was kind of
3    flexing at you, you put your hands on Mr. Queen to
4    kind of direct his attention to what was going on?
5    A.  With my right hand I was tapping his shoulder.
6    Q.  Okay.
7    A.  Saying Dan, Dan, Dan, as in, you know.
8    Q.  Look and see what he's doing?
9    A.  Correct.
10   Q.  What did you do -- what happened immediately after
11   that?  Did Mr. Queen turn and look at Mr. Mullins?
12   A.  He kept trying to argue with me for another instance.
13   Q.  He being?
14   A.  Dan Queen.
15   Q.  Okay.
16   A.  Arthur turns to exit.  And I don't know exactly where
17   I was and what I'm seeing, what I'm saying, but I was
18   tapping his shoulder saying, Dan.  And at some point
19   he continues his argument with me and then turns.
20   Arthur is now turning the corner exiting a second
21   time.
22   Q.  Okay.  And did Dan leave immediately after Mr. Mullins
23   leaves your office?
24   A.  Yes.  They sort of approached the secondary door to go
25   out, as I recall, together.  I don't remember any one

---

Page 56

1    of them staying in and the other one leaving or Dan
2    hanging off and Arthur leaving.  I remember them going
3    fairly closely together at the same time exiting.
4    Q.  Okay.  If we listen to the recording of that
5    particular interaction, could you point out at which
6    point during the conversation he said "fuck you,
7    bitch" to you?
8    A.  There's a spot that I believe I know where it
9    happened.
10       MR. LAURILA:  Okay.  Well, why don't we do
11   that then.  See if this works.  So this is the
12   recording titled Butcher second statement ends in
13   false threat dot M4A.  It's 33.3 megabytes.  I believe
14   it's an hour and eleven minutes and fifty-six seconds.
15       MR. DAVIS:  Could we go off the record for
16   a second?
17       (Off the record at 12:46 p.m.)
18       (Back on the record at 12:50 p.m.)
19       MR. LAURILA:  So do you want the file name,
20   Tom?
21       MR. DAVIS:  Yes.  What's the file name of
22   the one that you --
23       MR. LAURILA:  Sure.  It's Butcher, second
24   with a two, statment, S-T-A-T-M-E-N-T.  The E is
25   missing.

14 (Pages 53 to 56)

Electronically signed by Pamela Goletz (001-006-185-8642)                                    81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 61

1  trying to get the person that harassed him away from
2  him, and he will not answer the question who it is and
3  who did it today.
4       So were you harassed today, I'm asking?
5       (Audio pauses.)
6       MR. LAURILA:  I just want to pause it.
7  BY MR. LAURILA:
8  Q.  Earlier you testified, you mentioned that Mr. Mullins
9      got frustrated and angry regarding the distinction
10     between being harassed today versus to date.  You told
11     me about it, correct?
12  A.  Correct.
13  Q.  And you mentioned that you were trying to get from him
14      what was going on that day?
15  A.  Correct.
16  Q.  And is that generally what you were referencing?
17  A.  Correct.
18  Q.  Okay.
19       MR. DAVIS:  I just ask, can we have the
20  whole fifteen minutes or so play so she can transcribe
21  it?
22       MR. LAURILA:  You want to play it straight
23  through?
24       MR. DAVIS:  Yes.  So we don't keep
25  interrupting it.  I don't think -- I have never had to

Page 62

1  give actual audio to a court.  I might have to if it
2  gets to that.  I'm sure the court would like to see it
3  in transcript form.  This is a good opportunity to get
4  that done now as well.
5       MR. LAURILA:  Sure.  That's fine.  I'll
6  just let it play through.
7       (Audio resumes.)
8       MR. BUTCHER:  I can help.  I want to be
9  very, very clear.  I want to help.  The only thing
10  between me helping you is you answering my question
11  with a yes or a no.
12       Listen to that.  The only thing between me
13  helping you is you answer my question yes or no.
14       MR. MULLINS:  So --
15       MR. BUTCHER:  I'm still talking.  I'm still
16  talking.
17       MR. MULLINS:  Yes, sir, Mr. Butcher.
18       MR. BUTCHER:  The only thing standing
19  between me helping you today --
20       MR. MULLINS:  Mr. Queen, are you witnessing
21  this?
22       MR. BUTCHER:  -- is you answering my
23  question yes --
24       MR. MULLINS:  Are you seeing how he's
25  standing over his desk and being very uncooperative?

Page 63

1  Are you noticing this, his body language and
2  everything, Mr. Queen?
3       MR. BUTCHER:  Are you talking now?  I
4  thought I still had the floor.
5       I just want to make sure we're clear.  So
6  were you harassed today?
7       MR. BUTCHER:  Are you physically backing me
8  into a corner?
9       Do you physically see him approaching?
10       MR. BUTCHER:  He doesn't want me to help.
11  I've done everything I can.  I've done everything I
12  can.  You guys have to leave.  He just won't answer.
13       MR. MULLINS:  When it's my opportunity to
14  speak --
15       MR. BUTCHER:  You just said I'm threatening
16  you.  You just said I'm backing you literally
17  physically into the corner.
18       MR. MULLINS:  Mr. Butcher, you were
19  approaching me.
20       MR. BUTCHER:  I want you both to leave.  I
21  want you to go back to your job.  You won't give me a
22  statement.  You won't give me the statement.  Did
23  somebody harass you today, yes or no?  If you don't
24  answer --
25       MR. MULLINS:  Ongoing leave, ongoing leave,

Page 64

1  yes.  Ongoing, yes.  Ongoing, yes.  Ongoing, yes.
2       MR. BUTCHER:  Would you like to talk to him
3  and tell him how this works out?
4       MR. MULLINS:  Per my understanding --
5       MR. BUTCHER:  Go back to the job.  If
6  you're not going to answer yes or no, you can go back
7  to your job.
8       MR. MULLINS:  Ongoing, yes.  Ongoing, yes.
9  And per my understanding in an investigatory
10  interview, you're supposed to write down exactly what
11  I say.  It's my statement, not yours, Mr. Butcher.
12  You don't get to dictate what -- it's not a yes-and-no
13  option question.  That's not a --
14       MR. BUTCHER:  Do you see his posture
15  leaning over my desk?
16       MR. MULLINS:  I'm leaning over your desk?
17       MR. BUTCHER:  He's yelling.
18       MR. MULLINS:  I'm pointing at the computer.
19       MR. BUTCHER:  Your hands -- look at it.
20       MR. MULLINS:  I'm pointing at the computer.
21       MR. BUTCHER:  Look at that.
22       MR. MULLINS:  I'm pointing at the computer.
23       MR. BUTCHER:  It's up here.  Look at that.
24       MR. MULLINS:  You won't allow me to see the
25  questions that are on the screen.

16 (Pages 61 to 64)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

Page 65

1  MR. BUTCHER: Yeah, yeah. Your posture is
2  very threatening. I'd like you to sit down.
3  MR. MULLINS: I'm sorry.
4  MR. BUTCHER: I'd like you to sit back.
5  MR. MULLINS: Yes, sir.
6  MR. BUTCHER: And relax. Because you're
7  very threatening to me.
8  MR. MULLINS: I'm scared, Mr. Butcher.
9  MR. BUTCHER: You're leaning over my desk
10 at me.
11 MR. MULLINS: I'm not over your desk.
12 MR. BUTCHER: I'm making it very clear, I'm
13 scared. Arthur Mullins is frightening me with his
14 actions and his language.
15 MR. MULLINS: Yes, sir.
16 MR. BUTCHER: Who is threatening you today?
17 MR. MULLINS: Ongoing today.
18 MR. BUTCHER: No, no.
19 MR. MULLINS: Today.
20 MR. BUTCHER: They're my questions, not
21 yours. Just like they're your answers, they're my
22 questions.
23 Who is threatening you today?
24 MR. MULLINS: Today?
25 MR. BUTCHER: Yes.

Page 66

1  MR. MULLINS: This is my statement. Today
2  I have been the victim -- (inaudible).
3  MR. BUTCHER: I'll type when you get to a
4  name. I asked for a name. Who is threatening you
5  today?
6  MR. MULLINS: So you will not type my
7  statement as I stated?
8  MR. BUTCHER: Who?
9  MR. MULLINS: Today I have been the victim
10 of ongoing --
11 MR. BUTCHER: I'm going to end it. I'm
12 going to ask you to leave. I'm trying to help. He
13 won't --
14 (Audio pauses.)
15 MR. LAURILA: Shoot.
16 MR. DAVIS: Let's go back to that.
17 Fifty-one, that's about fifty-two minutes. It might
18 be a little bit of overlap, but that's about where you
19 stopped, about where it cut off.
20 (Audio resumes.)
21 MR. BUTCHER: Mr. Mullins is frightening me
22 with his actions and his language.
23 MR. MULLINS: Yes, sir.
24 MR. BUTCHER: Who is threatening you today?
25 MR. MULLINS: Ongoing today?

Page 67

1  MR. BUTCHER: No.
2  MR. MULLINS: Today.
3  MR. BUTCHER: No, they're my questions, not
4  yours. Just like they're your answers, they're my
5  questions. Who is threatening you today?
6  MR. MULLINS: Today?
7  MR. BUTCHER: Yes.
8  MR. MULLINS: This is my statement. Today,
9  I have been the victim -- (inaudible).
10 MR. BUTCHER: I'll type when you get to a
11 name. I asked for a name. Who is threatening you
12 today?
13 MR. MULLINS: So you will not type my
14 statement as I stated?
15 MR. BUTCHER: Who?
16 MR. MULLINS: Today I have been the victim
17 of ongoing --
18 MR. BUTCHER: I'm going to end it. I'm
19 going to ask you to leave. I'm trying to help.
20 He won't -- Dan, he won't answer who's
21 threatening you today.
22 MR. MULLINS: Mr. Butcher, I'm trying to
23 answer the question.
24 MR. BUTCHER: All right. You guys got to
25 go, man. I've done my best. He just won't give me a

Page 68

1  name.
2  You want to secretly whisper it to him so
3  he can --
4  MR. MULLINS: You're not allowing me to
5  answer the question.
6  MR. BUTCHER: I don't know what you want me
7  to do, Dan.
8  MR. MULLINS: You will not allow me to
9  answer the questions you have asked.
10 MR. BUTCHER: The platform is yours. Give
11 me a name. Who is threatening you?
12 MR. MULLINS: You just asked me a question,
13 Mr. Butcher.
14 MR. BUTCHER: Who is threatening you today?
15 MR. MULLINS: Ongoing threats from Shavonda
16 Williams.
17 MR. BUTCHER: Who is threatening you today?
18 Shavonda Williams?
19 MR. MULLINS: Shavonda Williams, Crystal
20 Perry.
21 And so once again, you're not writing my
22 statement as I'm stating it, Mr. Butcher. You're
23 writing it as you see fit.
24 MR. BUTCHER: Shavonda Williams, Crystal
25 Perry. Is there any others?

17 (Pages 65 to 68)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

## Page 69

1          MR. MULLINS:  Kimmy, and I do not know the
2 last name.
3          MR. BUTCHER:  Kimmy.
4          MR. QUEEN:  Arthur, if they didn't do that
5 today --
6          MR. BUTCHER:  I'm pulling them out.  I'm
7 going to suspend them for threatening Arthur Mullins.
8          MR. MULLINS:  That's not what I said.  He's
9 typing what he wants.
10          MR. BUTCHER:  Did he not say ongoing, yes?
11 You said that, right?
12          MR. MULLINS:  This is the act that you're
13 bringing to Labor Relations today.
14          MR. BUTCHER:  The active threat, the active
15 threat?
16          MR. MULLINS:  What is the active?  I don't
17 have glasses.  Your computer is over fifteen feet
18 away.
19          MR. BUTCHER:  I want to make sure we're
20 clear.  I just want to make sure you're clear.
21          MR. MULLINS:  May I move forward to look at
22 your computer, sir?
23          MR. BUTCHER:  No, you're good.  I read it
24 to you.
25          MR. MULLINS:  What was the question?

## Page 70

1          MR. BUTCHER:  What is the active threat
2 that you're bringing to Labor Relations today?
3          MR. MULLINS:  What is the active threat
4 that I'm bringing to Labor Relations today?  Ongoing
5 sexual harassment, retaliation, what is ongoing
6 against me.  I didn't say --
7          MR. BUTCHER:  Am I crazy here?
8          MR. MULLINS:  How can I answer?  That's not
9 a question.  That's not a yes-or-no question.
10          MR. BUTCHER:  Ongoing, yes.
11          MR. MULLINS:  That's an open-ended
12 question.  That's an open-ended question.  That's not
13 a yes-or-no question, Mr. Butcher.  That's an
14 open-ended question that requires a response, sir.
15          And the only thing that I ask is that you
16 write the statement as I stated, please, sir.  I
17 understand your question now.
18          You're changing your question, Mr. Butcher?
19          MR. BUTCHER:  Yes, I am.
20          MR. MULLINS:  Yes, sir.  So once it started
21 --
22          MR. BUTCHER:  Have you been threatened
23 today?
24          MR. MULLINS:  Have I been threatened today?
25 I've been victimized today.

## Page 71

1          MR. BUTCHER:  By who?  Who has victimized
2 you today?  So you've been victimized, so it's not a
3 threat.  Say it again.  Have you been threatened
4 today?
5          MR. MULLINS:  Victim of threats, sexual
6 harassment, zero tolerance.
7          MR. BUTCHER:  Today?  Today?
8          MR. MULLINS:  Yes, it's ongoing today.
9          MR. BUTCHER:  So this is the same thing.
10          MR. MULLINS:  Ongoing today.
11          MR. BUTCHER:  You're saying the same thing
12 a different way.
13          MR. QUEEN:  Today, if you're saying
14 today --
15          MR. MULLINS:  Mr. Butcher, I'm saying the
16 same thing.
17          MR. BUTCHER:  Have you been threatened
18 today?
19          He said yes, ongoing today.  I put it down
20 word for word.  I mean, this guy, he think he's like a
21 craft of words.  It's not what you think.
22          Who's threatening you today?  Shavonda
23 Williams, Crystal Perry, Kimmy, and I don't know her
24 last name.  That's what you said.
25          MR. MULLINS:  You have not -- you do not

## Page 72

1 let me finish my statement, Mr. Butcher.
2          MR. BUTCHER:  Keep going.  Because it's not
3 going to go on long.
4          MR. MULLINS:  So what is -- who is
5 threatening you?  Today, Shavonda Williams, Crystal
6 Perry, and Kimmy, not familiar with her last name --
7 you have that there -- are --
8          MR. QUEEN:  Arthur, I got to be clear here.
9 Did they come up to you and say or do anything to you
10 today?  Today, not to date, today.
11          (Audio pauses.)
12 BY MR. LAURILA:
13 Q.  That's Dan Queen, correct?
14 A.  Correct.
15          (Audio resumes.)
16          MR. QUEEN:  I'm asking, because if we put
17 their names on there then in response today, that they
18 came up to you today and did something in those
19 manners, because if you're saying yes to that, he's
20 going to suspend all those people from an incident
21 that you're saying happened today.
22          MR. MULLINS:  I'm saying that the
23 harassment is ongoing today.
24          MR. BUTCHER:  You keep saying today.
25          MR. MULLINS:  Because it has not been

18 (Pages 69 to 72)

Electronically signed by Pamela Goletz (001-006-185-8642)　　　　　81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

## Page 73

1  resolved, so it's ongoing.
2      MR. BUTCHER:  Did they threaten you today?
3      Now, Dan, watch this.  He won't answer
4  that.
5      MR. QUEEN:  Arthur --
6      MR. MULLINS:  Our first day back per Mr.
7  Butcher, I was placed in the 21st at fifteen minutes.
8      MR. BUTCHER:  Take him back to the floor.
9  This isn't an open discussion.  You are answering
10 interview questions only.  This isn't for you and him
11 to talk.  I want to be clear.
12     MR. MULLINS:  Mr. Butcher --
13     MR. BUTCHER:  I appreciate you trying to
14 get to the bottom of this, as he's being reluctant,
15 but this isn't a platform for you to just talk.
16 That's not what this is.  I'm trying to get a
17 statement.  I have many other things going on.  And
18 you just simply not wanting to go to your job isn't
19 one of them.
20     So I'm asking you, I'm asking you specific
21 questions.  Because you brought --
22     Dan, he brought threats up here, second
23 time in the two days he's worked in the past six.
24 Second time.  He's been on roll two days and he's been
25 in Labor two days saying he's being threatened that

## Page 74

1  current shift.  So he's being threatened that current
2  shift.  I'm trying to help him out.
3      And I appreciate you trying to get to the
4  bottom of that, but he thinks it's an open forum.
5  It's not an open forum.
6      MR. MULLINS:  So if it's an ongoing --
7      MR. BUTCHER:  It's not an open forum.
8      MR. MULLINS:  If it's an ongoing, you're
9  not helping me?
10     MR. BUTCHER:  We're investigating it.
11     MR. MULLINS:  And per your statement, while
12 the investigation is taking place, you place me within
13 one hundred feet of (inaudible).
14     MR. BUTCHER:  I don't place you.
15     MR. MULLINS:  You refuse to move me.
16     MR. BUTCHER:  I don't move you.
17     MR. MULLINS:  You don't have the authority?
18     MR. BUTCHER:  I'm in Labor.  No, I don't
19 have the authority to move manpower.
20     MR. MULLINS:  Under an ongoing
21 investigation of sexual harassment --
22     MR. BUTCHER:  No, no, no.
23     MR. MULLINS:  -- of zero tolerance?
24     MR. BUTCHER:  No, no.
25     MR. MULLINS:  You've given me the answer.

## Page 75

1      MR. BUTCHER:  I don't move manpower.
2      MR. MULLINS:  You don't have the authority,
3  nor do your superiors.
4      MR. BUTCHER:  That's right.
5      MR. MULLINS:  Get your superiors involved.
6      MR. BUTCHER:  No, no.
7      MR. MULLINS:  I'm asking for your
8  superiors, who has the authority or manpower to do so.
9      MR. BUTCHER:  You sign this statement.
10     MR. MULLINS:  You can't force me to sign
11 something I did not say.
12     MR. BUTCHER:  Free to review.
13     MR. MULLINS:  These are incomplete
14 statements from the statements that I've made and I
15 would like to make.  Would you like me to read them to
16 you or would you like to --
17     MR. BUTCHER:  Did you say that or not?
18     MR. MULLINS:  These are incomplete
19     MR. BUTCHER:  Did you say that or not?  Are
20 those the people that were threatening you?
21     MR. MULLINS:  These are incomplete
22 statements.
23     MR. BUTCHER:  Are those the people that
24 were threatening you?
25     MR. MULLINS:  There's are the people, yes.

## Page 76

1      MR. BUTCHER:  Are these the people that
2  were threatening you?
3      MR. MULLINS:  That victimized me from
4  ongoing harassment yes, and zero tolerance.
5      MR. BUTCHER:  Today.  My question is today.
6  You can read them.
7      MR. MULLINS:  Mr. Butcher --
8      MR. BUTCHER:  Is that accurate when you
9  said today --
10     MR. MULLINS:  You're not going to allow me
11 to write my statement as I stated.  I have to write it
12 out to answer --
13     MR. BUTCHER:  You brought --
14     MR. MULLINS:  -- the questions.
15     MR. BUTCHER:  You brought somebody's
16 threatening me.  I just want to know who and if it
17 happened today.
18     If it happened today, I'm going to help
19 you, Arthur.  I'm going to round them up.  I'm going
20 to get them and we're going to get a more stable
21 situation for you to report to work and go to work.
22 People are not allowed to come up and threaten you.
23 Right?
24     MR. MULLINS:  Yes.
25     MR. BUTCHER:  So I just need to know you

19 (Pages 73 to 76)

Electronically signed by Pamela Goletz (001-006-185-8642)                    81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

## Page 77

1    were threatened today. You said yes. Who threatened
2    you today? Those folks.
3          MR. MULLINS: Okay. So once again, the
4    threat is ongoing and it has not been resolved.
5          MR. BUTCHER: You said today?
6          MR. MULLINS: Yes. It's ongoing because it
7    has not been resolved, Mr. Butcher. I'm just asking
8    for help, sir. I'm not here to be combative with you.
9    I'm just asking for assistance.
10         MR. BUTCHER: I'm trying to help. I don't
11   need the speech. I'm trying to help. So let's just
12   end it there. Don't tell me what you're asking for.
13   I'm here to help, so let's help. Give me an
14   opportunity to help you.
15         MR. MULLINS: Yes, sir.
16         MR. BUTCHER: Yes, sir, what?
17         MR. MULLINS: I don't know.
18         MR. BUTCHER: You don't know what?
19         MR. MULLINS: What do you want? What would
20   you like? What's the question?
21         MR. BUTCHER: I don't have a question.
22         MR. MULLINS: Well, my concern is --
23         MR. BUTCHER: Can I see this? Can I see
24   this?
25         MR. MULLINS: Yes, sir, you may see the

## Page 78

1    interview.
2          MR. BUTCHER: Because you don't want
3    anything to do with this, correct?
4          MR. MULLINS: You're correct. I do want to
5    sign a statement that my answers are not on,
6    incomplete.
7          MR. BUTCHER: You didn't say these things?
8          MR. MULLINS: Partially.
9          MR. BUTCHER: Let me know if I'm putting
10   him on notice or if I'm going to get these people.
11   Because if he came up here and said he was threatened,
12   if he wasn't threatened, I have to address that. But
13   if he was threatened, I'm trying to get these people.
14         And if I'm wrong, then let me know that
15   these aren't the names he said. Kimmy, I don't know
16   her name, Shavonda Williams, and Crystal Perry. I
17   need to go get those people. And if that's an
18   erroneous statement, then I need to deal with Arthur
19   right now.
20         What are we doing at this moment? I'm
21   trying to help. People aren't allowed to threaten
22   co-workers.
23         MR. QUEEN: It's an open investigation. It
24   is what it is.
25         MR. BUTCHER: Was he threatened today, Dan?

## Page 79

1    Was he threatened today?
2          MR. QUEEN: I don't know. I'm not the one
3    answering questions.
4          MR. BUTCHER: What did he say?
5          MR. QUEEN: He said it's ongoing today.
6          MR. BUTCHER: Let's be clear. Yes, yes,
7    ongoing today, yes.
8          MR. QUEEN: Ongoing today.
9          MR. BUTCHER: So if you're not going to
10   sign this statement and you just wasted an hour of my
11   time -- you going to sign the statement?
12         MR. MULLINS: Mr. Butcher, I will gladly
13   sign the statement if my words are placed on there
14   exactly as I stated.
15         MR. BUTCHER: Are you saying these aren't
16   your words? Because this isn't an open-ended --
17   Arthur, I'm talking.
18         MR. MULLINS: You asked me a question. I'm
19   answering.
20         MR. BUTCHER: No, I didn't. No, I didn't.
21         MR. MULLINS: You asked me whether those
22   are my words. You just stated, are those my words.
23         MR. BUTCHER: I wasn't completed. I wasn't
24   completed.
25         MR. MULLINS: Continue.

## Page 80

1          MR. BUTCHER: So Arthur --
2          MR. MULLINS: Mr. Butcher --
3          MR. BUTCHER: -- the question was, were
4    you --
5          You just can't -- see, I can't even talk
6    without him talking, so I guess we're done if you're
7    not going to sign.
8          MR. MULLINS: So if I do not sign the
9    statement that has a partial statement --
10         MR. BUTCHER: It's not a partial statement.
11   See, you're trying to embellish the question. I don't
12   want embellishment. Were you threatened, yes or no?
13   Right, yes, ongoing today. Okay. Who threatened you?
14   That's all I need are the names. I don't need the
15   actions. I don't need none of that. Right? I will
16   go get them. I will interview them. I will handle
17   it.
18         MR. MULLINS: You need no details, just the
19   name. You want no details.
20         MR. BUTCHER: Of what happened today, yes.
21   You have details of today?
22         MR. MULLINS: Of today.
23         MR. BUTCHER: Oh, okay. What actions --
24   I want you to hear this, Dan.
25   What actions did they do today?

20 (Pages 77 to 80)

Electronically signed by Pamela Goletz (001-006-185-8642)                       81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 81

1    MR. MULLINS:  Today their presence in the
2    workforce one hundred feet from my assigned work
3    station signed by management upheld by Labor places me
4    in ongoing fear for my job, my safety, because --
5    because all former complaints were false and I have
6    been punished yet and still.
7    MR. BUTCHER:  So you're talking about
8    something other than today?
9    MR. MULLINS:  Today.  And with these
10   investigations --
11   MR. BUTCHER:  All former complaints were
12   false today?
13   MR. MULLINS:  To date, to date they are.
14   MR. BUTCHER:  To date?
15   MR. MULLINS:  To date they were false.
16   MR. BUTCHER:  I didn't ask for a history.
17   I asked today.
18   MR. MULLINS:  And today's date is?
19   MR. BUTCHER:  2-2.
20   MR. MULLINS:  To date, to date, to this
21   exact date, that's what that means, to date.
22   MR. BUTCHER:  Complaint today.
23   MR. MULLINS:  Because of former complaints
24   with false statements.
25   MR. BUTCHER:  Today?

Page 82

1    MR. MULLINS:  To date.
2    MR. BUTCHER:  The question has nothing to
3    do with to date.  It has to do with today, Arthur.  So
4    you don't have anything for today?
5    MR. MULLINS:  I understand your question.
6    MR. BUTCHER:  Arthur Mullins --
7    MR. MULLINS:  That is my answer.
8    MR. BUTCHER:  Collect your things, all
9    right?
10   Dan, when you stepped out he said, "fuck
11   you, bitch" to me.
12   Get your stuff.  You're suspended.
13   MR. MULLINS:  I said what?
14   MR. BUTCHER:  You said "fuck you, bitch" to
15   me.  If you think I'm playing with you, I'm not.  You
16   don't get to talk to me like that.
17   MR. MULLINS:  You're making this up.
18   MR. BUTCHER:  Collect your things.  You're
19   suspended.
20   MR. MULLINS:  Mr. Butcher, you're making
21   this up.
22   MR. BUTCHER:  Mr. Butcher?  You're
23   suspended, Mr. Mullins.  You said "fuck you, bitch" to
24   me.
25   MR. MULLINS:  Mr. Queen, why did you leave

Page 83

1    the room?  Why did you leave the room, man?
2    MR. BUTCHER:  Dan?  Dan?
3    MR. QUEEN:  This ain't even happening, man.
4    He did not say that.
5    MR. BUTCHER:  How would you know?  You
6    weren't in the room.
7    MR. QUEEN:  Get the fuck out of here.
8    Don't even try that.  Don't do that.  Don't do that.
9    Don't do that.
10   MR. BUTCHER:  Do what?
11   MR. QUEEN:  I can hear everything that was
12   being said.  I'm five feet from the room.  Don't put
13   that on me.
14   MR. BUTCHER:  Mr. Mullins is suspended.
15   We're done here.  You can leave or I can start making
16   calls.
17   (Audio pauses.)
18   MR. LAURILA:  So we're going to end it at
19   107:20.
20   We're good to proceed, Mr. Davis?
21   MR. DAVIS:  Yes.
22   BY MR. LAURILA:
23   Q.  Okay.  So we just listened to about twenty-five -- I'm
24   not great at math -- or thirty minutes of that
25   meeting, is that fair?

Page 84

1    A.  Yes.
2    Q.  Okay.  And --
3    MR. DAVIS:  Just for the record, I'm sorry,
4    it was we started at -- so we're talking about eight
5    minutes.  I'm sorry, eighteen minutes.
6    MR. LAURILA:  Eighteen minutes.  That's why
7    I became a lawyer.  I can't do math.
8    BY MR. LAURILA:
9    Q.  Okay.  So after listening to that recording, can you
10   tell me at what point in the discussion he said "fuck
11   you, bitch" to your mouth, or mouthed "fuck you,
12   bitch" to you, whatever it is?
13   A.  I believe it's when I say Dan, I want you to hear
14   this.  I'm saying that because Dan's not present.  So
15   you hear my voice elevate and call Dan, I want you to
16   hear this.  I'm asking him to come back into the room.
17   Q.  Okay.  And was that -- so there's a portion of it
18   where he talks about -- this is like around the 104:30
19   mark, where he says what ultimately got put into the
20   investigatory interview under what actions did they
21   take today, he talks about today their presence in the
22   workforce a hundred feet from my assigned work
23   station, assigned by management upheld by Labor, yada,
24   yada.  Was it during sort of after he finished
25   recounting that to you?

21 (Pages 81 to 84)

Electronically signed by Pamela Goletz (001-006-185-8642)                    81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 85

1    A.  Before that.
2    Q.  Before that?
3    A.  Yes.  There's a long silence in between me saying Dan,
4        I want you to hear this and him starting that
5        statement.  During that silence of him not talking he
6        recognized what I recognized, that Dan was out of the
7        room and he took the opportunity to say that then.
8    Q.  Okay.  And then after that is when he started to
9        recount the portion that I just read to you, today
10       their presence in the workforce, a hundred feet?
11   A.  Correct.
12   Q.  So why didn't you say anything about it immediately?
13   A.  Dan wasn't present.  I needed Dan to resurface.
14   Q.  So even though he said -- mouthed "fuck you, bitch" to
15       you while Dan was out of the room, you continued on
16       taking his statement?
17   A.  Yes.
18   Q.  And the reason that you did that, just to be clear, is
19       because Dan was not in the room?
20   A.  Yes.
21   Q.  And you previously told me that Mr. Mullins made a
22       threatening flexing step towards you when he was out
23       of the doorway coming back in.  At what point in the
24       record did that occur?  Was it like the very end?
25   A.  After you hear him say -- I believe he says, Mr.

Page 86

1        Queen, why did you leave the room, and his voice
2        elevates, he got up from his seat, turned, exited.
3        When he comes back and makes the approach, you hear my
4        voice say Dan, Dan, Dan, it's going down now,
5        something to that effect.
6    Q.  Okay.  Were you frustrated during this process, this
7        February 2nd meeting with Mr. Mullins?
8    A.  Yes.
9    Q.  Was it his conduct that caused you to be frustrated?
10       I mean, to me it sounds like you were asking some
11       specific questions and felt like you weren't getting
12       answers, is that fair?
13   A.  Fair.
14   Q.  And was that frustrating to you?
15   A.  It was frustrating that he was abusing the platform.
16   Q.  When you say abusing the platform, do you mean that
17       you felt like he was wasting your time?
18   A.  I feel like the Labor Relations Office is a support
19       mechanism for the members and he was taking full
20       advantage of that situation.
21   Q.  Did you get the sense that he was trying to avoid
22       working?
23   A.  I can't be certain.
24   Q.  I recall you saying to that effect during the
25       conversation, something about you can't come up here

Page 87

1        just to avoid doing your job or something like that?
2    A.  Correct.
3    Q.  Was that kind of your impression?
4    A.  There's a bit of impression.  There's a bit of -- it's
5        all posturing trying to get something out.  I was
6        actually trying to get out whatever it is he was
7        trying to convey.
8    Q.  Did you get angry at any point during this meeting?
9    A.  Just frustrated.
10   Q.  And I think I asked you earlier about this.  You had
11       no additional follow-up with Mr. Mullins face-to-face,
12       on the phone, any other communication, any other
13       encounters after this incident?
14           MR. DAVIS:  That misrepresents his
15       testimony.  Go ahead.
16   A.  I believe there was a hearing after this.
17   BY MR. LAURILA:
18   Q.  Okay.  Well, I guess just to clarify.  Did you have
19       any other meetings with Mr. Mullins face-to-face, you
20       know, in your office, in Labor Relations like this?
21           MR. DAVIS:  Object to the form.  Like this,
22       you mean like the investigatory statement, Counsel?
23   BY MR. LAURILA:
24   Q.  I'm not sure, because you said your first encounter
25       Mr. Mullins came in and talked to you did not result

Page 88

1        in an investigatory interview.  So I guess I'm trying
2        to be clear here.  Did you have any other face-to-face
3        discussions with Mr. Mullins in Labor Relations after
4        this February 2nd incident?
5    A.  Yes.  I need to correct that, because we had the
6        hearing, I believe it was on 2-9.  So the hearing
7        where we actually disciplined him would have been 2-9.
8    Q.  Sure.  But that was not a discussion with you and him
9        in your office?
10   A.  Yes.
11   Q.  Well, I mean, he wasn't sitting across your desk from
12       you, was he?
13   A.  Yes.
14   Q.  During the hearing?
15   A.  Yes.
16   Q.  Okay.  It wasn't like in a conference room or
17       something like that?
18   A.  No.  We conducted it in my office.
19   Q.  Got it.  But there were other individuals present from
20       Labor, correct?
21   A.  There was.
22   Q.  Okay.  So other than -- all right.  So it was this
23       February 2nd meeting that we've been talking about,
24       the February 9th hearing, those were the only two --
25   A.  Correct.

22  (Pages 85 to 88)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

Page 89

1  Q. -- interactions you had with him?
2  A. Correct.
3  Q. Did you ever speak to him outside of on the phone
4      after these two incidents or this incident and that
5      hearing?
6  A. I may have called him in for the hearing. I don't
7      know how else he would have got back, because he was
8      suspended. It may have been one of my associates in
9      the office. So potentially, yes. Potentially, no.
10 Q. Okay. If you did indeed call him to notify him to
11     come back for the hearing, fair to say nothing about
12     that stands out in your mind as being significant
13     beyond just it may have occurred?
14 A. No.
15 Q. Okay. Remind me again, when did you leave the
16     Dearborn Stamping Plant? You said in 2019?
17 A. It's a bit of a complicated question, because I've
18     never left. What we did was we absorbed more plants
19     in the complex. And my sole responsibility is no
20     longer just Dearborn Stamping, it is now Rouge site.
21 Q. Got it.
22 A. So I still have responsibilities for Dearborn
23     Stamping, but again, it's not my sole responsibility.
24 Q. Okay. So you were at or involved in Dearborn Stamping
25     Labor Relations activities continuously from 2017 to

Page 90

1      present?
2  A. Correct.
3  Q. Okay. Were there occasions when you were involved in
4      discussions about Arthur Mullins with Labor Relations
5      Department employees from 2017 through these incidents
6      to present?
7  A. I'm certain there is, because we have regular meetings
8      about our open cases.
9  Q. Do you recall discussing Mr. Mullins' February 2nd,
10     2018 interactions with you at one of those meetings?
11 A. Not specifically what took place in that meeting. My
12     discussion was once with Maria Watson. Beyond that, I
13     don't know that there was further in-depth discussion.
14     There would have been talk about the ongoing case.
15              There would have been a separate
16     conversation about the hearing, right. So the Labor
17     Office would have been privy to the hearing, because
18     we discuss what we settle on as a case we're all
19     in unison with that and what we settle on as a
20     penalty.
21 Q. Got it. Okay. So as far as the decision to hold a
22     disciplinary hearing, that is something that Labor
23     Relations Department kind of makes collectively, is
24     that fair?
25 A. Generally.

Page 91

1  Q. Did that occur in this situation with Mr. Mullins?
2  A. No. The decision was not ours.
3  Q. Whose decision was it?
4  A. Labor Affairs.
5  Q. What's the difference between Labor Relations and
6      Labor Affairs?
7  A. Labor Affairs is like a governing body for the Labor
8      Relations within the plants. If you thought of --
9      this is going to be a bad analogy -- but college
10     football and the NCAA. There's a governing body
11     over what each institution does.
12 Q. Got it.
13 A. So at each plant we report to Labor Affairs. We get
14     our direction from Labor Affairs.
15 Q. Got it. And does Labor Affairs employ -- or employ is
16     probably a bad word -- but involve union personnel, or
17     is it Ford Motor Company management personal?
18 A. It's Ford Motor Company management personnel.
19 Q. Do you know who -- was there a single individual in
20     Labor Affairs who made the decision to have the
21     disciplinary hearing on February 9th for Mr. Mullins?
22 A. I can't answer that. I don't know the inner workings
23     of Labor Affairs.
24 Q. Were you involved? Any conversations with any Labor
25     Affairs employees wherein that was discussed?

Page 92

1  A. No.
2  Q. Did you ever have any discussions with anybody from
3      Labor Affairs about Mr. Mullins, period?
4  A. About this incident?
5  Q. Yes.
6  A. None that I recall whatsoever.
7  Q. Okay. So was the Labor Relations Department notified
8      you're going to hold a disciplinary hearing for Mr.
9      Mullins?
10 A. Yes.
11 Q. Were you notified of that directly or did Maria Watson
12     tell you?
13 A. It's my understanding that the Human Resources
14     manager, Ashlie O'Reilly, took the information that,
15     you know, through my statement and what was reported
16     by Maria, sent it off to Labor Affairs, and Labor
17     Affairs got back directly with her.
18 Q. Do you know if Labor Affairs was aware of any prior
19     complaints that Mr. Mullins had made about the
20     harassment and threats from Crystal Perry, Shavonda
21     Williams, etcetera?
22 A. I do not know if they were aware.
23 Q. And as far as the disciplinary hearing that occurred
24     on February 9th, did you conduct that hearing?
25 A. Yes, I did.

23 (Pages 89 to 92)

Electronically signed by Pamela Goletz (001-006-185-8642)          81026cea-6bc1-4328-9a56-0abbaa700ie3

Bryan Butcher
10/15/2019

Page 101

1           DEPOSITION EXHIBIT 3
2           1:39 p.m.
3    BY MR. LAURILA:
4    Q.  Sir, I'm going to hand you what we just marked as
5         Exhibit 3, which is a March 1st, 2018 letter from
6         Labor Relations to Arthur Mullins informing him that
7         he has to complete an independent medical exam as part
8         of the fitness for duty.  And actually, the letter
9         states because of the February 2nd, 2018 incident.
10              My question is, is this letter normal
11        procedure for how an employee should get notified of
12        this kind of exam?
13   A.  Yes.  This so we're clear, this is actually the
14        follow-up, because he missed an appointment from what
15        I read here.
16   Q.  Got it.
17   A.  So that is the proper form for that.
18   Q.  Okay.  So as far as the decision to have him go to the
19        medical exam, that's a hundred percent of the purview
20        of the medical staff?
21   A.  Correct.
22   Q.  And were you aware that Mr. Mullins was fired or
23        terminated?
24   A.  Yes.
25   Q.  And how did you get notified of that?

Page 102

1    A.  There's a report that comes out from our hourly
2         personnel staff.  Anytime they do a five-day notice,
3         ten days quit of nonreporting, once the employee fails
4         to report, they send out a report of who failed and we
5         get notification that way.
6    Q.  Were you involved in any discussion about whether or
7         when Mr. Mullins was going to return to work?
8    A.  No.
9    Q.  Were you involved in any discussions about Mr. Mullins
10        kind of at all from March 2018 going forward?
11   A.  No.
12   Q.  You mentioned several times there was an ongoing
13        investigation into the allegations raised by Mr.
14        Mullins.  Do you know what the ultimate status or
15        conclusion of that investigation was?
16   A.  I don't offhand.  Because I wasn't even there when
17        they initiated it.  I don't know where that landed
18        exactly.
19   Q.  Okay.  From what you just told me it sounds like, fair
20        to say, you didn't have any involvement in what the
21        conclusion was going to be?
22   A.  I could have if they had either reassigned it to me
23        based on some things or, you know, change in events
24        because something happens during the time I'm working.
25        But that didn't take place, so.

Page 103

1    Q.  Okay.
2    A.  I did not have a follow-up or conclusion with it.
3    Q.  Okay.  During the February 9th, 2018 hearing, the
4         disciplinary hearing, did Mr. Mullins reference the
5         audio recording, the existence of an audio recording
6         of the February 2nd incident?
7    A.  No, I don't recall that.
8              MR. LAURILA:  I don't think I have any more
9    questions.  Thank you.
10             MR. DAVIS:  I'm going to have a couple.  I
11   may need to take a break at some point.
12             MR. LAURILA:  Sure.
13             EXAMINATION
14   BY MR. DAVIS:
15   Q.  First, Mr. Butcher, I just want to ask.  We've played
16        audio, I believe -- counsel can correct me if I'm
17        wrong -- we've played audio from about forty-nine
18        minutes into the audio recording and we stopped at
19        about one minute and seven seconds.  Do you recall
20        that?
21             MR. DAVIS:  Is that right, Counsel?
22             MR. LAURILA:  Yes.
23   BY MR. DAVIS:
24   Q.  Okay.  There was additional conversation with Mr.
25        Mullins prior to the portion of the audio that we

Page 104

1         heard and had transcribed, right?
2    A.  There was additional?
3    Q.  Yes.  We didn't listen to the entirety of your
4         interaction with Mr. Mullins?
5    A.  No.
6    Q.  On that day?
7    A.  No.
8    Q.  Okay.  How would you describe his conduct in the
9         portion of the tape that we didn't listen to?
10   A.  It varied throughout.
11   Q.  Was he uncooperative?
12   A.  Very.
13   Q.  Was he not answering your questions?
14   A.  Yes.  Just as the portion we did hear, same thing.
15             MR. DAVIS:  Okay.  I think for
16   completeness' sake, it's only about nine minutes, I'd
17   like to ask if counsel's okay with it, if you could go
18   to forty-one minutes and forty seconds.  And it starts
19   with I believe you'll hear Mr. Butcher step in
20   here, Dan, please.  And that's where I'd like to start
21   the audio and then we are just going to let it run.
22             MR. LAURILA:  You said --
23             MR. DAVIS:  About 41:42 or so.  I don't
24   know how precise you can be.
25             MR. LAURILA:  41:43, does that work?

26 (Pages 101 to 104)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

Page 105

1   MR. DAVIS:  It should start, step in here,
2   Dan, please.  Go ahead.  I'll tell you when to stop.
3           (Audio resumes.)
4   MR. BUTCHER:  Step in here, Dan, please.
5   MR. MULLINS:  (Inaudible).
6   MR. BUTCHER:  So you were threatened today?
7   MR. MULLINS:  No, sir.
8   MR. BUTCHER:  You were threatened today?
9   You were sexually harassed today?
10  MR. MULLINS:  No, sir.
11  MR. BUTCHER:  You weren't.  So none of this
12  went on today?
13  MR. MULLINS:  No, sir.
14  MR. BUTCHER:  Nothing happened today?
15  MR. MULLINS:  It's ongoing.
16  MR. BUTCHER:  So you gave me -- have you
17  given a statement on this ongoing issue?
18  MR. MULLINS:  I gave you a statement
19  Friday.
20  MR. BUTCHER:  You gave a statement already?
21  MR. MULLINS:  To you Friday.
22  MR. BUTCHER:  So we're investigating it, is
23  that --
24  MR. MULLINS:  I don't know.
25  MR. BUTCHER:  I'm telling you.  I'm telling

Page 106

1   you if you gave an investigatory statement and I read
2   you all the criteria, do you recall that?
3   MR. MULLINS:  I recall you asking me a
4   series of questions regarding --
5   MR. BUTCHER:  And telling you this is a
6   matter of company record and you cannot record it and
7   going through all that.  Do you not recall --
8   MR. MULLINS:  Yes, sir.
9   MR. BUTCHER:  Oh, do you recall that now?
10  MR. MULLINS:  I do recall that.
11  MR. BUTCHER:  You do recall that?
12  MR. MULLINS:  Yes, sir.
13  MR. BUTCHER:  So we opened an
14  investigation.  We told you this is an investigatory
15  interview and a matter of company record.
16  MR. MULLINS:  Yes, sir.
17  MR. BUTCHER:  Are you again going to tell
18  me you don't know or you do know?
19  MR. MULLINS:  I do recall.
20  MR. BUTCHER:  You do know now?
21  MR. MULLINS:  I haven't changed it.  I do
22  know.
23  MR. BUTCHER:  You just said I don't know if
24  you're investigating it.  But I read that to you
25  during the investigatory interview.

Page 107

1   MR. MULLINS:  If you are investigating it.
2   MR. BUTCHER:  This is an investigatory
3   interview.
4   MR. MULLINS:  I don't know if you
5   personally are conducting it.
6   MR. BUTCHER:  Did I interview you?
7   MR. MULLINS:  You did, yes, sir.
8   MR. BUTCHER:  Then what are you confused
9   about?
10  MR. MULLINS:  Was that your first time
11  interviewing me?  I have no confusion, sir.
12  MR. BUTCHER:  Well, you just said you don't
13  know if there's an investigation.  And I read to you
14  this is an investigatory interview.
15  MR. MULLINS:  So there's an ongoing
16  investigation regarding sexual harassment.
17  MR. BUTCHER:  So nothing happened today.
18  Let's just cut to the chase.  Did anything happen
19  today?
20  MR. MULLINS:  I'm --
21  MR. BUTCHER:  Just answer my questions.
22  This is my podium.
23  Did anything happen today?  Were you
24  harassed today?
25  MR. MULLINS:  Yes, sir.

Page 108

1   MR. BUTCHER:  By who?
2   MR. MULLINS:  The fear of Shavonda Williams
3   and Crystal Perry and Kimmy making sure --
4   MR. BUTCHER:  Shavonda Williams and Crystal
5   Perry came to you today and harassed you?
6   MR. MULLINS:  They have harassed me
7   ongoing.
8   MR. BUTCHER:  I asked today.  Today.
9   MR. MULLINS:  You asked today.
10  MR. BUTCHER:  Did they today?
11  MR. MULLINS:  Did they today?
12  MR. BUTCHER:  Yes.
13  MR. MULLINS:  They have done it several
14  times prior to today.
15  MR. BUTCHER:  Am I going to get an answer,
16  or no?  I'm trying to help.
17  MR. MULLINS:  Mr. Butcher, I'm trying to
18  answer your question.
19  MR. BUTCHER:  No, you're not.  You're
20  actually trying to not answer it.
21  Did anybody harass you today?  I'm asking
22  you to give me that statement.
23  MR. MULLINS:  Harassment is ongoing.
24  MR. BUTCHER:  Today.
25  MR. MULLINS:  Harassment is ongoing every

27 (Pages 105 to 108)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

## Page 109

1    day.
2          MR. BUTCHER:  I'm asking today.
3          MR. MULLINS:  Today it is ongoing.
4          MR. BUTCHER:  So go round them up.  I'm
5    going to suspend everybody.  He says they harassed him
6    today.
7          MR. MULLINS:  I said it's ongoing today.
8          MR. BUTCHER:  I want to be clear.  If they
9    harassed him today, I'm suspending everybody.  So he's
10   saying that harassment is --
11         MR. MULLINS:  Harassment is ongoing.
12         MR. BUTCHER:  Dan, I want you to get this
13   very clear to him.
14         MR. MULLINS:  Yes, sir.  Harassment is
15   ongoing today.
16         MR. BUTCHER:  Today.
17         MR. MULLINS:  Ongoing.
18         MR. BUTCHER:  You heard it from his mouth.
19   So I'm going to get a statement that he just signed.
20         MR. MULLINS:  Yes, sir.  Yes, sir, Mr.
21   Butcher, sir.
22         MR. BUTCHER:  All right.  Come on in.  Come
23   on in.  We're going to sign a statement.  Come on in.
24         MR. MULLINS:  We're professionals.
25         MR. BUTCHER:  Come on in.

## Page 110

1          MR. MULLINS:  We're professionals.
2          MR. BUTCHER:  No, it's not my professional.
3    You said you're harassed today.  I'm going to have you
4    sign --
5          MR. MULLINS:  It is your profession, Mr.
6    Butcher.
7          MR. BUTCHER:  Absolutely not.
8          MR. MULLINS:  It's in your power.
9          MR. BUTCHER:  Absolutely not.
10         MR. MULLINS:  You are the Labor rep.
11         MR. BUTCHER:  I have zero power.
12         MR. MULLINS:  The supervisor said --
13         MR. BUTCHER:  All I do is collect the
14   facts.
15         MR. MULLINS:  The supervisor said that
16   you're making the decision.  So Mr. Rinehart --
17         MR. BUTCHER:  What supervisor?
18         MR. MULLINS:  Mr. Rinehart.
19         MR. BUTCHER:  Mr. Rinehart is not a
20   supervisor, sir.
21         MR. MULLINS:  What is Mr. Rinehart's
22   position?
23         MR. QUEEN:  Senior process coach.
24         MR. MULLINS:  Senior process coach.
25         MR. QUEEN:  Area manager.  They're the same

## Page 111

1    thing.
2          MR. MULLINS:  Senior process coach/area
3    manager.  He has the authority of every supervisor on
4    the floor that I have taken zero tolerance concerns to
5    him, Mr. Butcher.  I have taken sexual harassment and
6    harassment concerns to him.  Friday I came into your
7    office on the 26th and we filed a formal statement.
8    Correct?  You said the investigation is ongoing.
9          MR. BUTCHER:  No, the investigation is
10   open.
11         MR. MULLINS:  The investigation is open.
12   So you placed me in Engine East for what reason?
13         MR. BUTCHER:  I don't even know what you're
14   talking about right now.  I don't place people.
15         MR. MULLINS:  This is January 26th --
16         MR. QUEEN:  Hold on, Arthur.
17         MR. BUTCHER:  I don't place people.
18         MR. MULLINS:  An agreement was made.  When
19   you placed me, you agreed.
20         MR. QUEEN:  This is my question.  It's an
21   open investigation, right, Bryan?
22         MR. BUTCHER:  Yep.
23         MR. QUEEN:  Okay.  During an open
24   investigation for say for, you know --
25         MR. BUTCHER:  For the statement he made

## Page 112

1    Friday.
2          MR. QUEEN:  Yes, okay.  So if there's an
3    open investigation on that, would it not make sense to
4    maybe ask them to put him in a different, you know, in
5    the East?
6          MR. MULLINS:  In a safe working
7    environment.
8          MR. BUTCHER:  I'm not asking them anything.
9    He didn't pose a threat when he walked in here Friday.
10   He said no one harassed him that day.
11         MR. MULLINS:  I did say someone harassed me
12   on the 26th.
13         MR. BUTCHER:  You said somebody drove up on
14   a truck.  We're investigating why that person drove up
15   on their hi-lo.  Were they authorized to be there or
16   not.
17         MR. MULLINS:  And they --
18         MR. BUTCHER:  Can I speak, or no?
19         MR. MULLINS:  Yes, sir.  Please give me my
20   time on this.  Yes, sir.
21         MR. BUTCHER:  Let me know when you're done.
22         MR. MULLINS:  I'll wait for you to inform
23   me it is my time to talk.
24         MR. BUTCHER:  Great.  He said somebody
25   harassed him today, Dan.  You heard it.  I was very

28  (Pages 109 to 112)

Electronically signed by Pamela Goletz (001-006-185-8642)                81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

| Page 113 |
| --- |

1  direct in my question.
2        MR. QUEEN:  No.
3        MR. BUTCHER:  Did somebody harass you
4  today?  He said yes.
5        MR. QUEEN:  They didn't come up to you and
6  harass you.
7        MR. MULLINS:  I didn't say yes, Mr.
8  Butcher.
9        MR. QUEEN:  He just said it's an ongoing.
10        MR. BUTCHER:  Ongoing today was his answer.
11        MR. MULLINS:  Today harassment is still
12  ongoing, yes, sir.
13        MR. BUTCHER:  So did they harass you today?
14        MR. MULLINS:  Harassment is ongoing.
15        MR. BUTCHER:  Did they harass you today?
16        MR. MULLINS:  I don't know why you're not
17  taking my statement.  I'll speak clearly.  Ongoing
18  today.  Harassment is ongoing today.
19        MR. BUTCHER:  That is not an answer, Dan.
20  I want to help, but he won't answer.
21        MR. MULLINS:  That is a very direct answer,
22  sir.
23        MR. QUEEN:  I think he asked you, did they
24  come up to you and --
25        MR. MULLINS:  I am in the middle of ongoing

| Page 114 |
| --- |

1  harassment.
2        MR. BUTCHER:  Were you harassed today?
3        MR. MULLINS:  Today.  I'm in the middle of
4  ongoing harassment today, yes, sir, Mr. Butcher.
5        MR. BUTCHER:  If you're saying that they came
6  up to you and harassed you today --
7        MR. MULLINS:  I didn't say they came up to
8  me today.
9        MR. BUTCHER:  Were you harassed today?  Is
10  the answer yes or no?
11        MR. MULLINS:  I didn't say that.
12        MR. BUTCHER:  You have two choices.  You
13  have yes or you have no.
14        MR. MULLINS:  Mr. Butcher, you cannot tell
15  me what my answers are.
16        MR. BUTCHER:  Were you harassed today?
17        MR. MULLINS:  Mr. Butcher --
18        MR. BUTCHER:  You have yes or no.
19        MR. MULLINS:  Mr. Butcher --
20        MR. BUTCHER:  Were you harassed today?
21        MR. MULLINS:  So you're going --
22        MR. BUTCHER:  Were you harassed today?
23        MR. MULLINS:  When is my time to talk?
24        MR. BUTCHER:  I haven't told you that yet,
25  have I?

| Page 115 |
| --- |

1        MR. MULLINS:  I'm waiting for it.
2        MR. BUTCHER:  Okay.  So let's do this
3  formally.  It's an investigatory interview.  You're
4  reporting harassment today.  All of us here today are
5  to remain -- maintain confidentiality.  Breaches of
6  the confidentiality may lead to disciplinary action.
7  You cannot record this conversation.  We expect that
8  your answers will be forthright to your responses and
9  questions.  Afterwards, I'll ask you to review the
10  statement and initial each page.  Okay?  This
11  discussion is considered a matter of company record.
12        Is it true, Arthur Mullins, your service
13  date is 3-16 of '15?  Is that true?
14        MR. MULLINS:  We didn't address the initial
15  brief that you gave for the rules of the
16  investigation.
17        MR. BUTCHER:  What's to address?  They're
18  the rules.  It's not a rebuttal.  It's just the rules.
19  You can't record it.  It's to remain confidential.
20  You're expected to be forthright and truthful in your
21  responses.
22        MR. MULLINS:  The opening sentence was?
23        MR. BUTCHER:  All of us here today are
24  required to maintain confidentiality.
25        MR. MULLINS:  And the next sentence?

| Page 116 |
| --- |

1        MR. BUTCHER:  I'm not reading the whole
2  thing again, Arthur.  What's your question?
3        MR. MULLINS:  The conversation may not be
4  recorded?
5        MR. BUTCHER:  Correct.
6        MR. MULLINS:  I'm trying to understand the
7  rules and regulations, Mr. Butcher.  Mr. Butcher, I
8  brought zero tolerance to you today of sexual
9  harassment.
10        MR. BUTCHER:  And I'm trying to address it,
11  but you don't allow me --
12        MR. MULLINS:  Mr. Butcher --
13        MR. BUTCHER:  You won't allow me to address
14  it.  I have a witness.  Were you harassed today?  You
15  won't even answer the question.  Ongoing.
16        Dan, please interpret what does that mean,
17  ongoing today?  I'm looking for a yes or no.  Also, it
18  ended yesterday?
19        MR. QUEEN:  (Inaudible).
20        MR. BUTCHER:  So it ended yesterday?
21        MR. QUEEN:  (Inaudible).
22        MR. BUTCHER:  He doesn't know.  Nobody
23  knows.
24        MR. MULLINS:  Mr. Butcher -- would you
25  please ask Mr. Butcher --

29 (Pages 113 to 116)

Electronically signed by Pamela Goletz (001-006-185-8642)                                    81026cea-6bc1-4328-9a56-0abbaa7001e3

Bryan Butcher
10/15/2019

Page 117

1    (Audio pauses.)
2    MR. DAVIS:  For the record, I think we went
3    past the 49:04 that Mr. Laurila started with.
4    BY MR. DAVIS:
5    Q.  So Mr. Butcher, is that the rest of the audio where
6        Mr. Mullins and Mr. Queen, part of the time at least,
7        was present in the room with you?
8    A.  It was at least another portion of that incident, yes.
9    Q.  Okay.  And let me ask you one question, look at
10       Exhibit Number 1.  I'm sorry.  Look at Exhibit Number
11       2.  Would you read the paragraph in italics underneath
12       the caption there, where it starts all of us here
13       today?
14   A.  Read it?
15   Q.  Yes, just read that out loud.
16   A.  All of us here today are required to maintain
17       confidentiality.  This conversation may not be
18       recorded and is to remain confidential.  Breaches of
19       confidentiality may lead to disciplinary action.  You
20       may not discuss it with anyone other than those
21       individuals conducting the investigation.  The
22       expectation is that you'll be honest and forthright in
23       your responses to the questions.  I will be taking
24       notes.  Afterwards, I will ask you to review your
25       statement, initial each page, and sign your name on

Page 118

1        the last page.
2    Q.  So is this -- again, you told Mr. Mullins this during
3        the portion of the tape we just listened to, correct?
4    A.  Yes.
5    Q.  Is it true or false that he is supposed to give honest
6        and forthright responses to your questions?
7    A.  Yes.
8    Q.  Was he doing that in the audio that you listened to?
9    A.  No.
10   Q.  Okay.  Was that part of the frustration that you had
11       explained --
12   A.  Yes.
13   Q.  -- in your earlier testimony?
14       You were asked about the Unusual Behavior
15       Report.  I'm going to hand you what I will mark as
16       defense Exhibit A, I guess.
17       MARKED BY THE REPORTER:
18       DEPOSITION EXHIBIT A
19       1:55 p.m.
20   BY MR. DAVIS:
21   Q.  Mr. Mullins, take a look at what I've handed you
22       marked as Exhibit A, defense Exhibit A.  And when
23       you're done taking a look at it, let me know that
24       you've completed reading it.
25       While you're reading, just for the record,

Page 119

1        this is Bate stamped Ford slash Mullins 01139 and
2        01140, for the record.
3    A.  Complete.
4    Q.  Is this the Unusual Behavior Form that you testified
5        earlier that you had filled out?
6    A.  Yes.
7    Q.  What was the date that you filled it out?
8    A.  I believe we did it the morning of the 2-9 hearing.
9    Q.  Why don't you turn to the second page of the report?
10       Is that your signature there?
11   A.  It is.
12   Q.  And is that your I.D., your CDSID?
13   A.  Yes.
14   Q.  Company I.D.?
15   A.  Yes, yes.
16   Q.  And what's the date there?
17   A.  2-9 of '18.
18   Q.  So that's the date you would have signed this?
19   A.  Yes.
20   Q.  Okay.  Look at the last sentence in the paragraph on
21       that last page, and read it out loud.
22   A.  The Labor Relations team is requesting a full
23       fit-for-duty examination, including an examination of
24       his mental state.
25   Q.  So is it fair to say that Labor Relations always was

Page 120

1        requesting that a mental health -- an examination of
2        Mr. Mullins' mental state be part of his fit-for-duty
3        as early as 2-9-2018?
4    A.  Yes.
5    Q.  That was always the intention?
6    A.  Yes.
7    Q.  Did that intention ever change at some point where you
8        wanted to do something less than a mental health
9        screening, but somehow expanded thought -- strike
10       that.
11       So was it always the intention from the
12       time you filled out this report that Mr. Mullins have
13       a fit-for-duty with mental health evaluation?
14   A.  Yes.
15   Q.  Okay.  I'm going to hand you a document.
16       MR. DAVIS:  Off the record for one second.
17       (Off the record at 2:00 p.m.)
18       (Back on the record at 2:01 p.m.)
19       MR. DAVIS:  We can go back on.
20       I'm going to -- I'll ask counsel.  There's
21       only one portion of a long e-mail chain that's not
22       otherwise relevant.  I would just like to use the
23       e-mail at the bottom of the chain.  If you want the
24       whole document, I'm willing to do that.
25       MR. LAURILA:  Can I look at it first?

30 (Pages 117 to 120)

Tri-County Court Reporters
248-608-9250

Bryan Butcher
10/15/2019

Page 121

1    MR. DAVIS: Yes. I just want to use this
2    e-mail. If you want the whole thing --
3              MR. LAURILA: I'm familiar with it. You
4    can use it.
5              MR. DAVIS: Okay. So I'm going to mark as
6    -- for the record, I'll just indicate this is
7    Ford/Mullins 00946 and 00947. I'd like to mark these
8    two pages as defense Exhibit B.
9         Counsel, you have your copy.
10        MARKED BY THE REPORTER:
11        DEPOSITION EXHIBIT B
12        2:01 p.m.
13   BY MR. DAVIS:
14   Q. I'm going to direct you to the bottom e-mail. It's
15   the one that's dated Thursday, February 1st, 2018 from
16   Maria Watson to a number of people. Do you see that?
17   Take a look at that e-mail, Mr. Butcher, and then I'll
18   have a question or two.
19   A. Complete.
20   Q. Okay. There's more on the next page.
21   A. Complete.
22   Q. This exhibit, defense Exhibit B, is an e-mail from
23   Maria Watson to Ford Medical and you were copied on
24   it, correct?
25   A. Yes.

Page 122

1    Q. And does that e-mail corroborate your testimony from
2    earlier that Ford had observed -- people at Ford,
3    including yourself and Maria Watson, had observed
4    unusual behaviors by Mr. Mullins even prior to the 2-2
5    incident and than an Unusual Behavior Report had been
6    completed as a result?
7    A. Correct.
8    Q. And one last thing. I'm going to ask Mr. Laurila one
9    last time to go to his audio. And this time I'm going
10   to ask you to tee it up to -- just for the record, I'm
11   going to ask you Mr. Laurila to go to about one hour,
12   four minutes, and six seconds.
13        But before we play it, I'm going to play
14   again the part that when you were discussing with Mr.
15   Laurila, you said this is where you think Mr. Mullins
16   had mouthed, lightly said "fuck you, bitch" to you.
17        Okay. So we're going to listen to that
18   sequence and then I'll have a couple of questions
19   about it, okay?
20        MR. DAVIS: So Andrew, if you can go ahead,
21   it should start right at 1:04:06. But a few seconds
22   behind it is better than a few seconds after.
23        (Audio resumes.)
24        MR. BUTCHER: What happened today? You
25   have details of today?

Page 123

1              MR. MULLINS: Of today.
2              MR. BUTCHER: Oh, okay. What actions did
3    they --
4              I want you to hear this, Dan. What actions
5    did they do today?
6              MR. MULLINS: Today their presence in the
7    workforce one hundred feet from my assigned work
8    station, assigned by management, upheld by Labor,
9    places me in ongoing fear for my job, my safety,
10   because -- because all former complaints were false,
11   and I have been punished yet and still.
12             MR. BUTCHER: So you're talking about
13   something other than today?
14             MR. MULLINS: Today.
15             (Audio concludes.)
16             MR. DAVIS: And you can stop.
17   BY MR. DAVIS:
18   Q. Mr. Butcher, you testified that you believe that it
19   was in between the portion where you spoke, where you
20   said, I want you to hear this, Dan, and when Mr.
21   Mullins starts to give his answer, you said that was
22   the time you believe that Mr. Mullins had lightly said
23   or mouthed "fuck you, bitch" to you, correct?
24   A. Correct.
25   Q. Is there anything else you hear on that audio that

Page 124

1    leads you to conclude that that was the moment that it
2    happened?
3    A. There's only one instance where I opened my desk
4    drawer, and it was to write down on a scrap piece of
5    paper exactly what he had said so that I didn't lose
6    that moment.
7    Q. And you could hear on that audio the sound of your
8    cabinet being opened?
9    A. In that audio I can hear the drawer to my cabinet
10   being opened.
11   Q. And you would agree with me that was a rather lengthy
12   pause in between when you asked that question and when
13   Mullins started to speak, correct?
14   A. Correct.
15   Q. Dan Queen wasn't in the room during that portion of
16   the discussion?
17   A. Correct.
18   Q. Did Mr. Mullins make a statement "fuck you, bitch" in
19   a way that you believe would be loud enough to be
20   captured on an audio recording?
21   A. I do not believe it would be.
22   Q. And you didn't know you were being recorded at that
23   time?
24   A. I did not.
25   Q. And Mr. Mullins' counsel just represented he did know

31 (Pages 121 to 124)

Tri-County Court Reporters
248-608-9250





**INVESTIGATORY INTERVIEW**

Date/Time:      1/26/2018
Location:       DSP, Labor Relations
Interviewer(s): Bryan Butcher – Labor Relations
Interviewee:    Arthur Mullins – Employee          GID - 002008718
                Aaron Patrick - UAW

*All of us here today are required to maintain confidentiality. This conversation may not be recorded and is to remain confidential. Breaches of confidentiality may lead to disciplinary action. You may not discuss it with anyone other than those individuals conducting the investigation. The expectation is that you will be honest and forthright in your responses to the questions. I will be taking notes. Afterwards, I will ask you to review your statement, initial each page and sign your name on the last page.*

**This discussion is considered a matter of Company record.**

**Please provide your full name and Ford Service Date.**
**Arthur Mullins/ 3.16.15**

**What is your classification?**
**MP&L/ Production**

**What shift/crew are you on?**
C Crew

**Who is your supervisor?**
I don't have one. Due to the ongoing challenges I have been moved too many times to name a specific supervisor.

**Please tell me why here today?  Did something specific happen today?**
Today as you're aware MR. Butcher is my first day returning from a medical leave. Medical instructed me to come to you due to the extent of my medical leave. I arrived to work followed the instructions of medical reported to labor per medicals instructions per Bryan Butcher, labor, Quote do you know where to report? Yes was my response. I reported to the last place I was employed which was east. I was assigned east by Chris Sanders, Karmel Bramlett and Bryan Butcher. Upon arriving to my assigned station I was asked to wait for a specific team leader that team leader immediately gave my to a production supervisor who immediately took me to Karmel that assigned me to line K24 Karmel is the same supervisor that sat present the day the agreement was made for me to go to east. And in that same day when I told her I fear for my safety for sexual harassment she stated she did not know what to do and handed me off to another supervisor. She immediately passed me off to Dennis Halleck. He heard my concerns of sexual harassment and retaliations and a list of others. He immediately sent me to labor. While waiting in labor for my committeeman I was approached by supervisor Karmel I was told that I'm being put on notice for failure to work. That was immediately resolved in the agreement with Chris Sanders in my new assignment to east. Chris is fully aware of the ongoing sexual harassment and retaliation. Stating that we would be separated until concerns were resolved at the next level. All four parties agreed and I was sent to east. However, these challenges are still ongoing and now being forced on west back in harms way.

1 of 3



Initials

**What is the act of threat that you are bringing to Labor relations today?**
On going retaliation and sexual harassment regarding employee in my current work assignment.

**Who is the culprit of the sexual harassment?**
Crystal Perry. Shavonda, she's a team leader for C crew MP&L.  She's east basement.

**What did Crystal do that was sexually harassing?**
She's passed threats & rumors of incest, violence and retaliation ongoing.  Made false statements in labor that had cost me my assignment and job placement.

**What did Shavonda do that was sexually harassing?**
Shavonda has placed her elbow in my crouch, spread the rumor of incest and today was already at my assigned workstation although she is engine basement employee, and I am currently assigned to east but being forced back in harms way by management .

**Who gave you your work assignment today?**
Bryan Butcher

**What job did you report to that Shavonda appeared at?**
The job I was forced place, by west management.  By west supervisor.

**What is it called?**
Sword job at K24.

**How did you get there?**
I was taken by production supervisor from east to west.

**What was that persons name?**
Brant Wilson.

**How did Crystal retaliate against you?**
She made malicious lies about my cousin & myself of assault, incest and subsequently both our jobs were taken due to her false statements.

**How did Shavonda retaliate against you?**
In the 15 min. I had been on my forced assignment Shavonda had been to my work station twice stopping directly in front of my work station all traffic clear and started to intimidate me with cold stares.

**How long were you on the job before Shavonda appeared?**
10 min. 15 min. max.

**Did she say anything to you?**
No.

**Did she touch you?**
No.

**Anything else you wish to add?**
Extremely disappointed in the way concerns of this magnitude have been overlooked and minimized by management at the supervisor level for Ford and Labor.  And after I have brought all of my concerns of safety fear intimidation it is the professional opinion of Bryan Butcher for me

Ford/Mullins 00997

Initial

to work in the same areas as Shavonda and Crystal and refused union's request as well as my own to please place me somewhere safe. Thank You.

*Thank you for participating in this investigation. This investigation is ongoing. Any information involved in this investigation is strictly confidential. You may not talk with anyone about your statement, people involved or anything else regarding the investigation. In addition, you are advised retaliation is strictly prohibited and may subject you to disciplinary action up to and including discharge. We may ask you to return for additional questioning.*

_____
Employee / Signature

01/26/2018
Date

_____
HR / Signature

1/26/18
Date

_____
Union / Signature

1-26-18
Date

3 of 3

Ford/Mullins 00998

Initial: _____



## INVESTIGATORY INTERVIEW

Date/Time:      2/2/2018
Location:       DSP, Labor Relations
Interviewer(s): Bryan Butcher – Labor Relations
Interviewee:    Arthur Mullins – Employee          GID - 002008718
                Dan Queen - UAW

*All of us here today are required to maintain confidentiality. This conversation may not be recorded and is to remain confidential. Breaches of confidentiality may lead to disciplinary action. You may not discuss it with anyone other than those individuals conducting the investigation. The expectation is that you will be honest and forthright in your responses to the questions. I will be taking notes. Afterwards, I will ask you to review your statement, initial each page and sign your name on the last page.*

### This discussion is considered a matter of Company record.

**Please provide your full name and Ford Service Date.**
Arthur Mullins/ 3.16.15

**Were you harassed today?**
Yes ongoing today.

**Have you been threatened today?**
Yes on going today.

**Who is threatening & harassing you today?**
Today Shavonda Willimas, Crytal Perry, Kimmy & I do not know her last name.

**What actions did they take today that made you feel threatened & harassed?**
Today their presence in the work force 100 feet from my assigned work station. Assigned by management upheld by labor places me in ongoing fear for my job my safety, because all former complaints were false to date.

*Thank you for participating in this investigation. This investigation is ongoing. Any information involved in this investigation is strictly confidential. You may not talk with anyone about your statement, people involved or anything else regarding the investigation. In addition, you are advised retaliation is strictly prohibited and may subject you to disciplinary action up to and including discharge. We may ask you to return for additional questioning.*

_____          _____
Employee / Signature                Date

_____          _____



1 of 2

**Ford/Mullins 00879**

Initial:

HR / Signature                                    Date


Union / Signature                                 Date

Ford/Mullins 00880

On the shift of 2/2/18 at approximately 7:00 a.m. I returned to the labor relations office (LRO) from completing a floor investigation. When I arrived Dan Queen, Alternate Committee representative, and Arthur Mullins were waiting in the lobby for assistance. They came into my office and began to ask me if Arthur could be moved to east side assembly from his west assembly assignment. I explained to them that I do not place manpower and I was not making a manpower move. I then asked Arthur to leave the LRO office so I could speak privately with Dan. I wanted to bring Dan up to speed that we were repeating similar actions with Arthur from one week prior. The last three days Arthur worked, he has come to labor and requested to be reassigned. I concluded with Dan and Labor Rep., Shine Joseph, came into my office stating that our Supervisor, Maria Watson, was trying to get in touch with me.

I stepped outside to call her back on my cell phone. When I returned Dan and Arthur met me in the lobby stating there was a threatening situation that occurred today warranting Arthur's request. I brought them back into LRO where I asked Arthur if he was threatened today. He said "yes ongoing & repeatedly." I said OK. I looked at Dan and said I am going to take his statement and I will bring all parties in and start suspending anyone who has taken part in threatening behaviors. Dan then cautioned him from providing any erroneous statements about events or coworkers. When we sat down to take the statement things began to get erratic. Arthur would not answer any question directly, he kept wanting to talk about historical events that he has already provided to HR/LR office. During discussions, he repeatedly acted like he was not given a chance to speak and state his case. I tried to keep it on track by talking about today only. Dan too, tried to keep him on track covering only today's events, nothing was working. Arthur continued to say he was being threatened. When I asked, "Have you been threatened today?" Arthur took an extremely long pause and finally replied "Yes. Ongoing today." I asked who was threatening him and he took another long pause and looked to the ground and then provided the names of Shavonda Williams, Crystal Perry, and Kimmy whom he does not know her last name. I asked what actions they took that he wanted to report as threatening. He said they were 100 feet from his job and fears for his safety and his job and former complaints were false. I was unsure what he meant and he could not describe it.

I printed his statement and he refused to sign it claiming it was incomplete and not recorded accurately. Dan reminded him that he did in fact say the things I had captured. Arthur wanted more topics covered and I told him I was only concerned with the immediate threat and needed to identify the source in order to help him. I explained that it was not an open forum to talk to Dan about other topics and we needed to focus on today's threat. Arthur began to accuse the company of not helping him with his claims. I went on to state that the only thing standing in the way of him being helped is him answering my question directly as yes or no to being threatened and then naming the individuals who were threatening him. When I said this he pursed his lips, sweat began to bead up on his nose, and his cheek between his nose and his eye flickered while he cut his eyes at me. He then clenched his fists and looked down at the ground. I finally told Dan if he cannot identify the threat and it's nature I'm going to send him back to work and put him on notice.

During this time, Dan appeared uneasy and continued to pace from the outer lobby back into my office. As Arthur began to make claims of twisting his words and not properly recording what he stated I asked Dan several times to come back into the room to verify what I was recording. The last time Dan stepped out Arthur leaned into my desk and with pursed lips and gritted teeth Arthur lightly said "Fuck you, bitch." I turned away and wrote down exactly what he

said. As this happened, Dan walked back into my office. I stood up said this meeting is over. I looked at Dan and said when you stepped out Arthur said, "Fuck you, bitch," to me. I'm suspending him. I need him to leave and he is not to return until contacted. Arthur began to call on Dan and state that he never said that. He stood up and turned to the door to exit my office. Then suddenly at the threshold turned back into the office with his arms flexed and took a hard step toward me. I stepped back away from him and said Dan "You better get him." Arthur stopped after the initial hard step and exited again, but lingered in the waiting area. Dan became angry and started to posture telling me he never heard him say that and he could hear everything said in the office. I told him it was time to go and not to do this here. He then told me not to do this here. I then said last chance to walk out on your own. I'm going to start making calls to have you both escorted out.

They then walked out and went to the committee offices. I verified this by taking Process Coach Everett Holland with me to see if Arthur left the premises and we watched them go into the committee offices. I then called security to see if they could have him removed from the premises and they said it would be difficult, as he has taken refuge in the committee room.

Bryan Butcher

Labor Relations Representative





**Ford**
Go Further

# Addressing Unusual Behavior in the Workplace
## Single Point Lesson for Supervisors

---

### UNUSUAL BEHAVIOR CHECKLIST

GID  __002008718__          Employee Name: __Arthur Mullins__

Date of Observation   Time: From __Start of Shift__ AM/PM  to  End of Shift ____ AM/PM

__Multiple Date(s)__

Location (Department, Unit and Station)   __Dearborn Stamping Plant__

Observed Personal Behavior: (check all appropriate items)

**1. Speech:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Normal x | Incoherent x | Confused x | Silent ☐ |
| Slurred ☐ | Rambling x | Talkative x | Rapid ☐ |
| Loud ☐ | Whispering ☐ | Slobbering ☐ | Slow ☐ |

**2. Balance:**

| | | | |
|---|---|---|---|
| Normal x | Swaying ☐ | Staggering ☐ | Falling ☐ |
| Rigid ☐ | Unable to stand ☐ | Feet wide apart ☐ | Sagging ☐ |

**3. Walking and Turning:**

| | | | |
|---|---|---|---|
| Normal x | Stumbling ☐ | Swaying ☐ | Falling ☐ |
| | Reaching for Support ☐ | | Arms Raised for Balance ☐ |

**4. Awareness:**

| | | | |
|---|---|---|---|
| Normal ☐ | Confused x | Hallucinations ☐ | Paranoid x |
| Illogical x | Lack of Concentration x | | Sleepy or Stupor ☐ |
| Inappropriate Laughing or Crying ☐ | | | Angry/Hostile/Uncooperative x |
| Restless/Purposeless Activity x | | | Erratic feelings/behavior x |

**5. Physical:**

| | | |
|---|---|---|
| Excessive Sweating ☐ | Chills/Tremors ☐ | Dilated Pupils ☐ |
| Blood-shot Eyes ☐ | Irregular Breathing ☐ | Glassy Eyes ☐ |
| Red/Flushed/Pale ☐ | Fumbling ☐ | Breath Smells of Alcohol ☐ |

**6. Other Actions or Observed Behaviors**

Mr. Mullins has been in HR/LR multiple times since September 2017. Mr. Mullins continually complains of being harassed / discriminated against, yet when pressed to provide examples he provides responsives that do not answer the questions at hand. Mr. Mullins has been in Labor Relations multiple times complaining of being fear for his life, yet again, when asked to provide examples he states that other employees are looking at him. He confims they do not approach, talk to, or gesture (non verbal communication) toward him to support the claim. On 2/2/18, Mr. Mullins was in LR to let the LR Representative know he was being harassed and feared for his life. When asked questions to support the claim that would allow LRO to investigate, Mr. Mullins demeanor changed from extremely paranoid to angry / threatening. After approximately 40 minutes and being asked to provide answers to the questions at hand, Mr. Mullins dropped his head, his nose began to sweat, the cheek area below his eye began to twitch and he looked up in an aggressive, threatening manner and said "*uck you *itch" to the LR Representative (Bryan Butcher). The Alternate UAW District Representative was not in the room at this time, yet upon reentry, Mr. Mullins' attitude reverted very quickly to paranoid and a near crying emotional state. Mr. Mullins was suspended immediately and asked to leave the property. Before exiting the office, Mr. Mullins demeanor changed again to one of aggression and he assumed a "Hulk Hogan pose," arms at each side, but flexed muscles and took a step toward the UAW representative. The erratic behavior has been ongoing with floor management as well. The concern for the quick shifts in mood are concerning to those working with him and create a level of fear and hostility.

**Ford/Mullins 01139**


Go Further

# Addressing Unusual Behavior in the Workplace
## Single Point Lesson for Supervisors

The HR Team is concerned for his well-being and mental state.  The LR Team is concerned for both Mr. Mullins and for the employees (hourly and salaried) that work around him or with him.  The LR Team is requesting a full Fit for Duty examination, including an examination of his mental state.

Dates: 9/8/17, 1/26/18, 2/2/18

The Above Behavior Witnessed by:

| BDBob | BBatche2 | 2/9/18 |
|---|---|---|
| NAME | CDSID | DATE |

**Completed form to retained by the Medical Department**

Ford/Mullins 01140