

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR MULLINS,

    Plaintiff,

v.

FORD MOTOR COMPANY;
and BRIAN BUTCHER, an individual,

    Defendants.

Case No. 19-cv-10372

Hon. Matthew F. Leitman

Magistrate Judge Anthony P. Patti

---

James B. Rasor (P43476)
Andrew J. Laurila (P78880)
RASOR LAW FIRM, PLLC
Attorneys for Plaintiff
201 E. Fourth St.
Royal Oak, MI 48067
(248) 543-9000
jbr@rasorlawfirm.com
ajl@rasorlawfirm.com

Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
 PELTON & FORREST, P.L.C.
Attorneys for Defendants
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

---

**Declaration of Larissa R. Kujan**

1. I make this declaration based on personal knowledge of the facts stated herein, and am able to so testify under oath if called upon to do so.

2. I am a Labor Relations Representative for the Dearborn Stamping Plant. I have been in that position since approximately December 2017.

3. On January 26, 2018, I had a scheduled meeting with Arthur Mullins and Michelle Pasquali regarding a call Mullins made to Ford's harassment hotline.

4. Mullins's conduct at that meeting was unusual and alarming to me. A few days later, I memorialized the events of that meeting in an email. The email is attached to this declaration as Exhibit 1.

5. The statements I make in Exhibit 1 regarding my January 26, 2018 interaction with Mullins are true and accurate. I reaffirm those statements under oath, as part of this declaration.

6. On February 1, 2018, I was present for an interview between Arthur Mullins and Michelle Pasquali. Ms. Pasquali prepared an investigatory interview statement during the interview, using our regular question and answer format. That statement is attached to this Declaration as Exhibit 2. Ms. Pasquali asked the questions listed and wrote down Mr. Mullins's answers. These interview forms are official company records. They are kept in the course of Ford's regularly conducted activity and are made as a regular practice of Ford's business activity.

7. Because I again observed Mr. Mullins's behavior during the February

1, 2018 interview to be unusual and alarming, I drafted a memo to file describing my impressions of Mullins during the meeting.

8.  The email is attached to this declaration as Exhibit 3.

9.  The statements I make in Exhibit 3 regarding my February 1, 2018 interaction with Mullins are true and accurate. I reaffirm those statements under oath, as part of this declaration.

10.  Following the February 1, 2018 interview, I and Michelle Pasquali reported our concerns over Mr. Mullins's unusual behavior to supervisor Maria Watson.

11.  On February 9, 2018, at a meeting attended by myself, Bryan Butcher, Arthur Mullins, and Mullins's UAW representative Chris Sanders, Mr. Mullins was informed that he would need to take a mental fit-for-duty examination and clear through medical before returning to work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 16, 2020

_Larissa R. Kujan_ (signature)
Larissa R. Kujan

# EXHIBIT 1

## to

## Declaration of Larissa Kujan

**Pasquali, Michelle (M.)**

| | |
|---|---|
| **From:** | Kujan, Larissa (L.) |
| **Sent:** | Friday, February 02, 2018 10:56 AM |
| **To:** | Pasquali, Michelle (M.) |
| **Subject:** | A. Mullins Statement Meeting - 1/26/18 |

On 1/26/18 – Myself, Michelle Pasquali, Mark Thornton - UAW and Arthur Mullins met at 1 PM in Michelle's office to provide a statement regarding reported concerns.

Mr. Mullins was unwilling to make a statement due to Harold Byrd not showing up as his Union Rep for his statement. When he saw Mark Thornton arrive, he proceeded to state he did not want him to be present.
Mr. Mullins proceeded to state that he would only speak to the highest levels regarding his statement, Ashlie O' Reilly and Harold Byrd.
Michelle proceeded to state she would try to call Mr. Byrd, but he was not available. Mr. Mullins then proceeded to make statements of corruption and that Maurice Wilson has Maria Watson, Labor Supervisor, in her back pocket.
Mr. Mullins stated he has made 2 police reports regarding sexual harassment and his little cousin, Shalisa Lee, who is also a Ford employee.
He again refused to have committee person Mark Thornton and began going back and forth with him stating that Mr. Thornton did not previously help him in a situation from the past.
Mr. Mullins continued to make comments that a threat was made against Shalisa Lee that retaliation would occur against Mr. Mullins.
He continued to state he would not make his formal statement and stated he was not fully prepare for his statement and needed to gather his evidence and information.
Michelle Pasquali questioned as to why Mr. Mullins wasn't prepared when he had scheduled this meeting with her.
Mullins stated that his evidence would prove everything and he had a rough morning since returning to work that morning on a Medical leave.
He was unable to focus and kept diverting from Ms. Pasquali's questions.

Mr. Mullins and Michelle Pasquali proceeded to end the meeting after 30 minutes and would discuss rescheduling the meeting for a later date.

Thank you,

**Larissa Kujan**
Labor Relations Representative
Dearborn Stamping Plant & Dearborn Diversified Manufacturing Plant
(313)248-8896
lkujan@ford.com

1

**Ford/Mullins 01007**

# EXHIBIT 2

## to

## Declaration of Larissa Kujan



## INVESTIGATORY INTERVIEW

Date/Time:  2/1/2018          12:40 PM
Location:   DSP, Plant Manager's small conf. rm.
Attendees:  Interviewer(s): Michelle Pasquali & Larissa Kujan
            Interviewee:    Arthur Mullins
            UAW Rep:        Mark Thornton

*You have been asked here as part of an open company investigation. This conversation may not be recorded. The expectation is that you will be honest and forthright in your responses to the questions. I will be taking notes. Afterwards, I will ask you to review your statement, initial each page and sign your name on the last page indicating I accurately captured our discussion today. This discussion is considered a matter of Company record.*

1. **Please provide your name and service date.**
   Arthur Mullins and my service date is March 16, 2015.

2. **Which department do you work in?**
   I work in the Assembly department.

3. **What is your job classification?**
   In-Progression.

4. **What shift are you on?**
   I am on C Crew.

5. **Who is your supervisor, and how long have you reported to them?**
   I think it is Darrell Rinehart. I have reported to him since January 26, 2018.

6. **In your September 15, 2017 call to the harassment hotline, you stated that you have had ongoing challenges since you were hired in March 2015. You stated in your call that when you were first hired you were not receiving a paycheck.**

   a. **How many paychecks did you not receive?**
      For the first six weeks, I received either no check or incorrect checks. Sometimes I would not receive the entire paycheck, or the check would be shorted a day or two.

   b. **Do you know what the issue was involving your paychecks?**
      After talking to everyone in my department, it was recommended that I take my concern to DSP Labor Relations. I met with Dawn Kittle in HR; she asked me who my supervisor was. I told her it was Jennifer Doyle. Jennifer came to Dawn's office, and Jennifer stated that she was aware of some of my pay issues. The TWOS system had me listed as a DDMP employee which was incorrect.

   c. **How was the situation resolved?**
      Ms. Kittle had to make the correction in TWOS to move me to DSP, and the correct C Crew DROT.

   d. **Were your paychecks correct after that?**
      Sometimes. There were times when Ms. Doyle paid me incorrectly by not entering my C Crew hours.

Ford/Mullins 00116

7. You also stated that you were not receiving overtime during this period.

    a. How many times did this occur and when did it occur (month/year)?
    This happened during the six weeks that I was listed as being at DDMP in TWOS. I didn't know how to read the DROT. Process Coach, Dar Luciani, was hanging the DROT, and she told me that she did not know what a DROT was. I was shorted too many times to count.

    b. Whom did you speak with about your overtime not being paid properly?
    I spoke with David DeSloover. He is a Dearborn Engine Plant committee person. DEP UAW represented me because I worked in the basement of DEP. I spoke with another man. I don't know his name, but he handles overtime. It was the DEP overtime coordinator. He said that he did not see any problems.

    c. Then what did you do?
    I took his word, but continued to watch the DROT meticulously. By December 2015 I was shorted several thousand dollars.

    d. Then what did you do?
    I was bringing it to Jennifer Doyle's attention that I was shorted overtime, and that I was not given the appropriate opportunities to receive overtime. During this time, other Process Coaches supervised me such Bill Thomas, Dar Luciani, Bill Thoms, and Paul Olczak. Jennifer Doyle closed my DROT.

    e. Was the issue resolved?
    No, there is a grievance for it. Mr. Engel has it. I have asked him for the grievance number, but he has not provided it. We had a meeting at the local to discuss this.

8. You also stated that you did not receive breaks or lunch during this period.

    a. Why were you unable to go to lunch and take breaks?
    Per my Process Coach, Paul Olczak, he asked me to work thru breaks and lunch. He stated that he would pay him. That is standard practice MP&L DEP basement.

    b. Was Paul paying you for your lunch and breaks?
    Paul stated that he did not have the capability to enter the information in TWOS. He told me that Jennifer Doyle was entering my time in TWOS.

    c. Whom did you speak with about this issue?
    I brought it to Paul's attention, and he said that he would get it rectified.

    d. Did that take place?
    No. I had to take it to David DeSloover who spoke with Jennifer Doyle. I was standing right there when he spoke to Jennifer, and she was not going to pay me for lunch and breaks. She said we were to take lunch and breaks as scheduled.

    e. Where was Paul Olczak when this took place?
    He confirmed with Jennifer that I did work thru my breaks and lunch, and she said that he did not have the authority to pay me for lunch and breaks.

    f. What period were you working thru you breaks and lunch?
    For two weeks. It happened in mid-April 2015.

    g. Was this issue resolved?
    No. David DeSloover told me to take my lunch and breaks as scheduled.

    h. How much time do you get for lunch and breaks?
    Lunch is 30 minutes. We get two breaks per day for either 22 or 25 minutes depending how long the line is running either 10.5 or 10.7 hours.

9. Who was your Process Coach during this time?
   Paul Olczak. He was learning the job. We were understaffed.

10. During what timeframe did you report to Ms. Doyle directly?
    I worked for Jennifer directly from approximately June 2015 until Bob Balk arrived in August 2015.

11. What was your position during this time, and where did you work in the plant?
    I was a hi-lo driver in the DEP basement.

12. You stated in your call that Ms. Doyle was reprimanded in front of you.

    a. Who reprimanded her?
       Dawn Kittle in Labor Relations.

    b. What did you hear Ms. Kittle say to Ms. Doyle?
       If I have to do your job than I will do your job. Do you understand? Ms. Doyle mumbled yes. Ms. Kittle apologized to me for the pay errors I received, and she said that my pay should be correct from this day forward.

    c. Approximately, when did this take place (month/year)?
       It was after Easter 2015.

13. In your call to the hotline, you stated that as a result of Ms. Doyle being reprimanded that you have become enemy #1, and that you are being harassed and retaliated against.

    a. Who is harassing and retaliating against you?
       Jennifer Doyle, Bill Thomas, Maurice Wilson, Chris Saunders, Karmel Bramlett, Jody Weiss, Alicia Shivers, Everette Holland, Shine Joseph, Darren Tatum, Bryan Butcher, Krystal Pierre, Shavonda ? (C Crew Team Leader MP&L), Kimmie ? (MP&L C Crew), and Maria Watson.

    b. When did Jennifer Doyle harass and retaliate against you (month/year)?
       Between June and July 2015.

    c. How has Ms. Doyle retaliated against you?
       When I was a new hire I was under the impression that I had personal and vacation time. I was told I had 20 hours personal and 40 hours vacation. Bill Thoms approved my days off. I talked to David DeSloover about my personal and time on how to fill out a 2611 form. I gave my form 2611 to Bill Thoms. He said he would take care of it. He did not give me my copy. He did state that you have to have the time available.

       I called ATS to report my absence. The following workday, Ms. Doyle placed me on notice for attendance progression. She said I had enough AWOLS to start the attendance progression.

    d. When did this occur (month/year)?
       July 24, 2015. Jennifer said that I did not have personal time or vacation time available. She said that I took personal time and vacation time that I did not have. I saw Bill Thoms later on, and he apologized for saying that I had the time to take off. He sent an email to Brittany McClintick. They would not remove one of the AWOL's.

    e. Aren't your vacation and personal time hours listed on the bottom of your paycheck?
       I couldn't trust any of the information on my paychecks.

    f. During your orientation, did they review what your paycheck looks like?
       I am not sure. I was told by Dawn Kittle that I had zero vacation and personal time during the first year of employment.

g. Who told you that you had 40 hours vacation and 20 hours personal?
Bill Thoms and David DeSloover.

h. How did Jennifer Doyle harass you?
She started me on the attendance progression. Both the union and management granted me the time off. She wrote me up for smoking in the plant, when I was not smoking in the plant. I was given an R&W + 3 Days for a Safety Violation. This happened November 20, 2015.

i. Where you smoking?
I was standing at the top of the stairs of the Dearborn Engine rails. I had a cigarette in my hand, but I was not smoking. I was getting ready to smoke. I saw Ms. Doyle, and I ran in to see Jennifer. I needed to talk about my payroll concerns. I fanned my hands when I waved at Jennifer, which caused the cigarette to ignite.

j. How did Ms. Doyle's reprimand by Dawn Kittle cause you to be harassed and retaliated against?

k. When did this occur (month/year)?

l. How have you been retaliated against?

m. When did this occur (month/year)?

n. How were you harassed?

o. When did this occur (month/year)?

p. How did Ms. Doyle's reprimand by XX cause you to be harassed and retaliated against?

14. In your call to the hotline, you stated that you were unfairly placed on attendance progression shortly after that.

    a. What was the issue with your attendance?
    I was awarded time off that Bill Thoms said that I had. The days were broken up over time. Bill was willing to fix my time, but he did not have the authority. Jennifer Doyle did, and she was unwilling to fix it.

    b. How many times did that happen?
    He let me take off five or six days off. No one brought to my attention that I did not have the time off to take.

    c. Was this due to you being AWOL or tardy?
    For being AWOL.

    d. Who was your Process Coach at this time?
    Bill Thoms and Ms. Doyle was the supervisor.

    e. Did you discuss this with your union?
    I spoke with David DeSloover, Robbie Burk, and Julius Matthews all the way to Frank Engel.

    f. Did anything happen as a result?
    Frank Engel said nothing could be done. No grievance was filed. There was a mass attendance correction that was made to other employees in Dearborn Stamping employees. Dearborn Engine UAW should have requested the correction for me.

15. Did you report to MP&L Process Coach, Bill Thomas or Bill Thoms?

   a. During what timeframe did you report to Bill Thomas and Bill Thoms?
      I reported to Bill Thoms in July & August 2015. I reported to Bill Thomas July 2015 and in 2016.

   b. What was your position, and where did you work in the plant during this time?
      I worked on the hi-lo at DEP when I worked for Bill Thoms. I worked on the hi-lo at DEP for Mr. Thomas.

   c. In your call to the hotline, you stated that Mr. Thomas approached you in an aggressive manner by yelling, cursing, and spitting on you. When did this happen?
      July 24, 2015

   d. What was Mr. Thomas saying when he was yelling and cursing at you?
      He told me that if I did not do what the fuck he said that you would not be working here. He was pointing at me at walking towards me backing me into the corner between the racks. He said he was tired of my bull shift. He said that if I wanted to keep my fucking job then I better start acting like a pain.

   e. Where did this conversation take place?
      It was in the DEP basement on the front door lines at the bottom of the ramp to Engine. I was on C crew. It took place during the day shift.

   f. Were there any witnesses?
      No.

   g. What was your response to Mr. Thomas?
      I was in disbelief. I did not say anything. As he kept walking towards me, I took steps backwards to keep space between us.

   h. Did you report this incident to anyone?
      I reported it two Dearborn Engine Plant committee persons. Their names are Chuck and Al.

   i. What was their response when you told them?
      They resolved the matter at hand and moved Mr. Thomas out of my work area. At that time, I was not aware of the grievance process or how to handle the matter.

   j. How did Mr. Thomas spit on you? Was he speaking to you when that occurred?
      When he was yelling and cursing obscenities, he continued forward in an aggressive manner. He had his finger so close to my face. He was so close I had to turn my head to the side because I could not get any more space between Mr. Thomas and I.

   k. Did Mr. Thomas realize he spit on you?
      He could not have missed it. He did not care.

   l. Did you inform Mr. Thomas that he spit on you?
      As his rant continued, I turned to look him in the eye. He saw the frustration in my face. He responded, "What are you going to do hit me. I told him that I am a 40-year-old man with three children, and I would appreciate if he treated me as such. He continued to rant obscenities while he removed his finger. While wiping the salvia off my face I could smell the stink of his salvia.

   m. What happened after that?
      I never left my job assignment. I told him that I was not going to move until a committee person was present. Chuck and Al from the DEP UAW came.

n. You stated that you wanted to file a grievance against Mr. Thomas, but that you were advised by the union not to do so because of possible retaliation from Mr. Thomas. Who advised you not to file a grievance?
Chuck and Al from DEP UAW.

16. You stated in your call to the hotline that you were suspended for threatening a supervisor.

   a. When did this happen (month/year)?
   In July 2015.

   b. Why were you suspended?
   Bill Thomas informed Maurice Wilson that I threatened him. I came to work the next day. I saw Mr. Thomas, and he told me to park the hi-lo. He put me on his buggy. We drove to the DEP basement, and asked me to leave the building. Ms. Doyle was on her buggy next to us.

   c. Did you go to DSP Labor Relations for a disciplinary hearing?
   I was brought to Labor Relations, and I was given three days off. When I returned on July 27 Labor Relations took my statement.

17. In your call to the hotline, you stated that Process Coach, Bob Balk, would always ask you if you wanted chicken, and that you found this offensive because it is a stereotype.

   a. Have you ever reported to Mr. Balk, if yes when (month/year)?
   From November/December 2015 for six to eight months consecutively.

   b. What would Mr. Balk ask you?
   "Hey Arthur are you treating to lunch today". Which means am I purchasing lunch for Bob Balk and your coworkers. There were four of us. Bob, myself, Charles Finley, and Bryan.

   c. Have you ever brought Mr. Balk lunch?
   Yes.

   d. How did that happen?
   I would go out for lunch and bring the food back. I would ask Bob what he would like for lunch. His response would be chicken. He said he loves chicken. The next day he would offer to pick up the lunch tap.

   e. What kind of chicken did Bob Balk like?
   He loves chicken. We ended up getting KFC most of the time due to convenience.

   f. Has Mr. Balk ever paid for your lunch? How many times has he paid for you?
   Yes. He has paid for it two to five times. It was not just me. It was other employees as well.

   g. Did Bob ever bring in pizza for the team?
   I don't recall having pizza with Bob for lunch.

   h. Did you and Mr. Balk have an arrangement where he would pay for both of your lunches, and that you would run out to pick it up?
   That happened some time.

   i. What type of food would you run out and by for yourself and Mr. Balk?
   Just KFC. Bob loves chicken.

   j. Did you ever tell Mr. Balk that you were offended when he would suggest KFC chicken for lunch?
   I would not dare.

Ford/Mullins 00121

k. **Why not?**
From what I have experienced from management so far just put your head down and do your 10 hours.

l. **Did you ever ask Mr. Balk if he wanted a coffee when you went out for break?**
Yes, I asked him every time.

m. **Why did you ask him if he wanted coffee or lunch?**
Trying my best to stay in Bob's good graces. Polite and courtesy at all time.

n. **What made you think that you had to offer coffee or lunch to stay in Bob's good graces?**
Bob would mandate that we violate safety rules to make production. He would have us on ladders while other MP&L drivers were bull dozing two to three rows of double stacked racks. This in the basement of Dearborn Engine. If the train leaves on time, he would pay us 12 hours even though we were schedule for 10 hours. He would not pay me. He would pay this to A Crew.

o. **Have you ever shared personal issues with Bob and called him at home?**
I have called Bob on his cell for work related. I have never shared personal issues with Bob. I have explained to him that I needed to leave because my son was about to make a mistake that would affect his scholarship.

p. **Did you state in your hotline call that you believed Mr. Balk was trying to agitate and manipulate you into reacting?**
Bob Balk called the DEP UAW on Sundays requesting their presence for me. They are not present in the building. They would be on their way in, but never make it in. Bob would then call the DEP Committee person back to say that I did not want representation. Frank Engel told me this. You would have to ask Mr. Engle how many times Bob did this.

18. **When did you start reporting to Process Coach, Everette Holland (month/year)?**
In December 2016.

19. **You stated in your call to the hotline that Mr. Holland appeared to already know who you were. What did Mr. Holland say to you when you met?**
I said hello to Jody Weiss who was training Everette. I shook Everett's hand. His eyes got big and wide. He finished by stating my last name. The moment he heard my first name he had look of surprise. He repeated my name – Arthur, Arthur Mullins. He knew who I was before I knew who he was. I took my concern to David DeSloover. I told him that I have on going challenges with management.

20. **You also stated in your call that Mr. Holland's response was proof that management is trying to take your job. Why do feel this way?**
Because he knew who I was before we met. That is validation that management is having conversations about me prior to supervisors coming to the floor.

21. **How long did you work for Everette Holland?**
From December 2016 until May 2017.

22. **What is your issue with Mr. Holland?**
He disqualified me twice. The first time was when I received an emergency call to go home. I explained to Mr. Holland what was going on with my mother. Mr. Holland you are going to have to bring back documentation to validate my time off. I explained that it would be a state sealed guardianship/conservatorship. I asked him if that would suffice for documentation. I don't want my mother's personal medical information listed in Ford's records. He did not say if he would accept it or not. The next day Mr. Holland asked me for the documentation which I did not have. I asked him if he would like me to go home and get it. I also said my wife could bring it to me. He told me to start working and not to worry about it. A few hours later Mr. Holland called my committee person and disqualified me. He said he was told by Labor to disqualify me.

The second one was for following the instructions of Ford medical. DSP Medical sent me home for the day. They told me not to go back on the plant floor. I exited thru the medical doors. Mr. Holland wrote me up, for following the instructions of medical.

23. You also stated in your call to the hotline that you have had issues with Crystal, and that she is harassing you by telling people that you and Shalisa Lee are sleeping together. Ms. Lee is your cousin.

   a. Do you work with Crystal Pierrie?
   I worked at DEP and Crystal worked at DSP for over a year. We never spoke to each other or work together. In 2016, Jody Weiss removed Shalisa Lee from the MP&L Tow job. 72 hours after Frank Quinn personally thanked her for her job performance in front of me. She then gave the Tow job to Crystal Pierrie. At that time, Crystal had on challenges with my cousin, Shalisa Lee. I can't say specifically what they were.

   It was brought to my attention by Bryan (DEP C Crew – African American) and by William (DEP B Crew MP&L); they recall Crystal coming to DEP asking if I was at work. Bryan and Williams said she would ask about my attendance.

   b. How do you know that Crystal is telling people about yourself and Ms. Lee sleeping together?
   Multiple employee and management have told me this. Bob Balk, William, Bryan, Chris, (the all work at DEP rails) have told me that they heard Crystal say this. Bob Balk now refers to Shalisa Lee and myself as kissing cousins.

   c. When did Bob start calling you kissing cousins?
   He called us this in 2016. He would say it daily. It was a running joke with Bob. Everybody else said that Shalisa and I were having sex.

   d. Did you confront Ms. Pierrie about this rumor?
   No.

   e. Who are Shavonda Williams and Kimmie X?
   They are friends of Crystal Pierre, and they work at DEP MP&L.

   f. Do you work with them?
   I use to work for Shavonda when I was in MP&L. She became a Team Leader. Kimmie is a coworker.

   g. In your call to the hotline, you stated that either Kimmie or Shavonda accused you and other employees of stealing their $100 charger. You also stated that you were patted down and searched.

      i. Who patted you down?
      Maurice Wilson took me into a closed room. I requested my committee person. He also took Bryan and Chuck. He asked us a series of questions, and said that he had the right to go thru your belongings and have security go thru your vehicle. He asked if we would show him what was in our pockets. Bryan and Chuck declined. I emptied my pockets on the table out of fear of denying a request of a supervisor.

      ii. When did this take place?
      In 2017.

      iii. Where did this take place?
      At the DEP blue break room.

    iv. **Were there any witnesses?**
    Charles Finley and Bryan.

24. **In your call to the hotline, you stated that when Shavonda was instructed to push a button to turn on your hi-lo, that she placed her elbow in your crotch.**

    a. **Please explain what happened.**
    I did not have my key fob to start the hi-lo. I notified Jody Weiss that I did not have my fob, and she said that she would send my Team Leader, Shavonda. Shavonda has made my work area dreadful. I fear coming to work because of her, Jody, and Maurice. You enter the hi-lo from the left and the controls are on the right.

    In the past Shavonda handed employees the key fob to activate your hi-lo while she is still on her hi-lo. You then return her fob back. On this day she got off her hi-lo and climbed onto my hi-lo from the right side which is the fob side. She leaned over the control panel. She placed her elbow on my crotch missing the arm panel. She said, "What is wrong Arthur, am I in your personal space". I leaned away from Shavonda. Her elbow was still in my crotch, and I asked her to start my hi-lo. She repeated her statement, and pushed her elbow further into my crotch. I pushed the horn hoping Greg on the dock would hear me. When Greg turned around to look she then started the hi-lo to step down. I am not sure when this happened.

    Arthur Mullins then stated that he had enough and needed to leave right now. He got up and left the room at 4 PM. He did not review anything.

*Thank you for participating in this investigation. This investigation is ongoing. You are advised retaliation is strictly prohibited and may subject you to disciplinary action up to and including discharge. We may ask you to return for additional questioning*

_____        _____
Employee Signature        Date

_____        _____
HR Representative        Date

_____        _____
HR Representative        Date

_____        _____
UAW Representative        Date

Ford/Mullins 00124

# EXHIBIT 3

## to

## Declaration of Larissa Kujan

Memo to File

On 2/1/2018 at approximately 12:40 PM, myself, Michelle Pasquali and Mark Thornton met with Arthur Mullins for his formal statement regarding a hotline call that was made on 9/17/17 in the conference room on the 3rd floor of DSP.

Mr. Mullins wore dark sunglasses throughout the entire meeting and his demeanor appeared to be upset/agitated.

Ms. Pasquali went through as much of the hotline call statement as she could throughout the entire meeting. Mr. Mullins kept going off track and unable to focus on the questions being asked. He would continuously avoid answering questions.

Mr. Mullins stated to Michelle Pasquali that he was no longer able to go on and was getting visibly upset. He was being asked too many questions and too many past things were being brought up. He continued to state he could no longer focus and needed to stop. Ms. Pasquali stated that she wanted to schedule another meeting to complete the statement in which Mr. Mullins agreed. He walked out of the meeting very upset and we believe that was the conclusion of his statement. Mr. Mullins returned with tears down his cheeks discussing how upset and frustrated he was over this process and being asked questions that were stirring up a lot of previous emotions. Ms. Pasquali has told him numerous times that they have been trying to get his statement and was not able to do so either from being out for various reasons or not willing to meet with the individuals assigned to meet with him. The meeting was again concluded and Mr. Mullins walked out.

His demeanor was abnormal throughout the entire statement and he continuously got emotional through the entire statement process.

The meeting with Mr. Mullins last over 3.5 hours and at that point the entire statement had not been completed. As stated previously, Ms. Pasquali attempted to reschedule to complete the rest of his statement regarding his hotline call.

*Larissa Kujan*
Larissa Kujan
Labor Relations Representative
Dearborn Stamping Plant