UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR MULLINS,

                             Case No. 19-cv-10372

      Plaintiff,                Honorable Matthew F. Leitman
v.                          Magistrate Judge Anthony P. Patti


FORD MOTOR COMPANY;
and BRIAN BUTCHER, an individual.

      Defendants.

_____/

| JAMES B. RASOR (P43476) | THOMAS J. DAVIS (P78626) |
|---|---|
| ANDREW J. LAURILA (P78880) | SARAH L. NIRENBERG (P77560) |
| Rasor Law Firm, PLLC | Kienbaum Hardy |
| Attorneys for Plaintiff | Viviano Pelton & Forrest, P.L.C |
| 201 E. Fourth St. | 280 N. Old Woodward Ave., Ste. 400 |
| Royal Oak, MI 48067 | Birmingham, MI 48009 |
| (248) 543-9000 | (248) 645-0000 |
| jbr@rasorlawfirm.com | tdavis@khvpf.com |
| ajl@rasorlawfirm.com | snirenberg@khvpf.com |

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NOW COMES, Plaintiff, ATHUR MULLINS, by his attorneys, Rasor Law Firm, PLLC, and for his Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 as there is no genuine issue of material fact as to whether Defendant discriminated against Plaintiff based on disability pursuant to the Michigan Persons with Disabilities Civil Rights Act, thus entitling Plaintiff to summary judgment as to his PWDCRA discrimination claim (Count III).

i

The undersigned counsel certifies that counsel communicated in writing with opposing counsel seeking concurrence in this motion; opposing counsel denied concurrence.

**WHEREFORE**, for the reasons set forth in the accompanying Brief in Support, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion for Summary Judgment as to his PWDCRA Discrimination claim against Defendants.

Respectfully Submitted,

THE RASOR LAW FIRM, PLLC

/s/ Andrew J. Laurila

ANDREW J. LAURILA (P78880)

Attorney for Plaintiff

201 E. 4th Street

Royal Oak, MI 48067

Dated: November 20, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR MULLINS,

                  Case No. 19-cv-10372

      Plaintiff,           Honorable Matthew F. Leitman

v.                      Magistrate Judge Anthony P. Patti


FORD MOTOR COMPANY;
and BRIAN BUTCHER, an individual.

      Defendants.

_____/

| | |
|---|---|
| JAMES B. RASOR (P43476) | THOMAS J. DAVIS (P78626) |
| ANDREW J. LAURILA (P78880) | SARAH L. NIRENBERG (P77560) |
| Rasor Law Firm, PLLC | Kienbaum Hardy |
| Attorneys for Plaintiff | Viviano Pelton & Forrest, P.L.C |
| 201 E. Fourth St. | 280 N. Old Woodward Ave., Ste. 400 |
| Royal Oak, MI 48067 | Birmingham, MI 48009 |
| (248) 543-9000 | (248) 645-0000 |
| jbr@rasorlawfirm.com | tdavis@khvpf.com |
| ajl@rasorlawfirm.com | snirenberg@khvpf.com |

_____/


## **TABLE OF CONTENTS**

Table of Contents…………………………………………………………………..iii

Index of Authorities …………………………………………………………………iv

Concise Statement of Issues Presented………………………………...…………v

Brief in Support……………………………………………………………………..1

Uncontroverted Facts………………………………………………………………1

    Standard of Review……………………………………………………...………11

iii

Argument…………………………………………………………..……...12

I. Plaintiff has a valid PWDCRA Discrimination Claim…………….….…12

i. Plaintiff is Disabled and Suffered an Adverse Employment
Action……………………………………………………………..13

ii. Direct Evidence……………………………………………….…..16

iii. Alternatively, Indirect Evidence…………………………………19

Conclusion and Relief Requested……………..…………………………..23
Proof of Service……………………………….……………………..24

## INDEX OF AUTHORITIES

Cases:                                                                                        Page #:

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)………………………12
*Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008)……………......12
*Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415 (Mich. App. 2002)………13, 19
*Bhama v. Mercy Mem'l Hosp. Corp.*, 416 Fed.Appx. 542, 552 (6th Cir. 2011)……17
*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 325 (1986)………………..………12
*Chen v. Wayne State Univ.*, 771 N.W.2d 820 (Mich App 2009)………………….…15
*Chiles v. Mach. Shop, Inc.*, 238 Mich App 462 (1999)………………………………13
*Chmielewski v. Xermac, Inc*, 580 N.W.2d 817 (1998)………………………………13
*Crittenden v Chrysler Corp,* 178 Mich App 324 (1989)……………………………14
*DeBrow v. Century 21 Great Lakes, Inc*., 620 N.W.2d 836 (Mich. 2001)…………17
*Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019)……………………………20
*Hazle v. Ford Motor Co.*, 628 N.W.2d 515 (Mich. 2001)…………………………17
*Jackson v Flint,* 191 Mich App 187 (1991)……………………………………......14
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)……12
*Payment v. Department of Transportation*,
2017 WL 3441453, *1 (Mich App 2017)……………………………………………14
*Reeves v Sanderson*, 530 U.S. 133, 142 (2000)……………………………………19
*Rosteutcher v. MidMichigan Physicians Group*,
332 F.Supp.2d 1049, 1059 (E.D. Mich. 2004)………………………………………14

*Smith v City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004)…………………16
*Sniecinski v. Blue Cross & Blue Shield of Michigan*,
666 N.W.2d 186 (Mich. 2003)……………………………………………………16
*Stevens v. Inland Waters, Inc.,* 559 N.W.2d 61, 63 (Mich App. 1996)……………15
*Texas Dept. of Community Affairs v. Burdin*e, 450 U.S. 248, 254 (1981)………...19
*Till v. Spectrum Juvenile Justice Serv.*, 805 F.Supp.2d 354 (E.D. Mich. 2011)…..13

<u>Statutes:</u>                                                                    <u>Page #:</u>

Fed. R. Civ. P. 56 ……………………………………………………..………..12
29 C.F.R. § 1630.2……………………………………………………………...15
M.C.L. § 37.1202(b)……………………………………………………………13
MCL § 37.1103……………………………………………………………………14

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

I.     Is there a genuine issue of material fact as to whether Defendant discriminated against Plaintiff based on his disability in violation of Michigan's Persons with Disability Civil Rights Act requiring summary judgment in Plaintiff's favor?

Plaintiff Responds: No

Defendant Presumably Responds: Yes

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS
## MOTION FOR SUMMARY JUDGMENT

NOW COMES, Plaintiff ARTHUR MULLINS, by his attorneys, Rasor Law Firm, PLLC, and for his brief in support of his Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

## UNCONTROVERTED FACTS

1.     Plaintiff Arthur Mullins began his employment with Defendant Ford Motor Company ("FMC") in 2015 as a production worker at FMC's Dearborn Stamping plant. (Ex. 1, Mullins Dep. p. 58:3-5).

2.     While there were various background facts that occurred between 2015 and 2017 involving Plaintiff's employment, only beginning in late 2017 is relevant to Plaintiff's PWDCRA claims here.

3.     Plaintiff took medical leave in 2017, among earlier points in the year, from September 16, 2017 to January 24, 2018. (Ex. 2, Medical Leave Dates). Plaintiff's medical leave(s) in 2017 were for major depression and anxiety. (Ex. 1, Mullins Dep. 77:1-9; 202:13-22; 267:5-21).

4.     Plaintiff's depression and anxiety have the effect of making it difficult for Plaintiff to stay focused and interferes with his ability to process information and think at times. (Ex. 1, Mullins Dep. pp. 82:4-21; 419:4-5).

5.     Part of Plaintiff's mental health problems arose from treatment he was receiving from various employees at FMC that he deemed harassing. Specifically,

Maria Watson (FMC's Labor Relations Supervisor), in an October 17, 2017 Memo referenced meetings with Plaintiff she had on September 8 and 15. (Ex. 3, Watson 10-17-17 Memo). In this memo, Ms. Watson states that she began "to question Mr. Mullins state of mind, whether it was mental or substance induced; I found his behaviors to be questionable." (*Id*.).

6.      Ms. Watson, in a meeting with Ford Union President, Harold Byrd, on October 12, 2017, asked if he knew that "Mr. Mullins was off on medical for his mental state." (*Id*. Bates No. 01080). In other words, there is no dispute that Maria Watson had knowledge of Plaintiff's medical condition.

7.      Brian Butcher came to FMC's Stamping Plant in June of 2017 working in FMC's Labor Relations Department. (Ex. 4, Butcher Dep. p. 21:21-25). Butcher, who was directly under Maria Watson, knew that Plaintiff had previously taken medical leave(s) in 2017. (Id. 29:8-15; Ex. 1, Mullins Dep. pp. 405:9-18; 407:6-18). Both Butcher and Watson knew Plaintiff suffered from depression and anxiety because Plaintiff was transparent about his medical leave(s). (Ex. 1, Mullins Dep. pp. 404:7-12; 405:9-18; 408:4-11).

8.      Plaintiff returned to work on January 25, 2018, wherein he produced a letter from his treating psychiatrist that the reason for his absence had been "major depression," but that Plaintiff could work with no restrictions. (Ex. 5, 1/10/18 RTW

Form). Plaintiff's symptoms of his depression and anxiety included "paranoia" and "poor concentration." (Ex. 1, Mullins Dep. p. 123:10-25).

9.     Following his return to work, Plaintiff continued to feel he was being harassed by various staff at FMC, prompting him to seek further relief from the Labor Relations staff, including Brian Butcher. (Ex. 6, 1/29/18 Email; Ex. 1, Mullins Dep. p. 345:4-10).

10.     Specifically, Plaintiff first made a statement to Labor Relations staff on February 1, 2018. (Ex. 7, 2-1-18 Investigatory Interview). Labor Relations representative Larissa Kujan defined Plaintiff's demeanor in this meeting as "abnormal" and that he "continuously got emotional." (*Id.*).

11.     On February 2, 2018, Plaintiff again went to Labor Relations to report further mistreatment. (Ex. 1, Mullins Dep. p. 345:4-10).

12.     During this February 2 meeting, Plaintiff and his union representative, Dan Queen, met with Brian Butcher. (Ex. 4, Butcher Dep. p. 38:4-21).

13.     At one point during the meeting, Queen stepped out of the office and was standing no more than five feet away from the door. (Ex. 1, Mullins Dep. p. 475:17-22.

14.     During this meeting, Butcher was being very aggressive with this interview process, beating his keys as he typed and at one point kicking a chair over. (*Id*. p. 475:4-9, 15-17).

3

15.     When Queen stepped out of the office, Butcher alleges that Mullins told him, "fuck you, bitch." (Ex. 8, Butcher 2-2 Statement). Butcher's initial statement provided to FMC was that Mullins "lightly said" this. (*Id*.). But in his deposition, he conflictingly claimed that Mullins "mouthed" it. (Ex. 4, Butcher Dep. p. 54:8-15).

16.     At this point Queen stepped back into the office, and Butcher stated that Mullins had said "fuck you, bitch" and him and Queen needed to leave. Queen responded to Butcher stating that he was just outside the door and Mullins did not say that. (Ex. 1, Mullins Dep. pp. 478:10-18).

17.     The moment Butcher told them to leave, Plaintiff followed his instructions and stood up to leave walking towards the door. (Ex. 1, Mullins Dep. p. 480:3-8).

18.     When Queen had returned to the room, Butcher "physically placed his hands on Mr. Queen." (*Id*. p. 380:1-3). There was then commotion that occurred, with Queen saying, "don't do that, don't do that," referring to Butcher physically touching him. (*Id*. p. 379:19-22).

19.     During the altercation between Queen and Butcher, Plaintiff had moved towards the door trying to remove himself from the situation. (*Id*. pp. 380:4-7; 388:11-21).

20.     Plaintiff's testimony is clear that at no point did he either say or mouth "fuck you, bitch" to Butcher. (Ex. 1, Mullins Dep. pp. 374:12-14; 375:2-4; 492:9-

19).  Further, Plaintiff specifically testified that he never got angry with Butcher or made any threatening gesture. (*Id*. pp. 142:21-24; 359:15-21; 379:19-22).  Any frustration in his voice was the result of feeling defeated by Butcher's refusal to adequately address his complaints. (*Id*. pp. 367-68).

21.    Butcher then told Mullins he was suspended. (Ex. 4, Butcher Dep. p. 83:14-16).

22.    Maria Watson set Plaintiff for a disciplinary conference with Brian Butcher on February 9, 2018. (Ex. 9, Watson 2-6 Email). In Watson's February 6 email, she states that "[p]rior to returning to work Mr. Mullins will need to complete a mental fit for duty examination." (*Id.*).

23.    Plaintiff underwent a disciplinary hearing conducted by Brian Butcher on February 9, 2018. (Ex. 4, Butcher Dep. pp. 88:1-7; 92:23-25).

24.    Following the conclusion of the February 9 disciplinary meeting with Butcher, Plaintiff was given a two-week suspension and a "fit for duty exam." (Ex. 1, Mullins Dep. p. 394; Ex. 10, 2-9-18 Discipline).

25.    This discipline form, signed by Butcher, states that "Employee used abusive language toward a fellow employee in Labor Relations Office;" "Employee displayed threatening and aggressive behavior in the Labor Relations office toward a fellow employee;" and "Employee's return is dependent upon a fit for duty exam

with clearance from medical staff." Notably, the form states: "if criteria is met from this penalty, [return to work] will be: 2/17/18." (*Id*.).

26.    Plaintiff was instructed he would need to "clear through medical upon completion of a mental fit for duty. Bryan [Butcher] stated that [Mullins] could go after this meeting or prior to the start of his next schedule shift upon his return." (Ex. 11, Kujan 2-9 Hearing Notes).

27.    Concurrently with this discipline, Butcher created an "unusual behavior in the workplace form." (Ex. 12, Butcher Unusual Behavior Form). Butcher's report, created on February 9 but pertaining to the February 2 incident, described Mullins as "paranoid to angry/threatening", "near crying emotional state", and noted "quick shifts in mood". (*Id*. Bates No. 00133-00134). Based on Butcher's words, "[t]he LR Team is requesting a full Fit for Duty examination, including an examination of his mental state." (*Id*.).

28.    Critically, per FMC's policy, following the medical examination "[t]he medical department will notify the supervisor of the employee's fitness for duty." (Id. Bates No. 00130).

29.    On February 14, 2018, Plaintiff filed an EEOC Charge of Discrimination, noting that he was required to "undergo a drug screening to return to work." (Ex. 13, 2-14 EEOC Docs, Bates No. 00558-00559). This Charge was served on Ford Motor Company on February 20, 2018. (Id. Bates No. 00554, 00556).

30.     On February 16, 2018, Plaintiff appeared at FMC's medical section for this examination, but was told he had to go elsewhere and undergo an Independent Medical Examination. (Ex. 1, Mullins Dep. pp. 401-402).

31.     On February 16, 2018, Plaintiff's union filed a grievance on behalf of Plaintiff based on the impropriety of the February 9 discipline. (2-16-18 Grievance). The following is from the grievance:

STATEMENT OF CASE:  Mr. Mullins was disciplined on February 9, 2018, by LRO Representative Bryan Butcher. Mr. Mullins's 4600 cited that he displayed threatening and aggressive behavior, and used abusive language towards a fellow employee. There is absolutely no proof of this allegation. Also, no formal investigation was conducted by an unbiased third party. The Union is confounded as to why the HR department, allowed Mr. Bucher, who was the individual that allegedly felt threatened, and was abused, to conduct the disciplinary hearing. The Union contends that in no way did member Arthur Mullins display threatening behavior, or use abusive language towards a fellow employee. Therefore, this discipline is unjust.  The UNION demands that Mr. Mullins's discipline record be corrected. In addition, the Union demands that he be made financially whole.

32.     Plaintiff filed another EEOC Charge of Discrimination on February 20, 2018. (Ex. 15, 2-20 EEOC Docs). This was received by Defendant FMC on February 21, 2018. (Id. at Bates No. 00568, 00570).

33.     On March 1, 2018, Defendant FMC's Labor Relations Office—i.e. either Maria Watson or Brian Butcher—sent Plaintiff a letter requiring him to take an Independent Medical Examination "because of the incident that occurred on February 2, 2018." (Ex. 16, 3-1-18 Letter). Brian Butcher admitted in his deposition that Plaintiff's medical evaluation was based on the "unusual behavior report" completed by him. (Ex. 4, Butcher Dep. p. 96:11-97:10). Butcher also testified that per the policy, "if medical disagrees, they have the authority to send that employee back to work." (*Id*. p. 99:14-22).

34.     Plaintiff underwent an IME with Dr. Kim Smith on or around March 13, 2018. (Ex. 1, Mullins Dep. p. 509:9-13; Ex. 17, 3-20-18 IME). This IME recognizes Plaintiff had symptoms "consistent with an unspecified mental health condition." (*Id*. Bates No. 00093). Notably, she states Plaintiff does not have "cognitive, emotional, thought, or behavioral dysfunction." (*Id*. Bates No. 00094). She then finds that Plaintiff "is fit for duty as long as the modification of moving him to another work station is met, and he can provide documentation of his scheduled appointment with psychiatrist.  He can provide documentation that he attended the appointment at a later date." (Id.).

35.     In a follow-up letter, Dr. Smith clarified on her prior report:

The employee was previously in treatment with a psychiatrist that released him to return to work in January 2018. It is recommended that he follow up with his psychiatrist for medication management of his mental health condition. Given the expansive schedule his psychiatrist has it would be reasonable to allow him three to six months to be scheduled for a follow up appointment with his psychiatrist and provide documentation that the appointment occurred. It is not necessary for continued monitoring by the employer following that one appointment.

(Ex. 18, 3-30-18 Smith Follow-up, Bates No. 00447).

36.     On April 5, 2018, Defendant FMC made a telephone call to Plaintiff and informed him that Defendant was "presently working through your case with the information provided by the medical department" and that he is "encouraged to continue to work with your personal physician." (Ex. 19, 4-5-18 Email). At no point was Plaintiff told he had to continue to seek treatment with his psychiatrist to return to work.

8

37.     There were a series of emails between Labor Relations and Medical between April 16 and April 19 pertaining to a correspondence that would be sent to Plaintiff's psychiatrist about his treatment. (Ex. 20, 4-16-18 Emails). In an email on April 19, 2018, it states that the letter's language should change because "Plant labor wanted the evaluation type changed because an IME has contractual binding implications" versus using the phrase "outside medical evaluation." (*Id*. Bates No. 00439).

38.     On April 27, 2018, Defendant FMC sent a letter to Plaintiff's psychiatrist, Dr. Leon Rubenfaer. (Ex. 21, 4-27-18 Letter). This letter was seeking information relating to Dr. Smith's March report(s). (*Id*.).

39.     On April 30, 2018, Plaintiff's union filed another grievance explaining that Defendant's "actions of placing Mr. Mullins out on suspension pending validation of medical exam, upon return of this test it was made aware that he was wrongfully subjected to the time off, his test returned negative." (Ex. 4-30 Grievance). This grievance was received by Maria Watson. (*Id*.).

40.     On May 4, 2018, Dr. Rubenfaer responded by letter to Defendant explaining that he had not seen Mr. Mullins for treatment since he signed the paperwork returning Plaintiff to work in January of 2018. (Ex. 23, Rubenfaer Letter).

41.     Based on Dr. Rubenfaer's response, Defendant sent Plaintiff a letter on May 8, 2018. (Ex. 24, 5-8 Letter).

42.    Plaintiff never received the results of his March 13 psych evaluation. (Ex. 1, Mullins Dep. pp. 488:24-489:8). In fact, during the two months he was off work, he repeatedly reached out to Defendant to determine the "process for me to return to work and what were the findings of the psychiatric evaluation." (*Id*. p. 490:8-12). His ability to return to work was Labor Relations' responsibility. (*Id*. p. 491:5-13).

43.    Defendants knew that Plaintiff did not receive the May 8 letter, given various correspondences between Defendants noting it had not been delivered. (Ex. 25, May Emails re Letter receipt). In fact, as of June 5, 2018, Defendant did not "receive the returned Certified." (*Id*. Bates No. 01207).

44.    Plaintiff was told by Sandra Charfoos, the liaison between Labor Relations and the employees, that she did not know why Labor Relations was not returning Plaintiff to work and she had never seen this type of treatment. (Ex. 1, Mullins. Dep. pp. 456:11-457:8).

45.    Plaintiff met with Defendant FMC employees on June 7, 2018. (Ex. 26, 6-7-18 Email). Plaintiff was provided a copy of the May 8 letter and told what he needed to do to "comply with the letter prior to reporting back to work." (*Id*.). Maria Watson told Plaintiff that he "was already outside of the time limits to comply, so he was given until COB on Friday June 8 to comply or he MAY face termination." (*Id*.).

46.    Plaintiff was terminated effect on June 12, 2018. (Ex. 27, 6/12 Termination). However, the decision to terminate Plaintiff occurred on June 4, 2018. (Ex. 28, 6-4-18 Emails). The reason for Plaintiff's termination was detailed in an email to Maria Watson, stating to "terminate him per the failure to meet the conditions outlined in the May 13th letter." (Id.).

47.    The Union filed the following grievance for Plaintiff involving his termination:

STATEMENT OF CASE:  THE UNION PROTESTS THE COMPANY ACTIONS OF UNJUSTLY TERMINATING MR. MULLINS FOR FAILURE TO COMPLY WITH A FIVE DAY NOTICE. THE COMPANY CONTENDS THAT THEY IN FACT SENT OUT A CERTIFIED LETTER TO MR. MULLINS HOME ON 5-8-18 (APROX) AND THAT HE WOULD NOT SIGN FOR IT. THEY THEN SENT IT AGAIN TELLING HIM THAT HE WAS SENT A FIVE-DAY NOTICE AND WOULD HAVE TO COMPLY TO IT WITH MEDICAL DOCUMENTATION STATING ALL DATES WERE COVERED BY A DOCTOR UPON RETURNING TO WORK. THE UNION CONTENDS THAT THE COMPANY PUT MR. MULLINS OUT PRIOR TO ANY OF THESE ACTIONS FOR AN ALLEGED CONFRONTATION AT LABOR BETWEEN MR. MULLINS AND LABOR REPRESENTATIVE BRYAN BUTCHER. WHEN THE COMPANY AT THIS SUBJECTED MR. MULLINS TO SEEK PSYCHIATRIC EVALUATION. UPON LEARNING THAT HE WAS CLEARED FULLY BY A PSYCHIATRIST THE COMPANY STILL WOULD NOT ALLOW HIM TO RETURN BACK TO WORK. THE UNION FILED MUTABLE GRIEVANCES FOR THIS ISSUE AND WERE GRANTED FULL PAY. NOW IN THE MIST OF ALL THIS GOING ON. THE COMPANY FAILED TO COMPLY WITH THE ORIGINAL ISSUE THAT SUBJECTED MR. MULLINS TO TIME OFF. THE UNION CONTENDS THAT THE COMPANY FAILED TO INFORM MR. MULLINS OF WHAT ISSUE HE WAS BEING HELD ACCOUNTABLE FOR IN NEED OF MEDICAL COVERAGE. MR. MULLINS WAS UNDER THE IMPRESSION THAT THE ISSUE THAT STARTED THIS TERMINATION TO TRANSPIRE WAS THE ISSUE HE HAD ALREADY PRESENTED DOCTOR'S NOTES THAT IN FACT CLEARED HIM FOR WORK.

(Ex. 29, 6-15 Grievance).

48.    All of Defendant's conduct that ultimately led to Plaintiff's termination encompassed Plaintiff's "mental illness" or that he "had a mental lapse." (Ex. 1, Mullins Dep. pp. 96:1-97:6).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This requires the Court to determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In ruling upon a motion for summary judgment, all evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Once the moving party identifies the elements of a claim, the non-moving party must present affirmative evidence tending to show a genuine dispute of material does exist. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 325 (1986). Production of a "mere scintilla of evidence" in support of the non-movant's response is not adequate to prevent a finding of summary judgment. *Anderson*, 477 U.S. at 252. (nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts."). In responding, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008).

## Argument

## I.    Plaintiff's has a Valid PWDCRA Discrimination Claim

The PWDCRA prohibits the discharge or otherwise discrimination against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position. M.C.L. § 37.1202(b). To establish a prima facie case of discrimination under the PWDCRA, a party must prove that (1) that she is disabled as defined by the statute, (2) that the disability "is unrelated to h[er] ability to perform h[er] job duties" and (3) that she has suffered an adverse action as defined in the statute. *Chmielewski v. Xermac, Inc*, 457 Mich 593, 602; 580 N.W.2d 817 (1998).

Generally, because the PWDCRA substantially mirrors the ADA, both state and federal case law will be instructive in interpreting PWDCRA claims. See *Till v. Spectrum Juvenile Justice Serv.*, 805 F.Supp.2d 354, 360-61 (E.D. Mich. 2011); *Chiles v Machine Shop, Inc.,* 606 N.W.2d 398, 405 (Mich. App. 1999). Regardless, a plaintiff proving PWDCRA discrimination may utilize either direct evidence of discrimination or indirect evidence, thus necessitating the *McDonnell Douglas* burden-shifting framework. *Till*, 805 F.Supp.2d at 361; *Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 436-37 (Mich. App. 2002).

### i.    Plaintiff is Disabled and Suffered an Adverse Employment Action

Per the PWDCRA, disability is defined, in relevant part, as a "determinable mental characteristic of an individual that substantially limits at least one major life

activity and is unrelated either to the person's qualifications for their job or ability to perform their job duties" and includes having a "history of a determinable physical or mental characteristic" and/or "[b]eing regarded as having a determinable physical or mental characteristic." MCL 37.1103(d)(i)-(iii). "Unrelated to the individual's ability means, with or without accommodation, an individual's disability does not prevent the individual from…performing the duties particular job or position." MCL 37.1103(l). Under the PWDCRA the opportunity to obtain employment without discrimination because of a disability is guaranteed and is an express civil right.  MCL 37.1101 *et seq*.  The PWDCRA is construed to require the employment of the disabled to the fullest extent possible. *Jackson v Flint,* 191 Mich App 187 (1991). Therefore, the statute should be liberally construed to reach that purpose.  *Crittenden v Chrysler Corp,* 178 Mich App 324 (1989).

In *Rosteutcher v. MidMichigan Physicians Group*, 332 F.Supp.2d 1049, 1059 (E.D. Mich. 2004), the plaintiff asserted PWDCRA and ADA claims, and the Court held that the plaintiff's depression did in fact qualify as an impairment. Likewise, in the unpublished case of *Payment v. Department of Transportation*, 2017 WL 3441453, *1 (Mich App 2017), the Court held that "[t]here is no serious dispute, nor would we entertain any, that depression and anxiety can cause one to be 'disabled' for the purpose of the PWDCRA."

Insofar as what constitutes a "major life activity", the Michigan Court of

Appeals has turned to the ADA for guidance in defining this term because the PWDCRA does not have a definition. See *Stevens v. Inland Waters, Inc.,* 559 N.W.2d 61, 63 (Mich. App. 1996). Citing to the ADA's regulations, the *Stevens* Court enumerated the following major life activities: "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id*. 29 C.F.R. § 1630.2(i)(1)(i) also defines "major life activities" to include "learning, reading, concentrating, thinking [and] communicating."

First, Plaintiff suffers from major depression and anxiety. (SOF ¶ 3). These serious mental health conditions make it difficult to focus and concentrate and interfere with his ability to process information and think at times. (SOF ¶¶ 4, 8). Moreover, throughout Plaintiff's employment, FMC had knowledge of Plaintiff's mental health problems given the instances Plaintiff took known medical leave. (SOF ¶¶ 5, 7-8). As such, it is undisputed that Plaintiff's depression and mental health issues are a "disability" under the PWDCRA given it effects multiple major life activities and did not interfere with his ability to perform his job.

Plaintiff also suffered multiple, distinct adverse employment actions. "There is no exhaustive list of what constitutes adverse employment actions." *Chen v. Wayne State Univ*, 771 N.W.2d 820 (Mich App 2009). Adverse employment actions must be "materially adverse to the employee…akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id*. (internal citations omitted). While a termination is undeniably an adverse employment action, a suspension likewise has been deemed sufficient. *Smith v City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004).

First, Plaintiff was suspended for two weeks regarding the February 2 incident with Butcher. (SOF ¶¶ 21, 24). Following that, Plaintiff was kept off work because he had to take a fit for duty exam and/or an IME. (SOF ¶¶ 24-25, 30). And finally, Plaintiff was terminated on June 12, 2018. (SOF ¶ 46). From the time of this underlying suspension up until Plaintiff's termination, Defendant's unwillingness to allow Plaintiff to return to work all constitute adverse employment actions for purposes of Plaintiff's PWDCRA claim. As such, these adverse actions can be broken into three categories: (1) Suspension; (2) Kept off work pending fitness for duty examination; and (3) termination. With these adverse employment actions in mind, Plaintiff will discuss the discriminatory animus behind these decisions next.

## ii.   Direct Evidence

Discrimination can be established by either direct or circumstantial evidence. *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186 (Mich. 2003). Where a plaintiff offers direct evidence of discrimination, the plaintiff may proceed and prove the unlawful discrimination in the same manner as in any other civil case.

16

*Hazle v. Ford Motor Co.*, 628 N.W.2d 515 (Mich. 2001). "Where direct evidence is offered to prove discrimination, a plaintiff is not required to establish a prima facie case within the McDonnell Douglas framework, and the case should proceed as an ordinary civil matter." *DeBrow v. Century 21 Great Lakes, Inc*., 620 N.W.2d 836 (Mich. 2001). The Michigan Supreme Court has defined direct evidence as "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle*, 464 Mich at 462; see also *Till, supra*, (citing *Bhama v. Mercy Mem'l Hosp. Corp*., 416 Fed.Appx. 542, 552 (6th Cir. 2011)).

There is no dispute that the alleged confrontation between Plaintiff and Brian Butcher prompted the above-referenced disparate treatment. Based on Butcher's perception of Plaintiff during the February 2 meeting, Plaintiff was suspended. (SOF ¶¶ 21-24). While the suspension is one issue, instead of solely being suspended for two weeks, Plaintiff was then forced to remain off work because of Butcher's "unusual behavior" form. Butcher has admitted that the requirement for Plaintiff to complete essentially a mental health examination before returning to work arose from his completion of the "unusual behavior report." (SOF ¶¶ 33). And looking at Butcher's comments in this report, his issues with Plaintiff were because Mullins purportedly acted "paranoid to angry/threatening", "near crying emotional state", had "quick shifts in mood." (SOF ¶¶ 27). Yet these are solely characteristics of

Plaintiff's known disability.

The only basis that Butcher had for requiring Plaintiff to take a fit for duty examination involved symptoms of Plaintiff's depression and anxiety: i.e. his disability. And there is no question that Butcher had direct knowledge of Plaintiff's medical conditions triggering these conditions. (SOF ¶¶ 7-8). As such, Plaintiff has direct evidence that being ordered to take a fit for duty examination and kept off work during that process was directly motivated by Butcher's discriminatory animus towards his disability.

And finally, Plaintiff has direct evidence that his termination was motivated by his disability. Plaintiff need not show "but for" causation here, just that Plaintiff's disability—i.e. his mental health—motivated Defendant's termination. Without Plaintiff's disability and Defendant's treatment of the same, he never would have been in the position he was in. For example, had Defendant not treated Plaintiff with a discriminatory animus, he would not have been placed in the unreasonable position of attempting to comply with FMC's medical requirements for him to return to work in an unreasonable short period of time. (SOF ¶¶ 43-46).

As such, Plaintiff has presented direct evidence that his suspension, continued status of being forced off work, and his ultimate termination all were directly related to Defendant's discriminatory animus towards Plaintiff's known disability—i.e. his mental health. While the analysis ends there and warrants summary judgement for

Plaintiff, even if Defendant attempts to proffer a nondiscriminatory explanation excluding Plaintiff's mental health, such an argument will not meet Defendant's burden under the McDonnell Douglas and warrants summary judgment regardless. This will be discussed, *infra*.

### iii.    Alternatively, Indirect Evidence

When direct evidence is not shown, following a *prima facie* showing, PWDCRA claims adhere to the McDonnell Douglas burden-shifting framework. See *Bachman v Swan Harb*our Ass'n, 653 N.W.2d 415, 436, note 26 (Mich. App. 2002). Under this analysis, after the Plaintiff makes a prima facie case, the burden shifts to the Defendant to produce a nondiscriminatory explanation. *Reeves v Sanderson*, 530 U.S. 133, 142 (2000). The *prima facie* elements create "a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Texas Dept. of Community Affairs v. Burdin*e, 450 U.S. 248, 254 (1981).

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves,* 530 U.S. at 147. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the

employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id*. (internal citations omitted). "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id*.

In order to meet this burden of production, Defendant must provide a sufficient legal explanation for its actions and "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-56. A recent opinion from the D.C. Circuit properly articulated this standard as applied to a defendant's burden at this stage. In *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019), the Court reviewed this standard in a failure to promote case. The defendant argued its subjective criteria utilized in its promotion process was a non-discriminatory explanation. *Id*. at 1088. Though subjective standards can under limited circumstances be a valid nondiscriminatory explanation, there is also "an intolerable risk that a nefarious employer will use them as cover for discrimination." *Id*. As such, an employer's burden of production at this stage requires a "clear and reasonably specific explanation as to how the employers applied their standards to the employee's

particular circumstances." *Id*. Based on the defendant's inability to satisfy its burden in articulating a valid nondiscriminatory explanation, the *Figueroa* Court held that on remand the trial court may grant summary judgment for the plaintiff "[i]f every reasonable juror would find that the prima facie case 'is supported' by the summary judgment record" because there is a "presumed fact of unlawful discrimination." *Id*. at 1095. (internal citations omitted).

First, Defendant cannot proffer am admissible, nondiscriminatory explanation for suspending Plaintiff. Defendant will assuredly cite to Plaintiff's alleged use of "abusive language towards a fellow employee" and/or "aggressive behavior." But Butcher's statement regarding this incident is both contradicted by his testimony and/or refuted by other testimony. (SOF ¶ 15). Nothing in his statement indicated Plaintiff acted aggressive. Instead, it appears the sole basis for Plaintiff's suspension was that he purportedly said, "fuck you, bitch" to Butcher. Yet this "explanation" is essentially a nonreason. Not only did Plaintiff deny saying that, but Dan Queen came back in from being just outside of the room and corroborated Mullins did not say that.[1] (SOF ¶¶ 16, 20). Moreover, Butcher's subsequent conflict between whether

---

[1] Defendant has taken issue with the substance of an audio recording Plaintiff took during this encounter. Plaintiff anticipates Defendant to argue that the audio was edited, implying that Plaintiff did say, "fuck you, bitch." However, Plaintiff's testimony is clear: he did not say or mouth it. As such, any argument addressing the validity of the audio recording is merely an improper attempt to interject credibility determinations at the summary judgment stage.

Plaintiff said it or mouthed it only furtherly discredits the merits of this explanation. (SOF ¶ 15).

And finally, the Grievance filed on behalf of Plaintiff pertaining to this suspension completely discredits Defendant's explanation.

STATEMENT OF CASE: Mr. Mullins was disciplined on February 9, 2018, by LRO Representative Bryan Butcher. Mr. Mullins's 4600 cited that he displayed threatening and aggressive behavior, and used abusive language towards a fellow employee. There is absolutely no proof of this allegation. Also, no formal investigation was conducted by an unbiased third party. The Union is confounded as to why the HR department, allowed Mr. Bucher, who was the individual that allegedly felt threatened, and was abused, to conduct the disciplinary hearing. The Union contends that in no way did member Arthur Mullins display threatening behavior, or use abusive language towards a fellow employee. Therefore, this discipline is unjust. The UNION demands that Mr. Mullins's discipline record be corrected. In addition, the Union demands that he be made financially whole.

The Union's recognition that there is no evidence that Plaintiff acted the way Butcher claimed only furthers the extent which any non-discriminatory explanation Defendant proffers must be discredited. All in all, Defendant does not have sufficient evidence to meet its burden in rebutting Plaintiff's prima facie case of discrimination involving the initial suspension.

Akin to the suspension, Defendant likewise cannot meet its burden by proffering any alleged nondiscriminatory explanation for keeping Plaintiff of work and/or his ultimate termination. Initially, Plaintiff was told he had to receive a fit for duty examination to return to work from FMC's medical department. (SOF ¶ 25). Yet when Plaintiff arrived for this examination on February 16, he was refused and told he had to take an IME. (SOF ¶ 30). On March 13, 2018, Plaintiff underwent an IME where it was concluded that he was "fit for duty." (SOF ¶ 34). Despite this, on April 5, 2018 FMC told Plaintiff that it was "presently working through your case

with the information provided by the medical department" and that he is "encouraged to continue to work with your personal physician." (SOF ¶ 6). During the two months he was off work, Plaintiff repeatedly reached out to Defendant to determine the "process for me to return to work and what were the findings of the psychiatric evaluation." (SOF ¶ 42).

Ultimately, Defendant purportedly terminated Plaintiff for failing to comply with the May 8 letter. (SOF ¶¶ 41, 43). However, Defendant knew that Plaintiff had not received this letter, evidenced by the various emails between FMC employees noting that it had not been delivered. (SOF ¶ 43). While Defendant met with Plaintiff on June 7, 2018 requesting him to comply with the letter, the decision to terminate him for failing to comply with a letter he had not received was made on June 4, 2018. (SOF ¶¶ 45-46). Accordingly, Defendant has no basis to support any argument that Plaintiff failed to comply with the letter before the decision to terminate him for doing so was made on June 4, 2018. As such, any nondiscriminatory explanation Defendant proffers for this termination decision does not meet Defendant's burden under McDonnell Douglas and pursuant to *Reeves* and *Burdine*, summary judgment is proper for Plaintiff.

## V.    Conclusion and Relief Requested

As stated above, all the material adverse actions Defendant took against Plaintiff were "motivated" by his disability and known symptoms related to the

same. While this direct evidence is sufficient to warrant summary judgment in Plaintiff's favor, even if not, Defendant cannot set forth legitimate, nondiscriminatory explanations for its patently discriminatory conduct. Given Defendant's inability to meet its burden under McDonnell Douglas, summary judgment is likewise proper for Plaintiff under this alternative theory.

For the above reasons, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion for Summary Judgment as to his PWDCRA Discrimination claim against Defendants.

Respectfully Submitted,

THE RASOR LAW FIRM, PLLC

*/s/ Andrew J. Laurila*
ANDREW J. LAURILA (P78880)
Attorney for Plaintiff
201 E. 4th Street
Royal Oak, MI 48067

Dated: November 20. 2020

### PROOF OF SERVICE

The undersigned certified that a copy of the foregoing instrument was delivered to each of the attorneys of record and/or unrepresented and/or interested parties on **November 20, 2020** at their respective addresses as disclosed in the pleadings on record in this matter by:

☐ US First Class Mail          ☐ Facsimile Transmission
☐ Hand Delivery                ☐ UPS
☐ Fed Ex                       ■ Other: Efiling

*/s/ Stephanie Moore*
Stephanie Moore