UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR MULLINS,

     Plaintiff,                            Case No. 19-cv-10372
                                             Hon. Matthew F. Leitman

v.

FORD MOTOR COMPANY and
BRIAN BUTCHER,

     Defendants.

_____/

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 26) AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 27)

Plaintiff Arthur Mullins is a former employee of Defendant Ford Motor Company. In this action, Mullins alleges that Ford and one of its employees, Defendant Brian Butcher, violated his rights under Michigan's Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.101 *et seq.* (the "PWDCRA") when they (1) terminated his employment based on his disability and (2) retaliated against him for filing disability discrimination complaints with the Equal Employment Opportunity Commission (the "EEOC"). The parties have now filed cross-motions for summary judgment. (*See* Mots., ECF Nos. 26, 27.) For the reasons explained below, the Court **DENIES** Mullins' motion and **GRANTS** Defendants' motion.

# I

## A

Mullins began working for Ford in 2015 as a production worker at the Dearborn Stamping Plant. (*See* Mullins Dep. at 58, 131, ECF No. 27-2, PageID.496, 514.) In late 2016, Mullins began having difficulties working in close proximity to three women who also worked at that plant – Krystal Pierrie, Shavanda Williams, and a woman named Kimmy. (*See id.* at 174, 424, PageID.525, 620.) These difficulties arose out of a romantic relationship that Mullins had with another Ford employee, Shalisa Lee. Mullins says that Pierrie, Williams, and Kimmy wrongly believed that Lee was his cousin, and they teased him for "having sex with [his] cousin." (*Id.* at 174-75, PageID.525.) According to Mullins, the teasing by Pierrie, Williams, and Kimmy caused him to develop depression and anxiety. (*See id.* at 77, 421, 434, PageID.501, 619, 622.)

Mullins took two medical leaves to address the depression and anxiety that arose out of his conflicts with Pierrie, Williams, and Kimmy. First, Mullins took a paid medical leave from May to September 2017. (*See id.* at 262-63, PageID.547.) When he returned from that leave, he was given a "clean bill of health" by his treating mental health professionals. (*Id.* at 80, PageID.501.) But soon after Mullins returned to work, he had another run-in with Pierrie that triggered his depression and anxiety. (*See id.*; *see also id.* at 341, PageID.599.) He took a second medical leave

from mid-September of 2017 to late January of 2018. (*See id.*; *see also id.* at 85, 341, 349, 407-08, PageID.503, 599, 601, 615-616.)

## B

When Mullins' returned from his second medical leave, Ford became concerned that his conflicts with Pierrie, Williams, and Kimmy were affecting his "mental stability[,] well-being … [and] his ability to do his job." (Declaration of Ford Human Resources Representative Maria Watson at ¶17, ECF No. 26-5, PageID.324.) For example, Mullins' supervisor, Darrell Rinehart, reported that Mullins was "constantly stating he is in fear of his life and spends 45 minutes at a time wanting to have a conversation with his UAW leadership. He states he is in fear for his life and feels threaten[ed] when there is no one even around and [he] ask[ed] for a Process Coach escort to assigned job." (Rinehart email, ECF No. 26-5, PageID.335.) In addition, at around this same time, other Ford employees reported that Mullins was "exhibiting incoherent, erratic, and confusing behavior, including expressing concern for his life due to a co-worker merely glancing at him." (Watson Decl. at ¶17, ECF No. 26-5, PageID.324.) And Mullins, himself, reported that his "hands [were] shaking and [his] vision [was] blurry" because he was "under a lot of stress." (Ford medical visit summary rpt., ECF No. 26-6, PageID.389.)

Mullins says that this stress resulted from the fact that he worked in "close proximity" to Pierrie. (Mullins Dep. at 350, ECF No. 27-2, PageID.601.) Being

around her caused Mullins to feel "uncomfortable" and "intimidated." (*Id.*) For this reason, Mullins asked to be moved. More specifically, he asked Butcher, then a Labor Relations Representative at the Dearborn Stamping Plant (*see* Butcher Decl. at ¶3, ECF No. 26-8, PageID.422), if he could be "move[d]" from his normal assigned post in the west wing of the plant to the east wing where he would not have to see Pierrie, Williams, or Kimmy. (Mullins Dep. at 350, ECF No. 27-2, PageID.601.) Butcher responded that he could not authorize the move because "Labor Relations [did] not have the ability to move manpower." (Butcher Decl. at ¶6, ECF No. 26-8, PageID.422.) But Butcher did present Mullins' request to Rinehart (Mullins' supervisor). (*See id.* at ¶7, PageID.422-423.) Rinehart agreed to allow Mullins to move to a different work station in the east wing of the plant for one day. (*See id.*)

Mullins did not experience anxiety or depression during his one day of work in the east wing. He "felt safe in east" and was "satisfied with [working in] east" because he did not have to see or interact with Pierrie, Williams, or Kimmy. (*Id.* at 348, PageID.601.)

## C

As of February 1, 2018, Mullins had returned to the west wing, and Ford remained concerned about his "alarming and unusual behavior." (Watson Decl. at ¶15, ECF No. 26-5, PageID.324.) Accordingly, on that day, Maria Watson, who

was then the Labor Relations Supervisor at the Dearborn Stamping Plant (*see id.* at ¶2, PageID.322), directed Butcher to "complete an unusual behavior report for [] Mullins." (*Id.* at ¶18, ECF No. 26-5, PageID.324-325.) Watson also decided on that day to require "Mullins [to] report for a mental-health fitness for duty examination." (*Id.*, PageID.325.) The examination was later classified as an independent medical examination (an "IME"). (*See* Mullins Dep. at 399-400, ECF No. 27-2, PageID.613-614.)

The next day, Mullins had another incident at work. The incident occurred during a meeting between Mullins, Butcher, and Dan Queen (Mullins' union representative). Mullins initiated the meeting in order to raise additional concerns related to Pierrie, Williams, and Kimmy. He had been assigned to a work station that was "in very close proximity" to Pierrie, Williams, and Kimmy, and that was causing him to experience "fear, worry, [and] despair." (*Id.*, PageID.600.) During the meeting, Mullins asked to be "moved away" from Pierrie, Williams, and Kimmy. (*Id.* at 349, PageID.601.) Butcher did not agree to relocate Mullins' work station, and Mullins became "demoralized" and "defeated." (*Id.* at 353, 359, 367 PageID.602-603, 605.)

According to Butcher, as the meeting progressed, Mullins became "aggressive," "angry," and "threatening." (Butcher Dep. at 45-46, ECF No. 26-7, PageID.395.) Butcher says that at one point during the meeting, Mullins "charged

at [him]." (*Id.* at 49, PageID.396.) Butcher also says that Mullins swore at him. (*See id.* at 47, PageID.395.) Mullins denies these characterizations of his behavior at the meeting. (*See* Mullins Dep. at 359, ECF No. 27-2, PageID.603.) At the end of the meeting, Butcher told Mullins that he was suspended from work. (*See* Butcher Dep. at 82-83, ECF No. 26-7, PageID.403.)

Butcher then drafted a statement summarizing the meeting. (*See* Butcher Statement, ECF No. 26-7, PageID.417-418.) Butcher wrote that during the meeting Mullins had "clenched his fists," had "sweat … bead up on his nose," and, at the conclusion of the meeting, "flexed" his arms and took a "hard step towards [Butcher]." (*Id.*)

Finally, on February 9, 2018, Butcher completed the unusual behavior report that Watson had requested about one week earlier. (*See* Unusual Behavior Rpt., ECF No. 27-7, PageID.419-420.)

**D**

On February 14, 2018, Mullins filed a Charge of Discrimination against Ford with the EEOC (the "February 14 EEOC Charge"). (*See* February 14 EEOC Charge, ECF No. 26-10, PageID.443-444.) In that charge, he alleged that a female employee whom he did not identify had made false accusations against him and harassed him, that he had asked an Area Manager to move him to another position "to address [his]

ongoing concerns of false allegations and harassment," and that the Area Manager then falsely accused him of making threats. (*Id*.)

On February 20, 2018, Mullins filed a second Charge of Discrimination against Ford with the EEOC arising out of Ford's requirement that he undergo a fitness-for-duty examination (the "February 20 EEOC Charge"; collectively with the February 14 EEOC Charge, the "EEOC Charges"). (*See* February 20 EEOC Charge, ECF No. 26-10, PageID.447-448.) In that charge, he complained that he was being sent for a mental health fitness-for-duty examination in retaliation for filing the February 14 EEOC Charge. (*See id*.) He also claimed that sending him for the examination violated the Americans With Disabilities Act. (*See id*.)

It is not clear what happened to the EEOC Charges after Mullins filed them. The record contains two documents on EEOC letterhead titled "Notice of Charge of Discrimination" (the "Notices"). (*See* Notices, ECF No. 26-10, PageID.441, 445.) One of the Notices is dated February 20, 2018. (*See id.*, PageID.441.) It describes Mullins' February 14 EEOC Charge. (*See id.*) The other Notice is dated February 21, 2018. (*See id.*, PageID.445.) It describes Mullins' February 20 EEOC Charge. (*See id.*)

Both of the Notices indicate that they were generated through the EEOC's "DIGITAL CHARGE SYSTEM." (*Id.*, PageID.441, 445.) And both are addressed to: "Suzie Furton, Manager of Equal Emp. Planning, FORD MOTOR COMPANY,

sfurton@ford.com." (*Id.*)  The Notices further instructed Ms. Furton how she could access Mullins' EEOC Charges in the EEOC's "secure online system." (*Id.*)

Mullins has not identified any evidence in the record that Ms. Furton or anyone else at Ford actually received the Notices or reviewed Mullins' EEOC Charges.  Likewise, Mullins has not pointed to any evidence that any Ford employee with whom he interacted and/or any Ford employee who made any decision concerning any aspect of his employment was aware of the EEOC Charges or their content.

## E

In March 2018, a psychologist conducted the IME of Mullins that Watson had ordered in early February. (*See* Mullins Dep. at 509, ECF No. 27-2, PageID.641.) The psychologist did not diagnose Mullins with any particular mental illness. Instead, she noted that while he "describe[d] a symptomology consistent with an unspecified mental health condition," she found "no indications of somatic, cognitive, emotional, thought or behavioral dysfunction present." (ECF No. 27-18, PageID.748.)  In addition, she found "no impairment in [] cognitive functioning." (*Id.*, PageID.749.)  She further noted that Mullins described suffering from "situational anxiety" that arose "when he c[ame] into contact" with Pierrie, Williams, and Kimmy. (*Id.*)  Because contact with those three women triggered Mullins' anxiety, the psychologist advised Ford "to relocate [Mullins'] work station

to another area in which he [would] not have contact with those specific employees."

(*Id.*) She ultimately concluded that Mullins was "fit for duty as long as the modification of moving him to another work station [away from Pierrie, Williams, and Kimmy was] met, and he [could] provide documentation of [a] scheduled appointment with [his] psychiatrist." (*Id.*)

After Ford received the psychologist's report, it had additional questions and sought clarification concerning some of her findings. Specifically, Ford posed these follow-up questions:

> 1. The employee does not have a set work station in his position; he rotates through different stations on a line. He interacts with multiple different employees at different times. The recommended modification of relocating the employee's work station to another area, in which he will not have contact with the co-workers the employee perceives have been harassing him, is difficult to accommodate. Are there specific activities or specific employees that can be named or described that should be avoided? Was there a specific incident or interaction that the employee described that can aid the employer in determining which coworkers or situations should be avoided if the employee returns to work?
>
> 2. In the original report, you stated the employee needed to provide documentation of his scheduled appointment with a psychiatrist and that he could provide documentation that he attended the appointment at a later date. Please be more specific as to whether the follow up documentation is required and when and/or how monitoring should be done.

(ECF No. 27-19, PageID.751-752.)

While Ford was waiting for a response to these questions, it did not lift Mullins' suspension. Instead, it told him that it was "working through [his] case with the information provided by the medical department." (ECF No. 27-20, PageID.754.) Until these issues were "resolved," Ford would not allow Mullins "to return to work."[1] (Watson Decl. at ¶21, ECF No. 26-5, PageID.325.) Meanwhile, Ford encouraged Mullins to "continue to work with [his] personal physician" while it determined when and if he could return to work. (*Id.*)

The psychologist later responded to Ford's follow-up questions. (*See* ECF No. 27-19.) She reiterated that Mullins' "anxiety [was] situational and reasonable accommodations to restrict and/or reduce his contact with [Pierrie, Williams, and Kimmy] that trigger the anxiety should be considered." (*Id.*, PageID.751-752.) She then said that Mullins was "not currently suffering from any behavioral, thought, or cognitive dysfunction that would prevent him from returning to work with accommodations." (*Id.*, PageID.752.) She again reported that with the "recommended accommodation" of moving Mullins to a work station away from Pierrie, Williams, and Kimmy, Mullins was "fit for duty." (*Id.*)

---

[1] Ford did not initially pay Mullins for this time that it kept him from working as it followed up with the psychologist. (*See* Watson Decl. at ¶21, ECF No. 26-5, PageID.325.) But Ford eventually paid Mullins "for all of the time he would have otherwise worked." (*Id.*)

Ford ultimately determined that it would not move Mullins' work station on a permanent basis because (1) doing so would not enable him to avoid contact with Pierrie, Williams, and Kimmy and (2) such a move risked running afoul of Ford's labor agreements. Watson explained Ford's reasoning for not moving Mullins' work station as follows:

22. For one thing, Pierrie's job was driving a hi-lo, and hi-lo drivers could be assigned to do tasks anywhere in the plant, as needed. Among other things, hi-lo drivers would pick up parts and other manufacturing-related items from the various assembly line areas, and Mullins worked on an assembly line. Thus, "relocating" Mullins's work station would not resolve the alleged issue, since her duties would inevitably bring her into a location where Mullins was nearby. Relocating Mullins's workstation also would have no effect on shared common areas, like the parking lot and shuttle busses, where employees like Mullins and Pierrie could interact.

23. Reassigning Mullins permanently would also likely have violated seniority rules. Labor Relations had no authority under the contract to bump an existing worker, in another area of the plant, out of his or her job so that Mullins could take it instead. And if there was an open position, it would have to be offered first to higher-seniority employees under the collective bargaining agreement.

24. It would also have been inappropriate to restrict Pierrie's movement around the plant or use of common areas when she had not been found to have done anything wrong. Moreover, imposing such restrictions on her without cause would likely have been viewed by the union as unjustified punishment in breach of the collective bargaining agreement or otherwise a

violation of her contractual rights (such as restricting her ability to bid for jobs or shifts based on whether Mullins would be impacted.)

(Watson Decl. at ¶¶ 22-24, ECF No. 26-5, PageID.326-327.)

## F

After Ford concluded that it would not re-assign Mullins to a different work station, it offered Mullins three options for moving forward from his suspension. Ford presented these options to Mullins in a letter it mailed to him on May 8, 2018 (the "May 8 Letter"). (*See* May 8 Ltr., ECF No. 26-5, PageID.354; *see also* Watson Decl. at ¶28, ECF No. 26-5, PageID.327.) The first two options involved Mullins returning to work. Ford said that Mullins could return to work if he provided either (1) "a letter [from his personal physician] indicating [he was] able to return to work with no mental health or physical restrictions" or (2) "a letter [from his personal physician] indicating [he was] able to return to work with mental health or physical health restrictions, and appropriate documentation detailing the specific mental health or physical health restrictions." (May 8 Ltr., ECF No. 26-5, PageID.354.) The May 8 Letter also provided Mullins a third option: he could "open" a "bona fide medical leave of absence" (which, as described above, Mullins had done at least twice before). (*Id.*) The May 8 Letter further informed Mullins that he had to exercise one of the three listed options within five business days. (*See id.*) And it told Mullins that his failure to timely exercise one of the options could "result in

termination with a loss of seniority pursuant to Article VIII, Section 5(4) of the National Collective Bargaining Agreement." (*Id.*) According to Watson, this provision of the Collective Bargaining Agreement sets forth Ford's "five-day quit rule" which "states that an employee who is not on medical leave, and who is notified that he may return to work, will lose seniority and be subject to termination" if he does not return to work as directed. (Watson Decl. at ¶29, ECF No. 26-5, PageID.327-328.)

## G

By June 4, 2018, Mullins had not exercised any of the options in the May 8 Letter. That day, Ford Human Resources manager Ashlie O'Reilly sent an email to Watson and Donna Frank (a Ford HRLO Representative) in which she informed Watson and Frank that Mullins "did not accept delivery" of the May 8 Letter. (Ford 6/4/2018 emails, ECF No. 27-29, PageID.795.) O'Reilly then proposed sending Mullins another letter that would function as a second quit notice. (*See id.*) O'Reilly assumed that another notice may be necessary before Ford could fire Mullins for failing to return to work. (*See id.*) Franks responded that a second letter was not necessary and that O'Reilly was authorized to "terminate [Mullins] per the failure to meet the conditions outlined" in the May 8 Letter. (*Id.*, PageID.794.) There is no evidence in the record that Ford actually terminated Mullins on June 4 as a result of Frank's or O'Reilly's emails.

## H

On June 7, 2018, Watson met with Mullins. (*See* Watson Decl. at ¶30, ECF No. 26-5, PageID.328.)  During that meeting, Mullins said that he wanted to return to work.  Watson responded by asking Mullins if he had exercised one of the three options described in the May 8 Letter.  He indicated that he had not timely received the May 8 Letter and that he did not understand why he needed to exercise one of the options described in that letter. (*See id.*)  She then told Mullins that he could not return to work until he exercised one of those options, and she gave him an additional copy of the May 8 Letter. (*See id.; see also* O'Reilly email, ECF No. 27-27, PageID.790.)  She also told him that because the time for exercising one of the options had expired, he had until the close of business on the following day (approximately 24 hours later) to exercise one of the three options. (*See* O'Reilly email, ECF No. 27-27, PageID.790; *see also* Watson Decl. at ¶30, ECF No. 26-5, PageID.328.)  Mullins did not exercise any of the options within the time frame specified by Watson. (*See* Watson Decl. at ¶31, ECF No. 26-5, PageID.328.)  Ford subsequently fired Mullins. (*See id.*)

## II

Mullins filed this action against Ford and Butcher on December 13, 2018, in the Wayne County Circuit Court. (*See* Compl., ECF No. 1-2.)  In his Complaint, Mullins alleged that the Defendants subjected him to a hostile work environment in

violation of Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws §

37.2101 *et eq.* (the "ELCRA") (Count I), retaliated against him in violation of the

ELCRA (Count II), discriminated against him in violation of the PWDCRA (Count

III), retaliated against him in violation of the PWDCRA (Count IV), and

discriminated against him in violation of the federal Family Medical Leave Act, 29

U.S.C. § 2601 *et seq.* (the "FMLA") (Count V). Based on Mullins' federal FMLA

claim, the Defendants removed Mullins' action to this Court. (*See* Notice of

Removal, ECF No. 1.)

Following removal, the Court entered a stipulated order dismissing Mullins'

ELCRA claims (Counts I and II of the Complaint). (*See* Stipulated Order, ECF No.

15.) At the conclusion of discovery, Defendants decided to file a motion for

summary judgment on the remaining claims in this action – Mullins' PWDCRA and

FMLA claims. Before Defendants filed that motion, their counsel contacted counsel

for Mullins and asked whether Mullins would grant his concurrence with respect to

any portion of Defendants' motion. Mullins' counsel "agreed that summary

judgment should be granted on Mullins' FMLA claim." (Defs.' Mot., ECF No. 26,

PageID.186.) But Mullins' counsel refused to grant concurrence with respect to

Mullins' PWDCRA claims. (*See id.*)

The parties then filed cross-motions for summary judgment. (*See* Mots., ECF

Nos. 26, 27.) Defendants moved for summary judgment on Mullins' discrimination

and retaliation claims under the PWDCRA, and Mullins moved for summary judgment on his PWDCRA discrimination claim only.[2] (*See id.*)

The Court held a video hearing on the motions on June 22, 2021. At the beginning of the hearing, the Court explained that Mullins was not entitled to summary judgment in his favor on his PWDCRA discrimination claim because the facts taken in the light most favorable to the Defendants did not support judgment in Mullins' favor. The Court therefore orally denied Mullins' motion for summary judgment. The Court then heard argument from the parties on Defendants' motion.

### III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."

---

[2] To the extent that Mullins' PWDCRA discrimination claim incorporated a claim that Defendants failed to accommodate Mullins' disability in violation of the PWDCRA, Mullins has withdrawn that portion of the claim. (*See* Mullins Resp., ECF No. 30, PageID.817 at n.1.)

*Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## IV

As described above, Mullins has brought two claims under the PWDCRA: a discrimination claim and a retaliation claim. Mullins does not have competent direct evidence that could support either claim.[3] Therefore, both claims are analyzed under the familiar *McDonnell-Douglas* burden shifting framework that applies to cases involving indirect evidence. *See*, *e.g.*, *Bachman v. Swann Harbour Ass'n*, 653 N.W.2d 415, 436 n.26 (Mich. App. 2002) ("The burden-shifting analysis under *McDonnell Douglas* [] applies to PWDCRA claims"). Under this framework, (1) a plaintiff must establish "a *prima facie* case" of discrimination or retaliation, (2) "[i]f the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate business reason for [the adverse employment action]," and (3)

---

[3] An example of direct evidence is "an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). Mullins has not identified any such statement (or anything remotely similar) that could constitute direct evidence that the Defendants discriminated against him by terminating his employment based upon his claimed disability and/or retaliated against him for engaging in protected conduct.

"[i]f the defendant provides such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge." *Aho v. Dep't of Corrections*, 688 N.W.2d 104, 108-09 (Mich. App. 2004) (internal quotation marks omitted).

## A

The Court begins with Mullins' PWDCRA discrimination claim. The PWDCRA provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability ... that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1202(1)(b).

"To establish a *prima facie* case of discrimination under the [PWDCRA], a plaintiff must show that (1) he is 'disabled' as defined by the statute, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute." *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 405 (Mich. App. 1999).

Defendants argue that Mullins' PWDCRA discrimination claim fails at the *prima facie* stage because Mullins has not shown that he is disabled under the PWDCRA. The Court agrees.

The PWDCRA defines a disability as:

> (i) A determinable physical or mental characteristic of an individual which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> > (A) ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

*Id.* at 405-06 (quoting Mich. Comp. Laws § 37.1103(d)(i)(A)).

Courts follow "a three-step process for determining whether a plaintiff has a disability" under the PWDCRA. *Id.* at 406. "First, [courts] consider whether [the plaintiff's complaint] was a physical [or mental] impairment. Second, [courts] identify the life activity upon which [the plaintiff] relies ... and determine whether it constitutes a major life activity under the [PWDCRA]. Third, tying the two statutory phrases together, [courts] ask whether the impairment substantially limited the major life activity." *Id.* (quoting *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998)).

At step one, Mullins has identified two cognizable mental impairments under the PWDCRA: depression and anxiety. (*See*, Mullins Dep. at 77, 93, ECF No. 27-2, PageID.501, 505.) Indeed, "[t]here is no serious dispute … that depression and anxiety *can*" constitute a sufficient mental impairment "for the purpose of the PWDCRA." *Payment v. Dept. of Transportation*, 2017 WL 3441453, at *1 (Mich.

Ct. App. Aug. 10, 2017) (emphasis in original).  "However, a [particular] diagnosis does not categorically translate to a disability under the PWDCRA." *Id.* at *2.  Thus, the Court must proceed to the next two elements of this test.

At step two, Mullins has successfully identified several "major life activities" that are impacted by his mental health impairments.  For instance, Mullins says that his depression and anxiety affect his ability to work, think, concentrate, and communicate.  Michigan courts have repeatedly identified these functions as "major life activities" for purposes of the PWDCRA. *See Chiles*, 606 N.W.2d at 407 (explaining that Michigan courts have "defined major life activities as functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working") (internal quotation marks omitted).  Mullins has therefore satisfied the second element of this framework.

However, Mullins has failed to satisfy the third element of the test for a disability under the PWDCRA because he has not shown that his depression and anxiety "substantially limit[]" the major life activities that he has identified.   For instance, he has not shown that his mental health conditions substantially limit his ability to perform the major life activity of working.  An impairment substantially limits a person's ability to work only where it "significantly restrict[s] an individual's ability to perform *at least a wide range of jobs*." *Id.* (emphasis added). Mullins has not presented evidence that his depression and anxiety "significantly

restrict" his ability to perform a "wide range of jobs." *Id.* at 408. On the contrary, the only job that Mullins' conditions prevent him from performing is one that involves contact with Pierrie, Williams, and Kimmy. Indeed, Mullins repeatedly said that he *could* work in a different area of the Dearborn Stamping Plant where he was away from those women. For example, Mullins testified that he was "satisfied" with working in the east wing where he would not have to see Pierrie, Williams, or Kimmy. (Mullins Dep. at 348, ECF No. 27-2, PageID.601.) He said that such a move was "sufficient" for him to be able to do his job. (*Id.*) Mullins' further testified that Pierre, Williams, and Kimmy were "basically the cause of [his] depression" and that he would not have suffered from depression if they were "out of the picture." (*Id.* at 434, PageID.622.) And the psychologist who performed the independent medical examination on Mullins confirmed that his mental health impairments were "situational" and that they would not manifest themselves if Mullins was assigned to a work station away from Pierrie, Williams, or Kimmy. (ECF No. 27-19, PageID.751-752.)

Mullins' ability to perform a wide range of jobs is underscored by the workplace accommodation that he sought from Ford. Mullins testified that if he were placed in a "safe work environment," which he described as "a different work area than [Pierrie, Williams, and Kimmy]," he would have considered that a sufficient accommodation that would have allowed him to work. (Mullins Dep. at

428-431, ECF No. 27-2, PageID.621.) Thus, Mullins himself acknowledges that he *could have* worked if he was located in a different "work area" than Pierrie, Williams, and Kimmy. (*Id.*) Under these circumstances, Mullins has not shown that he is "significantly restrict[ed]" from performing a "wide range of jobs," and thus he is not disabled under the PWDCRA. *Chiles*, 606 N.W.2d at 408. *See also Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 680 (6th Cir. 2014) ("Personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the [Americans with Disabilities Act]"[4]); *Fricke v. E.I. Dupont Co.*, 219 F. App'x 384, 389 (6th Cir. 2007) (same).

Mullins has also failed to show that his depression and anxiety have substantially limited his major life activities of thinking, concentrating, and communicating. As described in detail above, Mullins repeatedly acknowledged that his mental health conditions did not interfere with his ability to function normally when he did not work in proximity to Pierrie, Williams, and Kimmy. (*See* Mullins Dep. at 348, 428, 433-34, ECF No. 27-2, PageID.601, 621-622.) And as noted above, Mullins testified that Pierrie, Williams, and Kimmy were the "basically

---

[4] Cases interpreting the Americans with Disabilities Act (the "ADA") are instructive when analyzing a claim brought under the PWDCRA because "the PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (internal quotation marks omitted).

the cause of [his] depression" and that he would not have been depressed if not for their conduct. (*Id.* at 434, PageID.622.) Thus, Mullins' own testimony makes clear that the cause of his claimed inability to think and communicate clearly is contact with Pierrie, Williams, and Kimmy, not some underlying depression that substantially limits his major life activities. Mullins is thus not disabled under the PWDCRA.

For all of these reasons, the Court will grant Defendants' motion for summary judgment with respect to Mullins' PWDCRA discrimination claim.[5]

## B

The Court next addresses Mullins' retaliation claim against the Defendants under the PWDCRA. The PWDCRA provides that a person shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws § 37.1602(a). Mullins says that the Defendants retaliated against him in

---

[5] In Mullins' response to Defendants' motion for summary judgment, he argued that even if he was not actually disabled, he may proceed with his claim under the PWDCRA because Defendants terminated him based on their perception that he was disabled. (*See* Mullins Resp., ECF No. 30, PageID.819-820.) While the PWDCRA prohibits an employer from discriminating against an employee who is "regarded as" having a disability, Mich. Comp. Laws § 37.1103(e)(iii), the Court need not address Mullins' claim under this theory. At the hearing before the Court, Mullins told the Court that he is no longer advancing that claim.

violation of the PWDCRA in three ways: (1) by requiring him to undergo an IME, (2) by not allowing him to immediately return to work after that examination and thereby causing a "delay" in his pay; and (3) by terminating his employment. (Mullins Dep. at 451-55, ECF No. 27-2, PageID.626-627.) The Court will analyze each of these alleged acts of retaliation separately.

## 1

The Court begins with Mullins' claim that the Defendants retaliated against him when they required him to undergo a mental-health evaluation. (*See* Mullins Resp., ECF No. 30, PageID.832.)  This claim fails at the *prima facie* stage.  "To establish a *prima facie* case of unlawful retaliation under [the PWDCRA], a plaintiff must show: (1) that he engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Aho*, 688 N.W.2d at 108**.**

Mullins cannot show that there was a causal connection between his filing of the EEOC Charges and the decision to require him to undergo a medical examination.  Watson decided to refer Mullins for a "mental-health fitness for duty examination" on February 1, 2018. (Watson Decl. at ¶18, ECF No. 26-5, PageID.324-325.)  At some point prior to February 16, 2018, a determination was made that the fitness-for-duty examination would be an IME, and that change was

communicated to Mullins. (*See* Mullins Dep. at 399-400, ECF No. 27-2, PageID.613-614, acknowledging that he was told on February 16, 2018, that he needed to undergo an IME.) The EEOC did not generate the Notices until February 20 and 21, 2018. (*See* Notices, ECF No. 26-10, PageID.441, 445.) Because the Defendants decided to send Mullins for an IME *before* the EEOC generated the Notices, the decision to send Mullins for an IME could not possibly have been caused by Mullins' filing of the EEOC Charges.[6] Mullins' retaliation claim thus fails to the extent that it is based upon the Defendants' decision to send him for a fitness-for-duty examination and/or an IME.

## 2

The Court next turns to Mullins' claim that the Defendants retaliated against him when they did not allow him to immediately return to work after his IME and thereby caused a delay in his pay. This claim fails at the *prima facie* stage because Mullins has waived any argument that this conduct by the Defendants amounts to an adverse action.

The Defendants argued in their motion for summary judgment that the delay in pay that Mullins experienced did not amount to an adverse action, and Defendants cited authority in support of that argument. (*See* Defs'. Mot., ECF No. 26,

---

[6] Mullins has not directed the Court to any evidence that anyone at Ford was aware of the EEOC Charges before the EEOC generated the Notices.

PageID.220.) But Mullins did not respond to the argument. Mullins mistakenly concluded that the Defendants did "not dispute" that he had established the adverse action element of his *prima facie* case (Mullins' Resp., ECF No. 30, PageID.829), and based on that erroneous determination, Mullins did not oppose Defendants' argument that the delay in pay caused by his absence from work did not amount to an adverse action. By not responding to this argument, Mullins has waived his right to argue that his delayed return to work and resulting delay in pay amount to an adverse action. *See Design Basics, LLC v. Chelsea Lumber Co.*, 977 F.Supp.2d 714, 737 (E.D. Mich. 2013) (explaining that failure to respond to an argument in a summary judgment motion "is grounds for the court to deem opposition waived"). The Defendants are therefore entitled to summary judgment on Mullins' retaliation claim to the extent that it rests on his delayed return to work and resulting delay in pay. *See Mahindra & Mahindra, Ltd.* v. FCA US, LLC, 503 F.Supp.3d 542, 554 (E.D. Mich. 2020) (holding that moving party was entitled to summary judgment on a claim where non-moving party failed to substantively respond to moving party's arguments seeking summary judgment on the claim).

**3**

**a**

Finally, the Court addresses Mullins' claim that the Defendants retaliated against him when they terminated his employment. The Defendants have raised

some reasonable questions as to whether Mullins has established a *prima facie* case in support of this claim. More specifically, the Defendants have pointed out possible shortcomings in the evidence of causation offered by Mullins. (*See* Defs'. Reply Br., ECF No. 32, PageID.871.) And the Court explored other potential deficiencies in Mullins' causation evidence with his counsel during the hearing on the parties' summary judgment motions. However, the Court need not decide whether Mullins has established a *prima facie* case of retaliation based on his firing because – as explained below – he has failed to show that the reason for his firing was a pretext for retaliation. Under these circumstances, the Court may assume *arguendo* that Mullins' *prima face* case is satisfied and may proceed directly to the issue of pretext. *See*, *e.g.*, *Williams v. AT&T Mobility Svcs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017) (where parties vigorously disputed whether plaintiff had established *prima facie* case of retaliation, the court "assumed without deciding that [the plaintiff had] established her *prima facie* case," "proceed[ed] directly to the question of pretext," and affirmed summary judgment against plaintiff on ground that plaintiff failed to show pretext).[7]

---

[7] *See also Town v. Michigan Bell Telephone Co.*, 568 N.W.2d 64, 70 (Mich. 1997) ("presum[ing] that plaintiff has established a *prima facie* case" and "mov[ing]" directly to "plaintiff's evidence that the defendant's proffered nondiscriminatory reason is a pretext for discrimination").

**b**

Mullins has not carried his burden of showing that the Defendants' proffered reason for firing him was a pretext for unlawful retaliation. Mullins attempts to show pretext by demonstrating that the Defendants' reason for firing him "has no basis in fact." (Mullins Resp., ECF No. 30, PageID.825-828.[8]) To that end, he argues (among other things) that, contrary to the Defendants' reason for firing him, he did not knowingly fail to exercise one of the options in the May 8 Letter. (*See id.*, PageID.826-827.) But even if Mullins could show that the Defendants' reason for terminating his employment had no basis in fact, that would not be enough to satisfy his burden on the pretext issue under the circumstances of this case.

Under Michigan law, "disproof of an employer's articulated reason for an adverse employment decision [at the pretext stage] defeats summary [judgment] *only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action.* In other words, [a] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, *but that it was a pretext for [the adverse action].*" *Lytle v. Malady*,

---

[8] At the cited pages of Mullins' response brief, he offers arguments concerning the issue of pretext in the context of his PWDCRA discrimination claim. He incorporated those arguments into the analysis of his PWDCRA retaliation claim. (*See* Mullins Resp., ECF No. 30, PageID.836.)

579 N.W.2d 906, 916 (Mich. 1998) (emphasis added).[9] Stated yet another way, at the pretext stage "mere disproof of an employer's proffered [legitimate] reason [for the adverse action] is insufficient to survive summary [judgment], *unless such disproof also raises a triable question of [unlawful] motive, not mere falsity*." *Id.* at 918 (emphasis added). *See also Simon v. Wal-Mart Associates, Inc.*, 2014 WL 4854852, at *5 (E.D. Mich. Sept. 30, 2014) (explaining that under Michigan law, "[a]t the summary judgment stage it is insufficient [for a plaintiff] to merely claim that the employer's reason for dismissal was wrong, pretextual, or simply not the real reason for termination," and holding that "even if [the plaintiff could] show[s] that the reasons offered for her dismissal were fabricated, she ha[d] failed to show that discrimination was the true reason for her dismissal").

Mullins has not raised a triable issue of fact that the Defendants' proffered reason for firing him – even if false – was pretext *for retaliation based upon his filing of the EEOC Charges*. Indeed, Mullins has focused very little on the EEOC Charges in his prosecution of this case. The only references to the EEOC Charges in his factual recitation are statements identifying the charges, their content, and the

---

[9] The quote from *Lytle v. Malady* in text above comes from an Opinion joined by three Justice of the Michigan Supreme Court. Justice Brickley filed a separate Opinion in which he concurred in the portions of the plurality decision addressing the plaintiff's employment discrimination claims. *See Lytle*, 579 N.W.2d at 920 (Brickley, J.).

dates of the Notices.[10]  Moreover, there is no indication in the record that Mullins

made any effort in discovery to link his firing to his filing of the EEOC Charges.  He

took only a single deposition (of Butcher) and did not ask a single question related

to the EEOC Charges.  And there is no indication that he served any interrogatories

related to the EEOC Charges.  In addition, Mullins has failed to cite for the Court

any evidence in the record concerning (1) what happened at Ford after the EEOC

issued the Notices and (2) whether any of the relevant decision makers at Ford knew

about the EEOC Charges, saw the EEOC Charges, or considered the EEOC Charges

when the decision was made to fire him.  Simply put, Mullins has not presented

sufficient evidence to create a triable issue of fact that the reason offered for his

firing was a pretext *for retaliation based on his filing of the EEOC Charges*.

Ironically, Mullins' own briefing underscores that he has failed to show that

the Defendants' allegedly-false reason for firing him was a pretext *for retaliation*.

In the section of his brief concerning his PWDCRA discrimination claim, he insists

---

[10] Mullins' response to Defendants' motion for summary judgment did not include a statement of facts.  Instead, it incorporated the statement of facts from Mullins' own motion for summary judgment. (*See* Mullins Resp., ECF No. 30, PageID.815.) But Mullins' own motion focused exclusively on his discrimination claim; he did not seek summary judgment on his retaliation claim. (*See* Mullins Mot., ECF No. 27.)  The factual recitation in Mullins' brief in support of his motion for summary judgment does includes two references to the EEOC Charges, but those references simply note the dates on which they were filed, their content, and the dates of the Notices. (*See id*., PageID.459-460.)

that the Defendants' "alleged reasoning for its treatment of [him] has no basis in fact and can *only* be construed as a false reason to cover up *discrimination*." (Mullins Resp., ECF No. 30, PageID.828; emphasis added.) Of course, if the Defendants' allegedly-false reasons can "only" be interpreted as a "cover up" for "discrimination" based upon his disability, then those reasons cannot *also* be a cover up *for retaliation* based upon his filing of the EEOC Charges.[11]

Finally, even though Mullins erroneously limited his pretext arguments to the alleged falsity of the Defendants' reason for firing him, the Court has considered whether any of Mullins' other arguments could support a finding that the Defendants' reasons for firing Mullins were a pretext for retaliation. The Court has concluded that they could not. The Court first considered Mullins' contention – made when he addressed the causation element of his *prima facie* case – that the temporal proximity between his filing of the EEOC Charges and his firing could support an inference that the Defendants fired him for filing the charges. While the roughly three-month interval between the filing of the EEOC Charges and Mullins' firing could perhaps "seem[] suspicious," Mullins "needs more to reach a jury."

---

[11] Mullins does also say in his briefing that the Defendants' allegedly-false reasons for firing him "can *only* be construed as a false reason to cover up a retaliatory animus." (Mullins Resp., ECF No. 30, PageID.837; emphasis added.) But this statement does not help Mullins. On the contrary, it underscores that his pretext argument on his retaliation claim conflicts with his pretext argument on his discrimination claim.

*EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc). That is because "temporal proximity cannot be the sole basis for finding pretext." *Id.* The "more" that Mullins has offered is that the Defendants terminated him in violation of Ford's own policies and procedures. But for the reasons addressed in detail on the record during the hearing on the parties' motions, Mullins has failed to persuade the Court that the Defendants did, in fact, violate Ford's internal policies.[12] And in any event, for the reasons explained in detail above, Mullins has failed to present sufficient evidence that any alleged deviations from policy are evidence that the Defendants fired him *because he filed the EEOC Charges*.

For all of these reasons, Mullins' "proofs simply cannot sustain a reasonable inference" that the Defendants' justification for firing him "was really a pretext" *for unlawful retaliation. Lytle*, 579 N.W.2d at 918. The Court will therefore grant Defendants' motion for summary judgment with respect to Mullins' PWDCRA retaliation claim.[13]

---

[12] When pressed by the Court during the hearing, Mullins' counsel was unable to identify any Ford policy that the Defendants allegedly violated by number, name, or (most importantly) content.

[13] The Court's reasoning explained above applies to Mullins' retaliation claim against both Ford and Butcher. With respect to Mullins' retaliation claim against Butcher arising out of Mullins' firing, the claim fails for a second, independent reason: Mullins has not identified sufficient evidence in the record that Butcher played any meaningful role in the decision to terminate his employment.

# V

For all of the reasons explained above, and the reasons explained during the June 22, 2021, hearing on the parties' cross-motions, **IT IS HEREBY ORDERED** that:

- Defendants' motion for summary judgment (ECF No. 26) is **GRANTED**; and

- Mullins motion for summary judgment (ECF No. 27) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 7, 2021

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 7, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764
